UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PEOPLES SUPER LIQUOR STORES, INC., et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | 04-12219 - PBS |
| EDDIE J. JENKINS, in his capacity as Chairman ) | |
| of the Alcoholic Beverages Control Commission, et al., ) | |
| ) | |
| Defendants. ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS

This action is a facial challenge to several provisions in a duly enacted Massachusetts statute regulating retail liquor licenses. Mass. G.L. c. 138, § 15 ("Section 15"). While the plaintiffs mount numerous constitutional claims in their attempt to invalidate Section 15, each fails to state a claim upon which relief can be granted, particularly given the "daunting[ ]" standard for facial challenges. See Donovan v. Haverhill, 311 F.3d 74, 77 (1st Cir. 2002). The Court accordingly should dismiss the case pursuant to Fed. R. Civ. P. 12(b)(6).

## I.    RELEVANT BACKGROUND

The First Amended Complaint ("Complaint") presents the three plaintiffs as, respectively, a Massachusetts corporation that holds three Massachusetts retail liquor licenses, a Rhode Island corporation that franchises an entity known as "Douglas Wine & Spirits," and a Rhode Island resident who "provides business advice to liquor stores within the Commonwealth." Complaint ¶¶ 7-9.[1] The defendants are the Chairman and Commissioners of the Commonwealth's

---

[1]    The defendants assume the truth of the Complaint's allegations solely for the purpose of this Rule 12(b)(6) motion.

Alcoholic Beverages Control Commission, the state agency charged with enforcing Section 15. Id. ¶¶ 10-12. The plaintiffs sue the defendants in their official capacities only. Id.

The contested portions of Section 15 are its prohibitions against (1) nonresidents holding certain ownership interests in retail liquor licenses, (2) entities holding more than three such licenses within Massachusetts, and (3) entities engaging in conduct that effectively amounts to practical control of more than three licensees. See Complaint ¶¶ 17-30. The present version of the statute provides in pertinent part:

> The local licensing authorities in any city or town which votes to authorize the granting of licenses for the sale of all alcoholic beverages . . . may grant licenses for the sale at retail of such alcoholic beverages . . . , not to be drunk on the premises, [1] to applicants therefor who are citizens and residents of the commonwealth, or partnerships composed solely of such citizens and residents or to corporations organized under the laws of the commonwealth and whereof all directors shall be citizens of the United States and a majority residents of the commonwealth . . . , subject to such conditions as the commission may prescribe by regulation to address issues of citizenship and residency . . . . [2] No person, firm, corporation, association, or other combination of persons, directly or indirectly, or through any agent, employee, stockholder, officer or other person or any subsidiary whatsoever, shall be granted, in the aggregate, more than three such licenses in the commonwealth, or [3] participate in decisions regarding the purchasing of alcoholic beverages or the purchasing of insurance or accounting or bookkeeping services, or receive any percentage or fee derived from gross revenues in exchange for management assistance, or participate in any other action designed to effect common results of more than three licensees under this section . . . .

Mass. G.L. c. 138, § 15, ¶ 1 (as amended through Mass. St. 2004, c. 149, § 428) (bracketed enumeration added).

The legislative and judicial history of this language provides useful background. Prior to 2004, the statute contained only the first two enumerated provisions: the nonresident ownership ban and the three-license ownership limit. Mass. G.L. c. 138, § 15 (as amended through Mass. St. 2002, c. 514, § 2). During this time, both the First Circuit and the Supreme Judicial Court upheld the three-license limit against various legal claims. Mass. Food Ass'n v. Mass. Alcholic Bev. Control Comm'n, 197 F.3d 560 (1st Cir. 1999) (Sherman Act); Johnson v. Martignetti, 374 Mass. 784 (1978) (substantive due process and equal protection). In Johnson, the SJC identified

"many sound reasons . . . to support restrictions on the number of liquor licenses allowed any one business interest":

> Concentration of retailing in the hands of an economically powerful few has been thought to intensify the dangers of liquor sales stimulations, thereby threatening trade stability and promotion of temperance. Regulation of the number of licenses issued, therefore, aims at controlling the tendency toward concentration of power in the liquor industry; preventing monopolies; avoiding practices such as indiscriminate price cutting and excessive advertising; and preserving the right of small, independent liquor dealers to do business.

Johnson, 374 Mass. at 792. The Johnson Court also identified various types of circumstantial evidence that would establish joint ownership for purposes of the three-license limit:

> [T]his court has stated that, in the area of alcoholic beverage regulation, the existence of a "combination of persons" is a question of fact which may be inferred from such circumstantial evidence as: common group insurance policies, bookkeeping offices, employees, and bonus formulas; substantial intercompany dealings; common use of various assets; and a decisionmaking pattern whereby the owner of one business entity has authority to act on behalf of others.

Id. at 788-89; accord Cleary v. Cardullo's, Inc., 347 Mass. 337, 349 (1964) (upholding finding of joint ownership based on such evidence).

As might be inferred from the quoted language in Johnson and Cleary, business interests over the years have attempted to circumvent the three-license limit by a range of creative measures, such as the ones identified in those cases. While these devices historically had served as circumstantial evidence of joint ownership, Johnson, 374 Mass. at 792; Cleary, 347 Mass. at 348-49, the Massachusetts Legislature recently determined to prohibit them outright, in a 2004 amendment to Section 15. Mass. St. 2004, c. 149, § 428 (amending Mass. G.L. c. 138, § 15) ("2004 Amendment"). The 2004 Amendment specifically bans "participat[ing] in decisions regarding the purchasing of alcoholic beverages or the purchasing of insurance or accounting or bookkeeping services, or receiv[ing] any percentage or fee derived from gross revenues in exchange for management assistance, or participat[ing] in any other action designed to effect common results of more than 3 licensees under this section." Id. The similarity between the evidence cited in Johnson and the conduct prohibited by the 2004 Amendment is striking.

