was served additional alcoholic beverages by the bartender, Karen Shaw. The licensee knew, or should have known that William Cauldwell, Robert Derick, Joseph Carr and Richard Sypeck were intoxicated at the time of service.

4. The investigators then made observations of a fifth patron who was exhibiting a number of signs of intoxication. This patron was identified as Michael Rose. Despite the numerous signs of intoxication, this patron was also served an additional alcoholic beverage by Ms. Shaw. The licensee knew, or should have known that Michael Rose was intoxicated at the time of service.

5. One patron, Robert Derick approached the bar and ordered a double shot of vodka on the rocks and three Budweiser beers. He was unaccompanied by anyone at the time he was served this order. He drank the vodka double shot at the bar and left the bar area with the three beers. Mr. Derick then proceeded to offer the beers to patrons at random.

6. Mr. Derick gave one of the beers to a youthful female patron, who consumed approximately half of the beer in plain view before leaving the premises. That female patron was identified as follows: Erin Farrell (Date of birth: 9/24/74, then age 18). She was not asked for any identification nor did she present any prior to consuming the beer.

7. Officers from the North Attleboro Police Department arrived to provide assistance to the investigators. These two officers also made observations that the five above named patrons were intoxicated. All five were placed in protective custody by the police as a result of being intoxicated.

8. At the hearing the bartender, Karen Shaw, who has worked for the licensee for seven years testified that Mr. Cauldwell had a disability which accounted for his appearance of intoxication. She also noted that he does not drive and therefore posed no threat.

9. Ms. Shaw testified that Mr. Rose also has certain physical limitations, including routinely "slurred" speech, which accounted for his appearance of intoxication. She stated that Mr. Rose was discouraged from coming into the premises because he "scares" people.

10. Ms. Shaw testified that she just gave Mr. Sypeck one beer and that he did not seem "that bad".

11. Ms. Shaw stressed in her testimony that the fact that these people were not driving was a factor in determining whether to continue to serve them. When queried as to what standard or guidelines she uses in deciding who to serve, Ms. Shaw stated that she would not serve someone who had fallen down. Beyond that Ms. Shaw stated that it was difficult to determine whether someone had too much to drink.

12. The Commission finds Ms. Shaw's explanation for her continued service to the above named patrons to be inadequate.

13. As to the licensee's defense of service to two of the patrons, William Cauldwell and Michael Rose, the Commission finds that the opinion of the investigators and the police as to the intoxicated state of these patrons was not based solely on their lack of physical agility or poor elocution.

14. The licensee also presented testimony of Randy Spencer who identified himself as a friend who was working at the door as a favor. With regard to minors entering the bar, he testified that there were minors entering the premises, including Ms. Farrell.

15. The licensee and its employees demonstrated a total lack of understanding of the responsibilities in the sale of alcoholic beverages.

Based on the foregoing evidence, the Commission concludes that the licensee violated M.G.L. c. 138, sec. 69, Sale of alcoholic beverages to intoxicated persons (5 counts) and suspends the license for six days for each count.

The Commission finds that the licensee violated 204 C.M.R. 2.05(2), Permitting an Illegality on a Licensed Premises to wit: G. L. c. 138, section 34C, Possession of alcoholic beverages by a person under 21 years of age and the license is suspended for six days.

The Commission further concludes that the licensee violated 204 C.M.R. 4.03 (1)(B), Delivery of More than Two Drinks to One Person at one time and suspends the license for three days.

The total suspension is 39 days. Further, the Commission strongly recommends that the license review its policies and procedures with regard to sale of alcoholic beverages.

### GERALD F. ELY, II
### dba Jay's
### 1220 North St.
### PITTSFIELD

**DECISION** This was a hearing on alleged violations of:

a. 204 CMR 2.05 (2) permitting an illegality on the licensed premises, to wit: Chapter 138, section 69 sale or delivery of alcoholic beverages to intoxicated persons (6 counts);

b. 204 CMR 4.03 (1)(b) delivery of more than two drinks to one person at one time (4 counts);

c. 204 CMR 2.16 failure to post cover charge and to give receipts.

After hearing, the Commission makes the following findings:

1. On or about October 1, 1993, an ABCC investigator and state police troopers entered the licensed premises.

2. Upon entering, the investigator and troopers paid a cover charge. No receipt was given for the payment of the cover charge.