The plaintiffs concentrate most of their fire on the 2004 Amendment, asserting that it violates the First Amendment, the Takings Clause of the Fifth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the preemption provisions of the Employee Retirement Security Income Act ("ERISA"), as enforceable through the Supremacy Clause. Complaint ¶¶ 17-22, 27-30. In addition, they contend that Section 15's longer-standing residency requirements and three-license limit violate the dormant Commerce Clause. Id. ¶¶ 23-26. All claims are facial in nature: in each instance the plaintiffs assert that the relevant statutory language itself violates the Constitution, id. ¶¶ 17-30, and in each instance they seek declaratory and injunctive relief directly against the statute, id. p. 6 (Prayers A-G). The plaintiffs indeed assert that "the elements of the [2004 Amendment] are not separable," id. ¶ 16, leaving no doubt of their aim to strike the Amendment in its entirety.

## II.    THE PLAINTIFFS' FACIAL CHALLENGE TO THE 2004 AMENDMENT FAILS TO STATE A CLAIM UNDER THE FIRST AMENDMENT, BECAUSE THE CONTESTED STATUTE REGULATES CONDUCT RATHER THAN SPEECH OR ASSOCIATION.

The plaintiffs initially assert that the 2004 Amendment violates the First Amendment, U.S. Const. amend. 1, because it supposedly prohibits them from both "engaging in expression protected by the First Amendment," Complaint ¶ 17, and "forming an expressive association," id. ¶ 18. However, what the amendment actually prohibits is not speaking or associating but instead specified substantive conduct. Mass. St. 2004, c. 149, § 178. The statute thus generally proscribes "any . . . action designed to effect common results of more than three licensees," and it then lists certain "action[s]" that are specifically precluded, including joint purchases of alcohol, joint purchases of various business services, and joint management services. Id. This focus on conduct and "action" is fatal to the First Amendment claims.

"It is well settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute." Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 513-14 (1972). As a result, "it has never been deemed an abridgement of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language." Nat'l Ass'n for

the Advancement of Psychoanalysis v. Cal. Bd. of Psychology, 228 F.3d 1043, 1053 (9th Cir. 2000) (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949)). This is because "[s]uch an expansive interpretation of the constitutional guarant[y] of speech . . . would make it practically impossible ever to enforce laws against . . . agreements and conspiracies deemed injurious to society." Giboney, 336 U.S. at 502. Based on this construction of the First Amendment, the Supreme Court and the Circuit Courts of Appeals have repeatedly rejected free-speech challenges to laws regulating a wide range of subject areas, including labor picketing, id. at 501-03, antitrust conspiracies, Cal. Motor Transport, 404 U.S. at 513-15, learned professions, Nat'l Ass'n, 228 F.3d at 1053-54, and racial and religious discrimination, Jews for Jesus v. Jewish Comm. Rel. Council of N.Y., 968 F.2d 286, 295-96 (2nd Cir. 1992).

A similar rule obtains for freedom-of-association claims. "Although agreements to engage in illegal conduct undoubtedly possess some element of association, the State may ban such illegal agreements without trenching on any right of association protected by the First Amendment." Brown v. Hartlage, 456 U.S. 45, 55 (1982); accord Rice v. Paladin Enterprises, Inc., 128 F.3d 233, 243-44 (4th Cir. 1997). The Supreme Court explained the reason for this rule while upholding an antitrust injunction that actually dissolved an association:

> The appellants also urge that the decree violates their right of freedom of association guaranteed by the First Amendment. This contention, carried to its logical conclusion, would render unconstitutional not only many of the provisions of the antitrust laws, but all general criminal conspiracy statutes as well. Such a claim was explicitly rejected in Giboney[, 336 U.S. at 490].

Los Angeles Meat & Provision Drivers v. U.S., 371 U.S. 94, 101 n. 5 (1962); accord U.S. v. Wilson, 154 F.3d 658, 666-67 (7th Cir. 1998). The lower courts have rejected numerous free-association claims on this basis, again in a wide variety of contexts. See, e.g., Premier Elec. Const. Co. v. N.E.C.A., Inc., 814 F.2d 358, 376 (7th Cir. 1987) ("The First Amendment does not protect efforts to protect private cartels, in court or out"); Amer. Med. Ass'n v. F.T.C., 638 F.2d 443, 451-52 (2nd Cir. 1980), aff'd 455 U.S. 676 (1982) (upholding regulation of doctors' professional arrangements; "right to freedom of association does not include the right to violate the law"); U.S. v. Ferrara, 771 F. Supp. 1266, 1283 (D. Mass. 1991) ("doubtful" that "roving

-5-

intercept . . . directed at capturing a Mafia induction ceremony . . . involved defendants' freedom of assembly [and] association").