3. There was no sign posted stating that there was a cover charge.

4. The licensee served more than two alcoholic beverages to an individual on four separate occasions without knowing for whom the alcoholic beverages were intended.

5. The licensee served alcoholic beverages to one Donald Williams who was visibly intoxicated at the time of service.

6. The licensee knew or should have known that Mr. Williams was intoxicated at the time of service.

7. The licensee served alcoholic beverages to one Gary Love who was visibly intoxicated at the time of service.

8. The licensee knew or should have known that Mr. Love was intoxicated at the time of service.

9. The licensee served alcoholic beverages to one Robert J. Miletich who was visibly intoxicated at the time of service.

10. The licensee knew or should have known that Mr. Miletich was intoxicated at the time of service.

11. The licensee served alcoholic beverages to one Tara B. Meckes who was visibly intoxicated at the time of service.

12. The licensee knew or should have known that Ms. Meckes was intoxicated at the time of service.

13. The licensee served alcoholic beverages to one Christopher J. Storie who was visibly intoxicated at the time of service.

14. The licensee knew or should have known that Mr. Storie was intoxicated at the time of service.

15. The licensee served alcoholic beverages to one Julie L. Garzone who was visibly intoxicated at the time of service.

16. The licensee knew or should have known that Ms. Garzone was intoxicated at the time of service.

17. At hearing before the Commission, the licensee submitted separate statements from Christopher Storie, Gary Love, Tara Meckes and Robert Miletich in which each individual stated that he or she was not intoxicated while at the licensed premises. The Commission finds these statements to be not credible.

Based on the evidence heard, the Commission finds that the licensee violated:

a. 204 CMR 2.05 (2) permitting an illegality on the license premises, to wit: Chapter 138, section 69 sale or delivery of alcoholic beverages to intoxicated persons, 6 counts, and suspends the license for six days for each count;

b. 204 CMR 4.03 (1)(b) delivery of more than two drinks to one person at one time, 4 counts and suspends the license for two days for each count, to run concurrently;

c. 204 CMR 2.16 failure to post cover charge and to give receipts and warns the licensee.

The total suspension is 38 days.

### OSCO DRUG OF MA INC.
### 132 Granite Street
### QUINCY

**MEMORANDUM** This was an informational hearing on the issue of Chapter 138, section 15 - A person,

firm, corporation, association or other combination of persons, directly or indirectly, or through any agent, employee, stockholder, officer or other person or any subsidiary whatsoever, holding an interest in, in the aggregate, more than three (3) licenses issued pursuant to section 15 of Chapter 138 of the General Laws.

After hearing, the Commission makes the following findings:

1. Osco Drug of Massachusetts, Inc. holds a Section 15 license.

2. Star Market Company, under Star Market Liquors, Inc. holds three Section 15 licenses.

3. Osco Drug of Massachusetts, Inc. is a wholly owned subsidiary of American Drug Stores, Inc. (ADS). ADS is owned by American Stores Company, a Delaware Corporation which is publicly traded on the New York Stock Exchange.

4. Star Market Company is a division of Jewel Food Stores, Inc. (JFS) which is wholly owned by Jewel Companies, Inc. (JCI). JCI is owned by American Stores Company.

5. American Stores Company holds a direct or indirect beneficial interest in Osco Drug of Massachusetts, Inc. and Star Market Liquors, Inc.

MGL Chapter 138, section 15 states that "[n]o person, firm, corporation, association, or other combination of persons, directly or indirectly, or through any agent, employee, stockholder, officer or other person or any subsidiary whatsoever, shall be granted, in the aggregate, more than three such licenses in the commonwealth, or be granted more than one such license in a town or two in a city."

The Commission orders divestiture so that American Stores Company does not hold an interest in more than three licenses. An independent licensee may operate on the premises of a subsidiary of American Store Company with the following conditions:

a. The license must stand in the name of an independent owner.

b. American Stores Company, or any of its subsidiaries, may not have an ownership interest in the license.

c. American Stores Company, or any of its subsidiaries, may not derive revenue based on the independent owner's alcoholic beverage sales volume.

d. The independent ownership of the alcoholic beverage business must be made clear to the public by signage posted at the premises.

e. Conditions be placed on the license that follow those established in the Commission decision, Jet Wine & Spirits, Inc. dba Jet Liquors, dated December 2, 1993.

f. Conditions model the standard Commission policy for franchisee convenience stores, e.g. White Hen Pantry.