Given this settled doctrine, the plaintiffs' First Amendment claims cannot survive. For decades Massachusetts has adhered to a three-license limit for retail liquor sales, a policy choice that both the federal and state courts have upheld against multiple federal claims. Mass. Food Ass'n, 197 F.3d at 563-66; Johnson, 374 Mass. at 787-93. Earlier this year, the Commonwealth chose to reinforce this rule by expressly prohibiting certain additional conduct that, if left unchecked, might allow clever entrepreneurs to do an "end run" around the original rule and achieve effective control over more than three licenses. Mass. St. 2004, c. 149, § 178. The fact that speech is an incidental part of these prohibited actions does not protect them from regulation, just as it is "well established" that Sherman Act violations are not immunized because they may involve communication. ES Dev., Inc. v. RWM Enter., Inc., 939 F.2d 547, 556 (8th Cir. 1991) (citing Cal. Motor Transport, 404 U.S. at 513-14). Similarly, the fact that the acts barred by the 2004 Amendment may indeed be undertaken by joint agreement also does not remove them from the Commonwealth's reach, since "the State may ban . . . illegal agreements without trenching on any right of association protected by the First Amendment." Brown, 456 U.S. at 55; see also Amer. Med. Ass'n, 638 F.2d at 451-52 (upholding prohibition of doctors' collective actions against free-association claim). The plaintiffs' free-speech and free-association claims thus run directly counter to longstanding First Amendment precedent.

## III.    THE PLAINTIFFS ADDITIONALLY FAIL TO STATE A CLAIM UNDER THE TAKINGS CLAUSE, BECAUSE AS A MATTER OF LAW THEY COULD NOT HAVE HAD "REASONABLE INVESTMENT-BACKED EXPECTATIONS" GIVEN PREEXISTING STATE LAW IN THIS AREA.

The plaintiffs next contend that the 2004 Amendment violates the Fifth Amendment's Takings Clause. Complaint ¶¶ 19-20.[2] According to the Complaint, the 2004 Amendment "eliminates the reasonable investment backed property rights of the Plaintiffs . . . in their businesses and the value of their existing contractual relationships," and, as a result, "[t]he

---

[2]     The Clause provides, "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. 5.

Defendants have unconstitutionally taken the[ir] property . . . without just compensation." Id.
This claim also fails as a matter of law and is appropriate for dismissal at the Rule 12(b)(6) stage.
See, e.g., Puerto Rico Tel. Co. v. Telecomm. Regulatory Bd., 189 F.3d 1, 6-7, 16-18 (1st Cir.
1999) (affirming dismissal of takings claim on merits under Rule 12(b)(6)); Comm. for
Reasonable Regulation v. Tahoe Reg'l Planning Agency, 311 F. Supp. 2d 972, 992-98 (D. Nev.
2004) (dismissing takings claim on merits under Rule 12(b)(6)) .

      "The Supreme Court has distinguished between two branches of Takings Clause cases:
physical takings and regulatory takings." Phillip Morris, Inc. v. Reilly, 312 F.3d 24, 33 (1st Cir.
2002) (en banc) (lead opinion of Torruella, J.).   An alleged regulatory taking is at issue here, and
it "transpires when some significant restriction is placed upon an owner's use of his property for
which 'justice and fairness' require that compensation be given." Id.[3]   Ordinarily, a regulatory
"takings analysis should include consideration of 'the character of the governmental action, its
economic impact, and its interference with reasonable, investment-backed expectations'" -- three
elements often referred to as the "Penn Central factors." Phillip Morris, Inc. v. Harshbarger, 159
F.3d 670, 674 (1st Cir. 1998) (quoting PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 83
(1980)); see generally Penn Cent. Transp. Co. v. New York, 438 U.S. 104, 124 (1978) (seminal
opinion establishing basic standard).[4]   Despite the multi-part nature of this inquiry, "the Supreme
[C]ourt has frequently found that one of the Penn Central factors is dispositive." Reilly, 312 F.3d
at 33 n. 5 (lead opinion of Torruella, J.) (citing as example Hodel v. Irving, 481 U.S. 704, 716
(1987)); accord Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005 (1984). A similar result
should obtain here, because one of the three factors is indeed dispositive: "whether the
government action interferes with reasonable investment-backed expectations." Id. at 33.

---

    [3]     In contrast, "[a] physical taking occurs either when there is a condemnation or a
physical appropriation of property." Id.   No such allegations appear in the Complaint, which
instead quite clearly speaks in terms of a supposed regulatory taking.  See Complaint ¶¶ 19-20.

    [4]     "[T]he Supreme Court has developed at least one per se rule in the regulatory
takings sphere," holding that a taking is categorically established "[w]hen a regulation denies all
economically beneficial or productive uses of land." Reilly, 312 F.3d at 33. The Complaint
again contains no such allegations, instead invoking the "reasonable investment-backed"
language of the more generally applicable Penn Central standard.  Complaint ¶ 19.

This factor requires "more than a 'unilateral expectation or an abstract need,'" <u>Monsanto</u>, 467 U.S. at 1006 (quoting <u>Webb's Fabulous Pharmacies, Inc. v. Beckwith</u>, 449 U.S. 155, 161 (1980)), so that "the relevant inquiry should recognize that not every investment deserves protection and that some investors inevitably will be disappointed." <u>Reilly</u>, 312 F.3d at 36 (lead opinion of Torruella, J.). Two themes in the case law developing the "reasonable expectations" factor are particularly pertinent. First, the Supreme Court has accorded far more protection to real property than to personal property, indeed going so far as to say that "in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless . . . ." <u>Lucas v. South Carolina Coastal Council</u>, 505 U.S. 1003, 1027-28 (1992). <u>Id</u>. Second, the Supreme Court also has "dwelled on the level of regulation in a given area or industry, noting that those who conduct business in historically regulated fields 'cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.'" <u>Eastern Enter. v. Chater</u>, 110 F.3d 150, 161 (1st Cir. 1997), <u>rev'd without majority opinion</u>, 524 U.S. 498 (1998) (quoting <u>Concrete Pipe v. Constr. Laborers Pension Trust</u>, 508 U.S. 602, 645 (1993)); <u>accord Monsanto</u>, 467 U.S. at 1007.