### JUNCTION 95, INC.
### dba Portside Sports Bar
### 421 Bridge St.
### SALISBURY

**DECISION** This was a hearing on an alleged violation of Ch. 138, sec. 23, transfer of privilege of license without proper authority.

After hearing, the Commission makes the following findings:

1. On or about January 15, 1993, Ronald Francoeur, President and sole stockholder of the licensee, entered into a management agreement with Jonathan Corrigan, Patrick Murphy and Robert Crowley.

2. On or about March 25, 1993, the Commission approved Patrick Murphy as manager of the licensee.

3. During the course of the investigation of the new manager application, the licensee did not make known to the Commission or the Local Board that the licensee was entering into a management agreement with Murphy, Corrigan and Crowley.

4. Under the terms of the management agreement, the managers (Murphy, Corrigan and Crowley) assumed responsibility for the operation of the licensee, including the hiring of personnel and payment of vendors and taxes.

5. Under the terms of the management agreement, the owner retained the right to inspect the premises and the operation and to terminate the agreement if the managers failed to operate the premises in accordance with the policies of the owner spelled out in the agreement.

6. Between February, 1993 and July, 1993, the managers paid from the Other Side of the Bridge account sums to either Francoeur R.E. Management Acct. or Junction Ninety-Five Inc. for rent, liquor invoices and taxes. Junction Ninety-Five, Inc. or Francoeur R.E. Management Acct. then would submit payment to the vendor or to the Commonwealth of Massachusetts for taxes.

7. In records submitted to the Commission, the only exception to the above pattern is a February 24, 1993 payment to M.S. Walker from the Other Side of the Bridge.

8. Under the management agreement, the managers were not paid a salary but remuneration came from profits of the operation of the premises.

9. Under the management agreement, the owner did not receive profits from the operation of the business but was paid fixed costs by the management group.

10. The managers had a direct or indirect beneficial interest in the license.

11. Neither Jonathan Corrigan, Patrick Murphy, Robert Crowley, nor the Other Side of the Bridge is listed on the licensee's application as having a direct or indirect beneficial interest.

12. In a decision dated April 8, 1991, the Commission denied an application for change of manager to William R. Wilson and found and adjudicated a violation of MGL Ch. 138, sec. 23, transfer of privilege of license without proper authority based on findings that Mr. Wilson, had been operating the licensed premises under the provisions of a management contract.

Based on the evidence heard, the Commission finds that the licensee violated MGL Ch. 138, sec. 23 transfer of privilege of license without proper authority and suspends the license for 6 days.

### KEYSTONE MARKET,
### Stanley S. Goddard
### 42-44 Bridge Street
### SHELBURNE FALLS

**DECISION** This was a hearing to determine whether the application for a new license under Massachusetts General laws Chapter 138 should be approved or disapproved.

After hearing, the Commission makes the following findings:

1. On or about September 30, 1993, Stanley and Kim Goddard, principals of Keystone Market, filed an application for a package store license, located at 42-44 Bridge St.

2. On or about October 1, 1993, Ann Needham voluntarily surrendered the license of Shelburne Falls Supermarket, Inc., which was located at 42-44 Bridge St., following the death of George Needham, owner.

3. Stanley Goddard managed the wine and malt department of Shelburne Falls Supermarket, Inc. from 1985 - 1990.

4. The premises is owned by Ann Needham.

5. Ann Needham is the mother of Stanley Goddard.

6. Shelburne Falls Supermarket, Inc. is on the credit delinquency list.

The Commission approves the license of The Keystone Market as a transfer from Shelburne Falls Supermarket, Inc. conditional on the settlement of any debt owed to the Department of Revenue within sixty days from this date.

### P & F DINING, INC.
### dba Shrewsberries Banquet
### Facilities and Restaurant
### 889 Boston Turnpike
### SHREWSBURY

**DECISION** This was a hearing on an alleged violation of G. L. 138, sec. 23, Transfer of Privilege of License without Proper Authority.

After hearing, the Commission makes the following findings:

1. On or about September 13, 1993, an ABCC investigator was at the licensed premises to interview Mrs. Daphne Yiantisdis who was applying to become the manager of the license.

2. In the course of the interview, Mrs. Yiantisdis stated that she was already operating the business, including paying all bills (liquor, payroll, utilities, insurance) from a checking account in the name of Shrewsberries, C.D.Y., Inc. This corporation is not the licensee.

3. P & F Dining, Inc. is the