Given these principles, the 2004 Amendment did not interfere with "reasonable investment-backed expectations" as a matter of law. The claimed "property" at issue is personalty rather than realty, Complaint ¶ 19, and retail liquor is the quintessential "historically regulated field." <u>Eastern Enter.</u>, 110 F.3d at 161. The Supreme Court has even "sustained regulations prohibiting the sale of alcoholic beverages despite the fact that individuals were left with previously acquired stocks," <u>Andrus v. Allard</u>, 444 U.S. 51, 67 (1979) (describing <u>Everard's Breweries v. Day</u>, 265 U.S. 545 (1924)), a restriction far more palpable than the loss of general business opportunities asserted here.

The longstanding existence of both the three-license limit and Supreme Judicial Court precedent construing it confirm the lack (indeed impossibility) of any "reasonable" expectations of business expansion in this area. <u>See</u>, <u>e.g.</u>, <u>Johnson</u>, 374 Mass. at 792. This preexisting law provides the backdrop against which all recent business plans have to be measured, and it necessarily informed any expectations regarding the retail liquor business in Massachusetts. <u>See</u>,

-8-

e.g., Monsanto, 467 U.S. at 1005-16 (investors presumed to be aware of preexisting law; what constitutes reasonable expectations can vary with changes in that law). Despite the long-clear rule against holding more than three licenses, the plaintiffs now claim that they have "reasonably" expected to be able to achieve effectively the same result (i.e., practical control over more than three licenses) by such vicarious means as joint liquor purchases, collective insurance and accounting, and shared management. See Complaint ¶¶ 19-20. In reality, any such expectation of doing an "end run" around the then-existing statute was manifestly unreasonable as a matter of law. This is particularly true where the Supreme Judicial Court already had cited activities like those in dispute here as evidence of forbidden multiple ownership under the original law. Johnson, 374 Mass. at 788-89; accord Cleary, 347 Mass. at 348-49; see Section I supra. By definition, one cannot reasonably expect to undertake an activity without future restriction when the high court in the relevant jurisdiction had specifically cited it -- for at least forty years -- as evidence of a then-existing illegality. See Tahoe Reg. Plan. Agy., 311 F. Supp. 2d at 995-98. The absence of any "reasonable investment-backed expectations" is accordingly clear, and the plaintiffs' inability to satisfy that factor disposes of their Takings Clause claim.[5]

---

[5]    The defendants' position is that one of the three Penn Central factors can be dispositive standing alone, see, e.g., Monsanto, 467 U.S. at 1005, and that here one in fact is, as a matter of law. While it is therefore not necessary for the defendants to rely upon the other two Penn Central factors in the current motion, both cut heavily in the defendants' favor as well. As to the "character of the governmental action," "a taking is much more readily found when the government 'physically invade[s] or permanently appropriate[s]' assets for its own use than when the claimed deprivation merely 'arises from a public program that adjusts the benefits and burdens on economic life to promote the common good.'" Eastern Enter., 110 F.3d at 161 (quoting Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 225 (1986)). The 2004 Amendment is clearly the latter rather than the former. Similarly, as to "economic impact," the "interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests," and "loss of future profits -- unaccompanied by any physical property restriction -- provides a slender reed on which to rest a takings claim." Andrus, 444 U.S. at 66. The defendants additionally reserve the right to argue that even if the Penn Central factors were to cut in the plaintiffs' favor, no violation of the Takings Clause would exist because the plaintiffs have failed to seek any available right to just compensation in the Massachusetts state courts. See, e.g., Pascoag Resevoir & Dam, LLC v. Rhode Island, 337 F.3d 87, 92-94 (1st Cir. 2003); Gilbert v. City of Cambridge, 932 F.2d 51, 65 (1st Cir. 1991).

IV.    **THE ELEVENTH AMENDMENT SEPARATELY BARS ANY MONETARY RELIEF FOR THE TAKINGS CLAIM.**

The Complaint specifically requests the Court to "[o]rder that just compensation be paid to [two of the plaintiffs] for the taking of their property." Complaint p. 6, Prayer G; see also id. ¶ 20. In addition to the lack of any Takings Clause violation, see Section III supra, this direct claim for monetary relief fails for the additional reason that "absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court." Acevedo Lopez v. Police Dep't, 247 F.3d 26, 28 (1st Cir. 2001) (quoting Kentucky v. Graham, 473 U.S. 159, 169 (1985)). This rule applies equally to suits for damages against the Commonwealth as the named defendant and "official capacity" actions of the sort brought here, see, e.g., Rosie D. v. Swift, 310 F.3d 230, 234 (1st Cir. 2002), and courts have specifically enforced it in the context of a "just compensation" claim under the Takings Clause, see, e.g., Wash. Legal Found. v. Texas Equal Access, 94 F.3d 996, 1005 (5th Cir. 1996), aff'd, 524 U.S. 156 (1998); Culebras Enter. Corp. v. Rivera Rios, 813 F.2d 506, 516 (1st Cir. 1987). The Eleventh Amendment thus bars the requested monetary relief, even if the Takings Clause claim were otherwise viable.

V.    **THE SUPREME JUDICIAL COURT'S JOHNSON DECISION DEMONSTRATES THAT THE PLAINTIFFS ALSO FAIL TO STATE A CLAIM UNDER THE EQUAL PROTECTION CLAUSE.**

The plaintiffs next maintain that the 2004 Amendment violates the Fourteenth Amendment's Equal Protection Clause, U.S. Const. amend. 14, because it "treats the Plaintiff [sic] differently from similarly situated other individuals and businesses" and "lacks a legitimate purpose for this different treatment." Complaint ¶¶ 21-22. The claim runs afoul of longstanding equal protection principles.

"Absent a suspect classification or a fundamental right, courts will uphold economic and social legislation that distinguishes between two similarly situated groups as long as the classification is rationally related to a legitimate government objective." Fireside Nissan, Inc. v.

Fanning, 30 F.3d 206, 219 (1st Cir. 1994).[6]  "A state statute will survive this 'rational basis' scrutiny . . . as long as 'any state of facts <u>reasonably may be conceived</u> to justify it.'" <u>Id.</u> (quoting <u>Dandridge v. Williams</u>, 397 U.S. 471, 485 (1970) (emphasis added)).[7]  Because these "reasonably conceived" justifications "need not be supported by any evidentiary record at all," <u>Kittery Motorcycle, Inc. v. Rowe</u>, 320 F.3d 42, 47 (1st Cir. 2003), rational basis review is particularly well suited to a motion to dismiss.  The standard also allows the legislature to "take one step at a time" -- <u>i.e.</u>, to "select one phase of one field and apply a remedy there, neglecting the others." <u>Id.</u> at 48 (quoting <u>Williamson v. Lee Optical Inc.</u>, 348 U.S. 483, 489 (1955)).

Application of these principles is straightforward here, since the Supreme Judicial Court already has upheld the original three-license limit against an equal protection challenge. <u>Johnson</u>, 374 Mass. at 792-93.  Because the 2004 Amendment is really just an extension of the original statute, the same "reasonably conceivable" rationales cited by the SJC (and quoted in full in Section I <u>supra</u>) apply to each. <u>Id.</u> at 792.  For example, the Legislature reasonably could have concluded that concentrating economic power in the retail area, whether by direct or indirect means, may "intensify the dangers of liquor sales stimulations, thereby threatening trade stability and promotion of temperance." <u>Id.</u>  The <u>Johnson</u> Court also specifically rejected a claim, similar to that advanced here, of differential treatment:

> [T]here is no invidious discrimination in the fact that the specific multiple holding proscriptions of § 15 apply only to package store owners, and not to other types of liquor distributors such as wholesalers or restaurateurs.  It has been recognized that different segments of the liquor industry are motivated by different economic dynamics, and, within the industry, sales approaches vary greatly.  The Legislature may properly take this into account. . . .  Further, it is well recognized that

---

[6]     The plaintiffs make no claim of a suspect classification or fundamental right here. <u>See</u> Complaint ¶¶ 21-22.

[7]     This lenient standard "does not permit courts to pass judgment on the effectiveness of the legislature's proposed classifications," <u>Gun Owners' Action League, Inc. v. Swift</u>, 284 F.3d 198, 214 (1st Cir. 2002), and "'[e]ven foolish and misdirected provisions' will be upheld." <u>Kittery</u>, 320 F.3d at 47 (quoting <u>Craigmiles v. Giles</u>, 312 F.3d 220, 223-24 (6th Cir. 2002)).

> "[w]hen legislative authority is exerted within a proper area, it need not embrace
> every conceivable problem within that field."

Id. at 792-93 (quoting Jewel Cos. v. Burlington, 365 Mass. 274, 279 (1974)); see also Chebacco
Liquor Mart, Inc. v. Alcoholic Beverages Control Com'n, 429 Mass. 721, 723-34 (1999). The
SJC's reasoning is compelling and disposes of the plaintiffs' equal protection claim.

## V.    THE COMMERCE CLAUSE CLAIMS WARRANT DISMISSAL AS WELL.

The plaintiffs further contend that Section 15's residency requirements and three-license
limit violate the negative or "dormant" component of the Commerce Clause. Complaint ¶¶ 23-
26; see U.S. Const. art. I, § 8, cl. 3.[8] These are the only substantive claims based on Section 15's
preexisting text, rather than the language added to the statute by the 2004 Amendment. For two
separate reasons, they also merit immediate rejection.

### A.    The Plaintiffs Have Not Alleged Facts Sufficient To Establish Standing To Challenge Section 15's Residency Requirements.

"The burden of stating facts sufficient to support standing rests with the party seeking to
assert federal jurisdiction." Sea Shore Corp. v. Sullivan, 158 F.3d 51, 54 (1st Cir. 1998); accord
Warth v. Seldin, 422 U.S. 490, 518 (1975).  Specifically, "[a] litigant bears the burden of
showing 'that he personally has suffered some actual or threatened injury as a result of putatively
illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action
and is likely to be redressed by a favorable decision.'" McInnis-Misenor v. Maine Med. Ctr., 319
F.3d 63, 67 (1st Cir. 2003) (quoting Valley Forge Christian Coll. v. Ams. United for Separation
of Church & State, Inc., 454 U.S. 464, 472 (1982)).[9]  To satisfy this burden, "[t]he plaintiff must

---

[8]    The Commerce Clause explicitly empowers Congress "[t]o regulate commerce
with foreign Nations, and among the several States, and with the Indian Tribes . . . ." Id.  It is
settled that "this affirmative grant of authority to Congress also encompasses an implicit or
'dormant' limitation on the authority of the States to enact legislation affecting interstate
commerce." Healy v. The Beer Inst., 491 U.S. 324, 326 n. 1 (1989).

[9]    These are the basic standing requirements under Article III of the Constitution. Id.
While additional "prudential" standing requirements exist, see id. at 68, they are not at issue in

'set forth reasonably definite factual allegations, either direct or inferential, regarding each material element needed to sustain standing.'" <u>Dubois v. U.S. Dept. of Agric.</u>, 102 F.3d 1273, 1281 (1st Cir. 1996) (quoting <u>U.S. v. AVX Corp.</u>, 962 F.2d 108, 115 (1st Cir. 1992)). This Court recently enforced the First Circuit's pleading rule, dismissing claims by associational plaintiffs on standing grounds:

> None of the associations alleges specific members who purchased a specific drug from a specific company. Instead, the allegations in the complaint and accompanying affidavits contain only bare bones assertions and empirically non-verifiable conclusions unsupported by specific facts concerning any injury-in-fact on the part of one of its members. . . . Thus, all associations are DISMISSED as party plaintiffs.

<u>In Re Pharm. Indus. Average Wholesale Price Lit.</u>, 263 F.Supp.2d 172, 194 (D. Mass. 2003).

A similar result should obtain for the Commerce Clause challenge to Section 15's residency requirements. While the Complaint's allegations arguably support an inference of Article III injury from both the 2004 Amendment and the three-license limit that is sufficient to prevail at the Rule 12 stage (by seeming to imply frustrated opportunities for business expansion),[10] the pleading provides no basis whatsoever for inferring an injury from the residency requirements. <u>See</u> Complaint ¶¶ 23-26. Specifically, none of the plaintiffs asserts that he or it wants to do business in Massachusetts but is prevented from doing so because of the residency rules. As a result, these allegations are just as deficient as the ones in the <u>Pharmacy Average Wholesale Price</u> litigation were. <u>See</u> 263 F.Supp.2d at 194. "It is black-letter law that standing is a claim-by-claim issue," <u>Rosen v. Tennessee Comm'r of Fin. and Admin.</u>, 288 F.3d 918, 928 (6th Cir. 2002); <u>accord</u> <u>Donahue v. City of Boston</u>, 304 F.3d 110, 116 (1st Cir. 2002), and the utter lack of any allegations supporting standing for the residency claim mandates its dismissal under both Rule 12(b)(6) and Rule 12(b)(1).

---

the present motion.

[10]    The defendants may raise standing issues regarding the other claims should the case proceed beyond the Rule 12 stage and facts supporting standing fail to emerge.

**B.     The Plaintiffs Fail to State a Claim Under the Commerce Clause Because of the Twenty-First Amendment's Superceding Effect in the Area of Liquor Distribution.**

Above and beyond questions of standing, a key substantive defect afflicts both Commerce Clause claims: they challenge Massachusetts laws regulating the distribution of liquor within the Commonwealth. As such, they are "exempted from 'the normal operation of the Commerce Clause,' or more precisely, the dormant Commerce Clause.'" Swedenburg v. Kelly, 358 F.3d 223, 227 (2nd Cir. 2004).

"Under standard Commerce Clause analysis, a statute that facially discriminates against interstate or foreign commerce will, in most cases, be found unconstitutional," while "nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.' " Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 66 (1st Cir. 1999), aff'd, 530 U.S. 363 (2000) (quoting Pike v. Bruce Church, 397 U.S. 137, 142 (1970)). However, "Section 2 of the Twenty-First Amendment grants 'the States virtually complete control over [1] whether to permit importation or sale of liquor and [2] how to structure the liquor distribution system.'" Swedenburg, 358 F.3d at 233 (emphasis and bracketed enumeration added) (quoting Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 110 (1980)).[11] As to the second power, a "state's authority under the Amendment includes the 'plenary power to regulate and control . . . the distribution . . . of intoxicants within her territory . . . .'" Milton S. Kronheim & Co. v. Dist. of Columbia, 91 F.3d 193, 203 (D.C. Cir. 1996) (quoting Dep't of Rev. v. James B. Beam Distilling Co., 377 U.S. 341, 346 1964)) (emphasis added). In the view of the Second and District of Columbia Circuits, state laws that fall "within the ambit" of the Twenty-First Amendment in this manner are "exempt[] from the effect of the dormant Commerce

---

[11]     The text of Section 2 prohibits "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof." U.S. Const. amend. 21, § 2. This language "effectively constitutionalizes most state prohibitions regulating importation, transportation and distribution of alcoholic beverages from the stream of commerce into the state." Swedenburg, 358 F.3d at 232.

-14-

Clause." <u>Swedenburg</u>, 358 F.3d at 231, 239; <u>Kronheim</u>, 91 F.3d at 203; <u>see also</u> <u>Bridenburgh v.</u> <u>Freeman-Wilson</u>, 227 F.3d 848, 851-54 (7th Cir. 2000) (the Amendment "empowers Indiana to control alcohol in ways that it cannot control cheese"). Since both Section 15's residency requirements and its three-license limit clearly constitute regulation of the Commonwealth's "liquor distribution system," they are immune from Commerce Clause challenge under this standard.

The defendants acknowledge that other Circuits have adopted a different analytical approach to integrating the Commerce Clause and Twenty-First Amendment, <u>see, e.g.</u>, <u>Heald v.</u> <u>Engler</u>, 342 F.3d 517 (6th Cir. 2003), and that the Supreme Court has granted certiorari in both <u>Swedenburg</u> and <u>Heald</u> to resolve the resulting conflict, <u>see</u> 124 S.Ct. 2391 (May 24, 2004).[12] Until the Supreme Court has ruled, this Court should follow the Second Circuit's approach, because First Circuit authority appears to embrace it.[13] In <u>Solman Distrib., Inc. v. Brown-Forman</u> <u>Corp.</u>, 888 F.2d 170 (1st Cir. 1989), a Maine statute restricted the ability of a national liquor supplier to terminate its Maine distributor -- <u>i.e.</u>, it regulated the state's liquor distribution system. The First Circuit enforced this distribution statute against the supplier and stated, "Because of the Twenty-First Amendment to the Constitution, [the supplier] cannot even claim that the [Maine] Act was an undue interference with interstate commerce." <u>Id</u>. at 172. This unequivocal statement of the distribution statute's immunity from Commerce Clause challenge strongly comports with the Second Circuit's categorical approach in <u>Swedenburg</u>. <u>See also</u>

_____

[12]     Under the alternative standard, a statute that otherwise violates the Commerce Clause "can be 'saved' by the Twenty-First Amendment . . . <u>only if</u> it advances one of the Amendment's 'core concerns.'" <u>Swedenburg</u>, 358 F.3d at 231 (emphasis in original). Should this Court (or the Supreme Court) conclude that the Second Circuit's standard is not controlling here, the defendants will argue that they also should prevail under the alternative standard, as well as that Section 15 does not violate the dormant Commerce Clause in the first instance.

[13]     The Second Circuit's approach also should be followed because of that Court's detailed and compelling analysis of both the legislative history of the Twenty-First Amendment and the Supreme Court's jurisprudence regarding it. <u>Swedenburg</u>, 358 F.3d at 231-37. In particular, as the Second Circuit stresses, courts "should not allow the protective doctrine of the <u>dormant</u> Commerce Clause to subordinate the <u>plain language</u> of the Twenty-First Amendment" -- <u>i.e.</u>, constitutional text should control over constitutional inference. <u>Id</u>. at 231 (emphasis added).

Mass. Food Ass'n, 197 F.3d at 563 (First Circuit notes "the special status of state liquor regulation under the Twenty-First Amendment").[14] Given the First Circuit's predilection toward the Swedenburg standard, this Court should apply it here and dismiss both dormant Commerce Clause claims on Twenty-First Amendment grounds.

## VI.    THE ERISA PREEMPTION CLAIM ALSO FAILS TO STATE A CLAIM, FOR TWO THRESHOLD REASONS.

The plaintiffs' final claim asserts that ERISA, 29 U.S.C. §§ 1001 et seq., preempts the 2004 Amendment because the Amendment restricts "the purchasing of insurance" on a joint basis for more than three licensees. Complaint ¶¶ 27-30. This claim also has multiple flaws.

### A.    A Facial Challenge Is Grossly Misplaced.

The preemption claim's most glaring defect is its facial nature. As noted in Section I supra, the plaintiffs' claim is clearly a facial one: they assert that the 2004 Amendment's language violates ERISA "by prohibiting more than three licensees from working together to purchase insurance for their employees," Complaint ¶ 4; accord id. ¶ 30, and they request a declaration that the Amendment as enacted "violates 29 U.S.C. § 1001, et seq.," id. p. 6 Prayer E. However, a facial claim faces a "dauntingly high hurdle." Donovan, 311 F.3d at 74. It indeed is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." Pharm. Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 77 (1st Cir. 2001), aff'd 538 U.S. 644 (2003). As a result, the fact that a statute "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." United States v. Salerno, 481 U.S. 739, 745 (1987).

---

[14]    Dictum in an intervening decision declined to opine on how to integrate the Twenty-First Amendment with the Commerce Clause, describing the issue as "difficult." 44 Liquormart, Inc. v. State of R.I., 39 F.3d 5, 9 (1st Cir. 1994), rev'd on other grounds, 517 U.S. 484 (1996) (Supreme Court states in dictum at p. 514-15 that "[t]he States' regulatory power over this segment of commerce is . . . largely 'unfettered by the Commerce Clause'"). The categorical language in Solman regarding the Maine distributorship statute is the First Circuit's clearest statement on the issue and should control here.

Instead, the plaintiffs must show that the statute will be always unconstitutional, under all scenarios.

The plaintiffs cannot meet this stringent standard for the 2004 Amendment's "purchasing of insurance" provision. Even if one were to assume that the joint purchase of insurance could establish an "employee benefits plan," but see Section VIB supra, ERISA does not in fact apply to several major types of employee-related insurance:

> The provisions of this subchapter shall not apply to any employee benefit plan if . . . .
>
> (3) such plan is maintained solely for the purpose of complying with applicable workmen's compensation laws or unemployment compensation or disability insurance laws.

29 U.S.C. § 1003(b)(3). As a result, if (for example) disability insurance were jointly purchased for the employees of several licensees, ERISA by its terms would not apply, id., and any state law regulating that joint purchase would fall entirely outside of the federal statute. This hypothetical scenario is but one of many "sets of circumstances" where the 2004 Amendment would not violate federal law, leaving the plaintiffs well short of satisfying the difficult standard for facial challenges.

### B. Section 15 Does Not Satisfy ERISA's Preemption Standard of "Relat[ing] to an[ ] Employee Benefits Plan," Because There Is in Fact No "Plan."

In addition to its inappropriately facial nature, the ERISA claim would fail to satisfy the statute's preemption standard regardless of how the plaintiffs might try to structure it. Section 514(a) of ERISA generally provides that its provisions "shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C. § 1144(a). While some early ERISA preemption cases seemed to construe this "relate to" language literally, applying it "according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." DeBuono v. NYSA-ILA Med. and Clinical Svcs. Fund, 520 U.S. 806, 813 n. 7 (1997) (quoting Cal. Div. of Lbr. v. Dillingham Constr., N.A., Inc., 519 U.S. 316, 335 (Scalia, J., concurring)). The Supreme Court accordingly has tempered its original "relate to" standard of "ha[ving] a connection with or

-17-

reference to . . . a plan," observing that "[f]or the same reason that infinite relations cannot be the measure of pre-emption, neither can infinite connections." N.Y. Conference of Blue Cross v. Travelers Ins. Co., 514 U.S. 645, 656 (1995). The Court's ERISA cases are instead now unequivocal that "where federal law is said to bar state action in fields of traditional state regulation, . . . [the Court works] on the 'assumption that the historic police powers of the States were not to be superceded by the Federal Act unless that was the clear and manifest purpose of Congress.'" Id. at 657 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)); accord DeBuono, 520 U.S. at 813-14.

One way in which the lower courts have narrowed ERISA's preemptive scope in accord with the Supreme Court's more recent direction is by insisting that, consistent with the preemption provision's actual text, see 29 U.S.C. § 1144(a), there be a "plan" for the contested state law to "relate to." Decisions have thus specified that "the starting place for any ERISA preemption issue is the determination of whether a 'plan' exists under the Act," Tucker v. Employers Life Ins. Co., 689 F. Supp. 1073, 1075 (N.D. Ala. 1988), because "[a] plan must exist for [a c]ourt to exercise jurisdiction under ERISA." Callaway v. G.S.P., Inc., 793 F. Supp. 133, 135-36 (S.D. Tex. 1992) (denying preemption where "[t]here simply is no plan"); accord Whitt v. Sherman Int'l Corp., 147 F.3d 1325, 1327 (11th Cir. 1998) ("Because we conclude that no ERISA 'plan' existed at the time of Whitt's termination, we hold that Whitt's state causes of action are not preempted by ERISA"); Williams v. Cypert, 708 F. Supp. 229, 230 (W.D. Ark., 1989) ("First, there must a 'plan' as defined by the Act"); see Dist. of Columbia v. Grtr. Wash. Bd. of Trade, 506 U.S. 125, 130 ("In Fort Halifax Packing Co. v. Coyne, 482 U.S. 1 (1987), we construed the word 'plan' to connote some minimal, ongoing 'administrative' scheme or practice [emphasis added]"). Here the plaintiffs have made no allegation of any existing "plan" that the 2004 Amendment affects, see Complaint ¶¶ 27-30, almost certainly because there is none. The preemption claim accordingly cannot prevail.

Two additional considerations confirm the correctness of this conclusion. First, the 2004 Amendment does not regulate the type of relationship that Section 514(a)'s preemption language

-18-

is meant to reach. Judge Ponsor has distinguished among various types of relationships when
construing Section 514(a):

> "The key to distinguishing between what ERISA preempts and what it does not
> lies . . . in recognizing that the statute comprehensively regulates certain
> relationships: for instance, the relationship between plan and plan member,
> between plan and employer, between employer and employee (to the extent that
> an employee benefit plan is involved), and between a plan and trustee." Gen.
> Amer. Life Ins. Co. v. Castonguay, 984 F.2d 1518, 1521-22 (9th Cir. 1993).
> Preemption will not apply to traditional common law causes of action that do not
> "implicate the relations among the traditional ERISA plan entities." Coyne &
> Delany Co. v. Selman, 98 F.3d 1457, 1469 (4th Cir. 1996).

Reder v. Travelers Plan Adm., 44 F. Supp. 2d 92, 102 (D. Mass. 1999); accord Woodworker's
Supply, Inc. v. Principal Mut. Life, 170 F.3d 985, 991 (10th Cir. 1999). Consistent with this
principle, a District Court rejected preemption when a state law dispute involved none of the
relationships described by Judge Ponsor but instead concerned two corporations contesting which
one was responsible for paying benefits (following a sale of a business from one to the other).
Moline Machinery, Ltd. v. Pillsbury Co., 259 F. Supp. 2d 892, 903 (D. Minn. 2003) (rejecting
preemption where "the dispute here is between Moline, and Pillsbury -- neither of whom is a
'plan,' 'employer,' fiduciary,' 'beneficiary,' or any other recognized ERISA entity, as to the
other" [emphasis added]). The entities regulated by the 2004 Amendment's "purchasing
insurance" language similarly stand in no ERISA-recognized relationship "as to the other," and
preemption is inappropriate on this ground as well.

In addition, the 2004 Amendment is simply not "the type of state law that Congress
intended ERISA to supercede." DeBuono, 520 U.S. at 814. The Supreme Court has summarized
the cases that Section 514's preemption provision does reach:

> In each of these cases, ERISA pre-empted state laws that mandated employee
> benefit structures or their administration. Elsewhere, we have held that state laws
> providing alternative enforcement mechanisms also relate to ERISA plans,
> triggering preemption.

Travelers, 514 U.S. at 658; accord DeBuono, 520 U.S. at 814-15. The present claim falls within
none of these categories. It instead is "quite remote from the areas with which ERISA is
expressly concerned -- 'reporting, disclosure, fiduciary responsibility, and the like.'" Dillingham,

-19-

519 U.S. at 330 (quoting <u>Travelers</u>, 514 U.S. at 661). As in <u>Dillingham</u>, "[a] reading of § 514(a) resulting in the preemption of traditionally state-regulated substantive law in those areas where ERISA has nothing to say would be 'unsettling,'" <u>id</u>. (quoting <u>Travelers</u>, 514 U.S. at 665), and the preemption claim plainly cannot prevail.

## VI.     CONCLUSION

For the foregoing reasons, the defendants respectfully request that the Court allow Defendants' Motion To Dismiss and enter judgment in their favor on all claims against them.

By their attorneys,

THOMAS F. REILLY
ATTORNEY GENERAL

Pierce O. Cray, BBO # 104630
Assistant Attorney General
Government Bureau
One Ashburton Place
Boston, MA 02108
(617) 727-2200, ext. 2084

Dated:   December 17, 2004

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) on   12/17/04.