UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PEOPLES SUPER LIQUOR STORES, INC.,
WINE & SPIRITS RETAILERS, INC.
and, JOHN HARONIAN,

      *Plaintiffs,*

*v.*

EDDIE J. JENKINS, in his capacity as
Chairman of the Alcoholic Beverages
Control Commission, SUZANNE IANNELLA
and ROBERT CRONIN, in their capacities as
Commissioners of the Alcoholic Beverages
Control Commission,

      *Defendants.*

Civil Action No. 04-cv-12219-PBS

**(PROPOSED) OPPOSITION to DEFENDANTS' MOTION to DISMISS**

### STATEMENT OF THE CASE

This is an action by Wine & Spirits Retailers, Inc. (W&SR), a Rhode Island corporation in the business of franchising liquor store operations, Peoples Super Liquor Stores, Inc., a Massachusetts corporation owning three Massachusetts liquor stores that are franchisees of W&SR, and John Haronian, an individual residing in Rhode Island, who is the owner of both W&SR and Peoples, against the Massachusetts Alcoholic Beverages Control Commission. The plaintiffs seek declaratory and injunctive relief against the Commission to prevent the enforcement of a 2004 amendment to Section 15 of the Massachusetts Liquor Control Act (M.G.L. c.138) that provides: "No person, firm, corporation, association, or other combination of persons, directly or indirectly, or through any agent, employee, stockholder, officer or other person or any subsidiary whatsoever, shall . . . *participate in decisions regarding the purchasing of alcoholic beverages or the purchasing of insurance or accounting or bookkeeping services, or*

*receive any percentage or fee derived from gross revenues in exchange for management assistance, or participate in any other action designed to effect common results of more than 3 licensees under this section, . . .,*" because the italicized requirement unconstitutionally restricts the rights of speech and association and denies the plaintiffs their right to Equal Protection of the laws by treating them differently from similarly situated other business entities; violates Article 1, §8 of the Constitution of the United States by limiting licensees to only three licenses and by requiring that the majority of directors of a licensee be residents of Massachusetts; and, violates 29 U.S.C. §1001, *et seq.* (ERISA) by prohibiting more than three licensees from working together to purchase insurance for their employees.

The matter is now before the court on the Commission's motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.

### STATEMENT OF FACTS

I.    **The History of Massachusetts Restriction of "Multiple Ownership" of Liquor Stores**

Since the repeal of prohibition the Massachusetts Liquor Control Act has contained a prohibition against ownership of more than three retail liquor store licenses in the Commonwealth.  "No person, firm, corporation, association, or other combination of persons, directly or indirectly, or through any agent, employee, stockholder, officer or other person or any subsidiary whatsoever, shall be granted, in the aggregate, more than three such licenses in the commonwealth, or be granted more than one such license in a town or two in a city."  M.G.L. c.138, §15 before the 2004 amendment.  What constituted prohibited "multiple ownership" has been the subject of a few appellate cases, which dealt with their unique facts.  For example, in *Powers v. Sixty Broadway*, 371 Mass. 296, 356 N.E. 2d 704 (1976), the Supreme Judicial Court held that evidence of interlocking stockholders, directors and officers, family relationships,

guidance, assistance and financial support, and joint activities between the owner of a corporate licensee and other owners of other corporate licensees was sufficient to sustain a finding that there was a combination of persons owning more than three liquor licenses. However, at the same time the Court was careful to note: "A friend of the court urges us not to discourage package store licensees from achieving economies of scale through joint activities. We do not pass on any such issue, or on the effect of use of the same attorney and accountant, joint bookkeeping, group insurance, joint advertising, and use of a common trade name, where the licensees are otherwise independent."  371 Mass. at 300, 356 N.E. 2d at 706.

In 1978 the Supreme Judicial Court had occasion to define the perameters of prohibited multiple ownership more clearly.  In *Johnson v. Martignetti*, 374 Mass. 784, 375 N.E. 2d 290 (1978), the court held that the focus should be upon whether there is sharing of more than ten percent of the beneficial interest in the licenses.

> "Section 15A of c. 138 indicates that, with regard to the granting of liquor licenses, the broad legislative concern with direct or indirect license holdings is, more specifically, a concern with business entities which have a 'direct or indirect beneficial interest' in a licensed establishment.  The terms of s 15A suggest a definite guideline as to the meaning of this phrase.  The section provides that a holding of less than 10% of the outstanding voting stock of a corporation owning a liquor license does not constitute a direct or indirect beneficial interest within the meaning of the statute.  The logical, reasonable inference is that a holding of more than 10% of the voting stock of an establishment owning a liquor license would tend to support an inference that there was a 'direct or indirect' interest under c. 138's statutory scheme." 374 Mass. at 789, 375 N.E. 2d at 295.

The court's clarification of the meaning of Section 15's prohibition of multiple ownership, coupled with its specific refusal to make a blanket prohibition of more than three liquor stores taking advantage of some economies of scale, has led to adjudication by the Commission of when specific arrangements between licensees to take advantage of economies of scale are permissible. Specifically, the Commission has allowed Section 15 license holders to

enter franchising relationships. "The Commonwealth has maintained a policy relative to franchise package goods stores which allows a chain to operate more than three licenses under its 'doing business as' (dba) provided that the additional licenses are independent and no financial benefit is made between franchisor and franchisee relative to the liquor license or its operation." *White Hen Pantry, 660 Industrial Drive, Elmhurst, IL*, November 1993 (Commission determined that White Hen's loan to franchisee for purposes of buying liquor license violated G.L. c. 138, § 25; attached as **Exhibit C**). In a later decision, the Commission clarified the "no financial benefit condition" by stating that a franchisor "may not derive revenue based upon the independent owner's alcoholic beverage sales volume." *Osco Drug of MA, Inc., 132 Granite Street, Quincy*, May 1994 (Osco Drug allowed to operate under its Section 15 license on the premises of a chain supermarket holding three other Section 15 licenses; attached as **Exhibit A**). Consistent with this decision, the Commission approved the sale of beer and wine in 7-Eleven stores with the franchisor receiving a flat fee in exchange for same. In this case, W&SR revised its Franchise Agreement with its prospective franchisee DW&SR of Fall River, Inc. to reflect a flat fee at the specific direction of the Commission. This agreement had been approved locally and was pending final review before the Commission at the time the amendment to Section 15 was enacted. The Fall River store is now forbidden from purchasing W&SR's marketing and management advice. The Commission has also allowed the Massachusetts Package Stores Association, the organization that successfully lobbied the General Court to pass the amendment, to provide many of the same services to its members for years without objection. Such services include providing "information and advice concerning matters relevant to the beverage alcohol industry," working together to get better deals from distributors and to form purchasing strategies, and securing better deals on various business services, including insurance.

II.    <u>**The Plaintiffs' Franchise Relationship.**</u>

The Commission asserts that the long standing interest of the Massachusetts Liquor Control Statute is preventing any one individual or organization from maintaining practical control over more than three liquor stores and argues that the new language merely codifies a clearer definition of that longstanding prohibition.    But the franchise relationship was specifically designed to avoid creating practical control of more than three liquor stores by any one entity.    Rather than being an effort to evade the three-store rule, franchises were created as a tool to live within its requirements.    In recognition of that fact, the Commission has approved franchises in the Massachusetts liquor retail field.    Before the statutory change, the Commission had approved W&SR and various other franchisors to have more than three franchisees.    **Exhibit A –** Commission decision in *Osco Drug of MA Inc., 132 Granite Street, Quincy*, May 1994; **Exhbit B** – Commission decision in *Joanne Contaldi d/b/a White Hen Pantry, 2245 Massachusetts Avenue, Cambridge*, August 1992; **Exhibit C** – Commission decision in *White Hen Pantry, 660 Industrial Drive, Elmhurst, IL*, November 1993.

Franchises in excess of three stores were permitted because a properly formulated franchise does not create "practical control" of the franchisees.    The Commission held that franchises do not constitute "practical control" where the franchisees are (a) independently owned; (b) the franchisor does not have an ownership interest in the franchisees; (c) the franchisor's fee is not based on the franchisees' liquor sales volume; and (d) the identity of the independent owners of the franchisees must be posted in the sore.    **Exhibit A** – *Osco Drug of MA Inc., 132 Granite Street, Quincy*.

The W&SR franchise agreement was drafted specifically to meet these requirements and to avoid creating "practical control" over the liquor stores.    **Exhibit D –** *Franchise Agreement*.

Under the franchise agreement used by W&SR and those used by other franchisors, as approved by the Commission, each store remains independently owned and operated, there is not practical control by the franchisor over the franchisees. The relationship that was permitted under the pre-amendment statute and that is now barred under the amended statute, is the advisory role of the franchisor giving paid marketing and management advice and the joint advertising of the franchisees.

W&SR d/b/a/ Douglas Wine and Spirits is a corporation organized under the laws of Rhode Island created for the purpose of selling franchises that provide certain services and use of the trade name "Douglas Wine and Spirits" to independent package store owners and license holders in the Commonwealth and elsewhere. W&SR does not purchase alcoholic beverages on behalf of its franchisees. The services provided by W&SR include training in its proprietary system for the establishment, operation and marketing of package stores, use of an operating manual that suggests specifications, standards, and policies designed to maximize revenue, as well as advertising and promotional services. In accordance with W&SR's Franchise Agreement, these services are provided in exchange for a flat fee. Each franchise is independently owned and operated with its own financial records, managers and employees, and individual accounts with distributors. Prices are independently set by each franchisee and there is no commingling of revenue or inventory amongst franchisees.

W&SR provides those desiring to enter the liquor retail industry a proven business plan they can use in setting up a successful liquor store. Just as someone entering the restaurant business can either learn by trial and error or buy a ready made strategy for layout, management and marketing, and an already recognizable brand name through signing a franchise agreement with a McDonalds or Olive Garden.

### III.     The Nature of the Plaintiffs' Challenge.

The Plaintiffs' challenge the amended statute as it is applied to them, not on its face. W&SR is in the business of selling management and marketing advice through franchises. Its complaint is that it is currently barred from entering a franchise agreement with a fourth Massachusetts liquor store. A fourth franchisee had entered a franchise agreement with W&SR, but, following enactment of the amendment, the Commission would not permit the liquor store owner to operate as a franchisee. Peoples Super Liquor Stores, Inc. (Peoples) is a franchisee of W&SR, which owns three liquor stores, all of which operate as W&SR franchisees. Essentially, the relationship between the Plaintiffs is buying and selling management and marketing advice and joint advertising. It is banning this relationship by the amended statute that the Plaintiffs challenge. Even the challenged three store rule, which pre-dated the amendment, is based on its application to Peoples, which is barred from expanding to a fourth liquor store of its own.

Put simply, there is nothing facial about the Plaintiffs' claims. The Plaintiffs are currently prohibited from obtaining the benefits of entering a franchise relationship as a result of the amended statute. W&SR is prohibited from contracting with a fourth Massachusetts franchisee. The Plaintiff Franchisee, Peoples, is prohibited from benefiting from the expanded marketing strength that would come with the addition of more franchisees, from working with out of state franchisees in the purchase of insurance, and from expanding to a fourth store owned by Peoples. Plaintiff Haronian, as a Rhode Islander, is currently required to be a minority director in his own company in order to comply with the majority in-state director requirement.

To the extent that any of the Plaintiffs' claims could be characterized as facial challenges to the statute, the standard is not as insurmountable as the Commission asserts. *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (plurality opinion) ("To the extent we have consistently

articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself"). As even the authority cited by the Commission recognizes, this is especially true when the regulation in issue affects constitutional rights. *Donovan v. City of Haverhill*, 311 F.3d 74, 77 (1st Cir. 2002) ("To prevail in a facial challenge to an ordinance that does not regulate constitutionally protected conduct, plaintiff must surmount a dauntingly high hurdle" (emphasis added)), *citing*, *Village of Hoffman v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) ("perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply"). When First Amendment rights are involved, the normal presumption of validity afforded state statutes is not applicable. Instead, the presumption of validity is replaced by a presumption of invalidity. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (restrictions on speech are "presumptively invalid" – holding hate speech law to be facially unconstitutional).

**ARGUMENT**

**I.    First Amendment – Speech**

    **A.  The Relationship Between the First and Twenty-First Amendments.**

The fact that stores that sell alcoholic beverages are involved in this litigation does not alter the First Amendment analyses. "The Twenty-first Amendment cannot save an otherwise invalid restriction on speech. Nothing in the Amendment's text or history justifies its use to alter the application of the First Amendment." *44 Liquormart,* 517 U.S. at 532-533 (O'Connor, J. concurring).

**B.   The Amended Statute Regulates Speech not Conduct.**

The Commission seeks to avoid the stringent requirements of the First Amendment by arguing that the challenged statute regulates conduct, not speech.  *Defendants' Memorandum in Support of Motion to Dismiss*, p.4 ("what the amendment actually prohibits is not speaking or associating but instead specified substantive <u>conduct</u>" (emphasis in original)).  The Commission identifies the "specified substantive conduct" as "joint purchases of alcohol, joint purchases of various business services, and joint management services." *Id*.   However, W&SR does not engage in the purchase of alcohol, or in the purchases of business services, and do not provide joint management services, purportedly the only activities prohibited.  So, unless the Defendants are prepare to stipulate that the Plaintiffs' business activities are not precluded by the amended statute, the activity precluded must include giving management and marketing advice (for a fee).  Giving management and marketing advice (for a fee) is speech, not conduct.  *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 482 (1989) (using "tutoring, legal advice, and medical consultation provided (for a fee)" as examples of speech protected by the First Amendment).   It is the restriction on paid management and marketing advice that W&SR challenges as violating the First Amendment.

Likewise, Peoples does not engage in joint purchases of alcohol with other franchisees of W&SR.   Peoples does not jointly purchase business services with the other franchisees of W&SR.   Peoples does not share joint management services with the other franchisees of W&SR.[1]   Peoples, and all franchisees of W&SR, buy their own alcohol and make their own hiring decisions, independent of the franchisor.   The only activity Peoples engages in with the

---

[1] The three stores owned by Peoples do, of course, engage in joint purchase of alcohol and business services with each other, as is permitted by §15.   These stores do not engage in joint purchases with the other W&SR franchisees.

out-of-state franchisees or would engage in with the additional in-state franchisee is advertising under a common name, Douglas Wine & Spirits, and engaging in joint advertising.[2]  Unless the Commission is prepared to stipulate that the amended statute does not prohibit (1) that the Franchisees' advertising activities (using the same name and using joint adds) or (2) the purchasing of marketing and management advice from a franchisor, it is these restrictions on speech that are at issue in the First Amendment challenge.

The Commission's conduct verses speech argument fails because, as applied to the Plaintiffs, speech is the only thing being restricted.  The cases dealing with restrictions on conduct where there is an incidental impact on speech are not applicable in the present case.  In *United States v. O'Brien*, 391 U.S. 367 (1968) the Supreme Court did hold that statutes that are designed to regulate conduct rather than speech, but which have an incidental impact on speech, are to be treated differently than those that directly regulate speech.  In order "[t]o qualify as a regulation of communicative action governed by the scrutiny outlined in *O'Brien,* the State's regulation must be unrelated to expression."  *Lorillard Tobacco Co. v. Reilly/Altadis U.S.A. Inc. v. Reilly,* 533 U.S. 525, 567 (2001) (applying the lower Commercial Speech standard).[3]  As the Plaintiffs do not engage in any of the conduct identified in the Defendants' memorandum ("joint purchases of alcohol, joint purchases of various business services, and joint management services"), for the amendment to apply to the Plaintiffs at all, it must be targeted at the

---

[2] Peoples and the other W&SR franchisees also jointly acquire health insurance for their employees.  This employee benefit plan is covered by ERISA and is addressed separately below.

[3] As explained in the next section of the memorandum, most of the speech at issue in this case is not subject to the Commercial Speech standard of review.

expressive activity of giving management and marketing advice.[4]

To the extent that advertising and providing advice also include conduct as well as speech, where conduct and speech are so intertwined as to make them inseperable, full strict scrutiny applies. *Riley v. National Fed'n of the Blind*, 487 U.S. 781, 789 (1988) ("where, as here, the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an endeavor would be both artificial and impractical. Therefore, we apply our test for fully protected expression"); *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 959 (1984) ("charitable solicitations are so intertwined with speech that they are entitled to the protections of the First Amendment").

Unlike the assertions of the Commission that "speech is an incidental part of the[] prohibited actions," the restrictions of the amended statute, as applied to the plaintiffs, restrict only speech and association for expressive purposes. W&SR sells speech, not alcohol. The amendment, as applied to W&SR, therefore restricts only speech and not conduct. The amendment as applied to W&SR is therefore an abridgment of speech, subject to strict judicial scrutiny, and not a regulation of conduct that has only an incidental impact on speech. Peoples does not engage in any of the activities listed as prohibited on page 4 of the Defendants'

---

[4] Under the standard articulated in *O'Brien*, a regulation of conduct that has an incidental impact on speech will only survive,

> "if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of the interest." *O'Brien*, 391 U.S. at 377.

Memorandum.  The amended statute, as applied to Peoples must also be reviewed as a restriction of speech, not conduct.[5]

### C.   Commercial Speech Verses Non-Commercial Speech

Protected speech under the First Amendment can be divided into two categories: commercial speech and non-commercial speech.  *Central Hudson Gas & Electric Corp. v. Public Service Comm'n.*, 447 U.S. 557 (1980).  Commercial speech is subject to a lower, yet still stringent level of scrutiny.  *Lorillard Tobacco,* 533 U.S. at 555.  However, not all "speech for profit" is considered commercial speech.  Providing paid marketing and management advice, is not commercial speech and therefore is entitled to the full protection of the First Amendment.

Commercial speech is "speech which does '*no more than* propose a commercial transaction.'"  *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 762 (1976) (emphasis added).  The Supreme Court has found that not all speech of a commercial nature is "commercial speech."   Addressing a prohibition on commercial activities in state university dormitory rooms, the Supreme Court noted that the regulation: "would prohibit tutoring, legal advice, and medical consultation provided (for a fee) in students' dormitory rooms.  While these examples consist of speech for a profit, they do not consist of speech that ***proposes*** a commercial transaction, which is what defines commercial speech."  *Fox*, 492 U.S. at 482 (emphasis in original).

---

[5] Even if the *O'Brien* standard were applicable, the Commonwealth cannot show that the restrictions on speech contained within the amendment do not go further than is necessary in order to accomplish the Commonwealth's interests (*O'Brien*, 391 U.S. at 377 ("the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of the interest")) or that the interests advanced by the amendment are sufficiently important to justify the impact on speech (*Id*. (the incidental restriction on speech must "furthers an important or substantial governmental interest")).

The marketing and management advice provided by a franchisor to a franchisee is indistinguishable from "tutoring, legal advice, and medical consultation provided (for a fee)" used by the Court as examples of speech for profit that is accorded full First Amendment Protection.

To the extent that joint advertising activities engaged in by franchisees could be considered commercial speech, the burden of justification on the Commission remains impossibly high. *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*., 447 U.S. 557, 566 (1980) (government restriction on advertisements or other commercial speech is permissible only on a showing that (1) the advertising is misleading, (2) the government interest in regulation is substantial, (3) the regulation directly advances that interest, and (4) the regulation is not more extensive than necessary to serve the interest).[6]

It bears repeating that even though the business in issue concerns the sale of alcoholic beverages, that fact provides the State with no greater power to regulate speech, whether it is defined as commercial speech or not. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996).

---

[6] Five current Justices of the Supreme Court have suggested that the *Central Hudson* test should be abandoned and that strict judicial scrutiny should be the applicable standard for content-based restriction on truthful, nonmisleading commercial speech. *See 44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 501, 510-514, (1996) (joint opinion of Stevens, Kennedy, and Ginsburg, JJ.); *id.,* 517 U.S. at 517 (Scalia, J., concurring in part and concurring in judgment); *id.,* 517 U.S. at 518 (Thomas, J., concurring in part and concurring in judgment). *See also, Lorillard Tobacco Co. v. Reilly/Altadis U.S.A. Inc. v. Reilly,* 533 U.S. 525, 272 (2001) (concurring opinion of Thomas, J.) ("I continue to believe that when the government seeks to restrict truthful speech in order to suppress the ideas it conveys, strict scrutiny is appropriate, whether or not the speech in question may be characterized as 'commercial'"); *id.*, 533 U.S. at 571-72 (concurring opinion of Kennedy, J., joined by Scalia, J.) ("the [*Central Hudson*] test gives insufficient protection to truthful, nonmisleading commercial speech").

### D. The Commission Has the Burden of Justifying its Restriction of Non-Commercial Speech

In order for its restriction on non-commercial speech to survive strict judicial scrutiny, the Commission must meet a heavy burden of justification.

> "It is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny . . . Thus encroachment 'cannot be justified upon a mere showing of a legitimate state interest.' The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest . . . Moreover, it is not enough that the means chosen in furtherance of the interest be rationally related to that end. The gain to the subordinating interest provided by the means must outweigh the incurred loss of protected rights, and the government must 'emplo(y) means closely drawn to avoid unnecessary abridgment. . . .' '(A) State may not choose means that unnecessarily restrict constitutionally protected liberty. 'Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.' If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties.'" *Elrod v. Burns*, 427 U.S. 347, 362-63 (1976) (internal citations and footnote omitted).

The restriction on speech in this case is not content neutral. It prohibits a specific type of speech – paid marketing and management advice. Therefore, the Commission must prove that its ban is narrowly tailored to accomplish a compelling governmental interest. The Commission will be unable to meet this burden, and more pointedly, certainly cannot meet it by moving to dismiss the Complaint. The Commission has not even attempted to meet its burden of proving the existence of a sufficiently compelling interest or that the restrictions are narrowly tailored to meet such an interest.

When deciding a motion to dismiss, the court is required to "take the factual averments contained in the complaint as true, including every reasonable inference helpful to the plaintiff's cause." *Garitia Hotel Ltd. Partnership v. Ponce Fed. Bank*, 958 F.2d 15, 17 (1st Cir. 1992). A Complaint may not be dismissed "unless it appears *beyond doubt* that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v.*

*Gibson*, 355 U.S. 41, 45-46 (1957) (emphasis added).  The court may not consider the likelihood that the plaintiffs will be able to prove the factual allegations of their complaint; it must assume that the plaintiffs *will* prove those facts.  "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test."  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

Restrictions on speech are "presumptively invalid," *City of St. Paul*, 505 U.S. at 382, and the requisite heightened judicial scrutiny requires the Commission to prove both the sufficiency of the governmental interest and that the challenged statue is narrowly tailored to meet that interest, *Elrod*, 427 U.S. at 362-63.  Because the standard for a motion to dismiss draws "every reasonable inference helpful to the plaintiff's cause," the Commission cannot profit from the absence of more specific allegations in the Complaint negating the alleged governmental interest.

### E.   Even under the Commercial Speech Standard, the Plaintiffs have Plead a Valid Claim.

#### 1.      Development of Commercial Speech as a Doctrine

The concept of commercial speech, as a category of speech without First Amendment protections, first appeared in 1942.  *Valentine v. Chrestensen*, 316 U.S. 52 (1942).  The Court has steadily retreated from its position in *Valentine*.  *See e.g., Bigelow v. Virginia*, 421 U.S. 809 (1975) (striking down a Virginia statute that prohibited advertisements of abortions – "speech is not stripped of First Amendment protection merely because it appears in [a paid commercial advertisement]"); *Virginia Pharmacy Bd. v. Virginia Consumer Council*, 425 U.S. 748 (1976) (striking down a Virginia statute that outlawed price advertising by pharmacists); *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85 (1977) (holding that a township ordinance prohibiting the posting of real estate "For Sale" and "Sold" signs for the purpose of

stemming what the township perceived as the flight of white homeowners from a racially integrated community violated the First Amendment); *Rubin v. Coors Brewing Co.* (1995) (striking down a federal prohibition on identifying alcohol content on beer bottles); *44 Liquormart v. Rhode Island* (1996) (state ban on advertising the price of alcoholic beverages was a violation of the First Amendment); *Greater New Orleans Broadcasting Association v. United States* (1999) (reversing a lower court decision upholding a federal law banning broadcast advertising of casino gambling).

### 2.    The *Central Hudson* Test

In 1980, the Court developed a balancing test for commercial speech.  *Central Hudson Gas & Electric Corp. v. Public Service Comm'n.*, 447 U.S. 557 (1980)  The *Central Hudson* test, which remains the rule today, is a version of the test developed in *United States v. O'Brien*, 391 U.S. 367 (1968), for determining the constitutionality of content-neutral state regulations affecting speech or expression, but is applicable to even content based restriction of commercial speech.  Under *Central Hudson,* a government restriction on advertisements or other commercial speech is permissible only on a showing that (1) the advertising is misleading, (2) the government interest in regulation is substantial, (3) the regulation directly advances that interest, and (4) the regulation is not more extensive than necessary to serve the interest.  *Central Hudson*, 447 U.S. at 566.

### 3.    Application of *Central Hudson* to this Case

The Commission will not be able to satisfy either the third or fourth prongs of the *Central Hudson* test.  As the Supreme Court recently instructed this Commonwealth, in a case concerning advertising restriction on tobacco products:

"The third step of *Central Hudson* concerns the relationship between the harm that underlies the State's interest and the means identified by the State to advance that interest. It requires that 'the speech restriction directly and materially advanc[e] the asserted governmental interest. 'This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.'" *Lorillard Tobacco*, 533 U.S. at 555 (alterations in original), *quoting, Greater New Orleans Broadcasting Assn., Inc. v. United States*, 527 U.S. 173, 188 (1999).

The Commission will not be able to show that the elimination of paid marketing and management advice in the liquor retail industry advances the government's asserted interest in temperance. "A regulation cannot be sustained if it 'provides only ineffective or remote support for the government's purpose . . . or if there is 'little chance' that the restriction will advance the State's goal." *Lorillard Tobacco*, 533 U.S. at 566, *quoting, Edenfield v. Fane*, 507 U.S. 761, 770 (1993) and *Greater New Orleans*, 527 U.S. at 193. The Commission will also be unable to show that the prohibition of franchises is no more restrictive than is necessary to serve that interest. *Lorillard Tobacco*, 533 U.S. at 561 ("The final step of the *Central Hudson* analysis . . . requires a reasonable fit between the means and ends of the regulatory scheme"); *Lorillard Tobacco*, 533 U.S. at 563 ("the range of communications restricted seems unduly broad. For instance, it is not clear from the regulatory scheme why a ban on oral communications is necessary to further the State's interest").

## II.     **First Amendment – Expressive Association**.

The act of association cannot be made illegal merely because the state makes associating together illegal. The Commission essentially argues that because it has made the act of association by more than three liquor store owners illegal, any association of more than three liquor store owners is an association for an illegal purpose and thus not protected by the First Amendment. The act of association at issue is not an association for an illegal purpose, other

than the illegal purpose of associating. The pre-amendment language of the statute did not prohibit the purchase of alcohol from distributors – a perfectly legal act; it prohibited the <u>combination</u> of more than three licensees for the purpose of controlling more than ten percent of the beneficial interest of more than three licenses. *Johnson v. Martignetti*, 374 Mass. at 789, 375 N.E.2d at 295.

The amended language goes even further. It prohibits "participat[ion] in decisions regarding the purchasing of alcoholic beverages." Under the amended language it is not only joint purchases from distributors that is illegal, it is any participation in the process of deciding what to buy is banned.

The impact of the amended statute on expressive and associative rights protected by the First Amendment can be seen by examining another organization apparently barred by it. The Massachusetts Package Store Association, Inc. (MassPack) is a lobbying organization made up of a number of liquor store owners, including Plaintiff Haronian, who serves as a vice-president of the group. **Exhibit E** – MassPack webpage, pp.1, 25. Because MassPack is an "association, or other combination of persons . . . [who] participate in decisions regarding the purchasing of alcoholic beverages or the purchasing of insurance or accounting or bookkeeping services, . . . or participate in any other action designed to effect common results of more than 3 licensees under this section" some of its activities are clearly proscribed by the amendment to Section 15. MassPack "furnish[es its] members with information and advice concerning matters relevant to the beverage alcohol industry." **Exhibit E**, p.1. Its members work together to get better deals from distributors and work together on purchasing strategies. **Exhibit E**, p.6 (noting that members who attend MassPack's trade show will be able to "VISIT suppliers and distributors to plan your holiday buying strategy"). As the motto on the MassPack newsletter states, there is

"Strength in Unity." **Exhibit F**, p.1. MassPack's members work together to secure better deals on various business services, including insurance. **Exhibit E**, p.14. *See also*, **Exhibit F**, p.5 (describing MassPack's "POWER in Numbers" program by which its members receive a discount on energy services by "[c]apitalizing on MassPack's volume buying power"). Indeed, except for the use of a common name, MassPack functions like a franchisor.[7] To the extent that the amended statute reaches the activities of the W&SR franchise and its franchisees, it must also reach the similar activities of MassPack.

Under the Commission's argument, the protection of the First Amendment's Freedom of Association Clause does not apply to MassPack because MassPack is an association for an illegal purpose in the same way the Commission argues that the W&SR franchise is an association for an illegal purpose. But the store owners who have banded together through MassPack to negotiate better deals for insurance and other business services, to work with suppliers and distributors, to work together in planning marketing strategies, to share advice on the effective operating of their stores, and to take advantage of "Strength in Unity" are only associating for an illegal purpose because the Commonwealth has made the <u>act of association</u> illegal. It is not because the members' underlying activity (running individual liquor stores) is illegal; it is because associating together to achieve that otherwise legal end has been outlawed by the Commonwealth.

Long ago, the Supreme Court held that the members of the NAACP cannot be denied the right to associate by a state merely outlawing more than three African-Americans working

---

[7] It may be that MassPack provides its members with some in-store sign or decal to indicate membership. If so, MassPack functions like a franchise in all respects.

together for a common goal, and then declaring the NAACP an association for an illegal purpose.

> "It follows from these considerations that, consistently with the Federal Constitution, peaceable assembly for lawful discussion cannot be made a crime. The holding of meetings for peaceable political action cannot be proscribed. Those who assist in the conduct of such meetings cannot be branded as criminals on that score.  The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects."

*De Jonge v. Oregon*, 299 U.S. 353, 365 (1937).

"[I]t is immaterial whether the beliefs sought to be advanced by association pertain to political, *economic*, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny."  *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460-461 (1958) (emphasis added).  The franchisees of W&SR associate with W&SR so that they can benefit from the marketing and management advice provided by W&SR.   It is this management and marketing advice that the amendment targets.   The amendment does not have merely an incidental effect on association for purposes of speech.  The amendment's purpose and effect is to eliminate marketing and management advice, which is speech, in the liquor retail industry.  In the present case, the Commission cannot show that the statute is narrowly tailored to achieve the interest that it claims motivated its adoption.  *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984) ("Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms").

**III.    W&SR's and Peoples' Regulatory Takings Claim Should Not Be Dismissed As They Had Reasonable Investment Backed Expectations In Their Ability To Enter Franchise Agreements.**

In their complaint, W&SR and Peoples assert that the amendment to M.G.L. c. 138, § 15 interferes with existing contractual relationships, *i.e.* franchise agreements, thereby constituting a regulatory taking in violation of the Fifth Amendment of the United States Constitution.    The Commission argues that claim should be dismissed because there is no taking since Peoples and W&SR did not have reasonable investment backed expectations in their contracts.    For the reasons discussed below, this is not the case.

Peoples is a Massachusetts Corporation that holds three Section 15 licenses to operate retail stores engaged in the business of selling alcoholic beverages for off-site consumption. Peoples is also a franchisee of WS&R.    At the time Peoples entered into the franchise agreement with W&SR, it had reasonable investment backed expectations based on W&SR's operation in Rhode Island, consisting of twelve franchises, that the franchise fee would decrease over time as the number of franchisees in the Commonwealth grew and W&SR's costs could be defrayed amongst them.

In 1994, W&SR entered into a Franchise Agreement with DW&SR of Fall River, Inc., which was simultaneously seeking approval of the transfer of a Section 15 license from another company to itself.    Despite having local approval of the Franchise Agreement and verbal assurances by Alcoholic Beverages Control Commission that the Franchise Agreement would be approved at the state level as well, W&SR and Peoples were forced to void the Franchise Agreement as a result of the amendment to Section 15.    The new legislation was surprising and contradicted W&SR's investment backed expectations where, as more fully discussed below, the Commission had previously allowed Section 15 license holders to operate as franchisees of large

chain stores such as White Hen Pantry, 7-11, and others. Because Section 15 has foiled the reasonable investment backed expectations of W&SR and Peoples, their regulatory takings claims cannot be dismissed.

The Supreme Court has established that the government's interference with certain intangible rights, including contract rights, creates a colorable takings claim.

> "Although takings problems are more commonly presented when 'the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good,' *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (citation omitted), economic regulation [] may nonetheless effect a taking, see *Security Industrial Bank,* [103 S.Ct. 407, 412 (1982)]. See also *Calder v. Bull,* 3 Dall. 386, 388, 1 L.Ed. 648 (1798) (opinion of Chase, J.) ("It is against all reason and justice" to presume that the legislature has been entrusted with the power to enact "a law that takes *property* from A. and gives it to B")." *Eastern Enterprises v. Apfel*, 524 U.S. 498, 522 (1998).

Fifth Amendment protection "is not restricted to physical invasions, occupations, or removals of property; in some cases, overly assiduous government regulation can create an unconstitutional taking. Whether a particular restriction implicates the Takings Clause is context-sensitive and hinges on the specific circumstances. See *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958)." *Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178, 190 (1st Cir. 1999).

Contracts have been recognized as "property" which cannot be taken without just compensation. *See U.S. Trust Co. of New York v. New* Jersey, 431 U.S. 1, 19 (1977); *Lynch v. U.S.*, 292 U.S. 571, 579 (1934); *Puerto Rico Telephone Co. v. Telecommunications Regulatory Bd. Of Puerto Rico*, 189 F.3d 1, 16 (1st Cir. 1999).

> "[T]he process for evaluating a regulation's constitutionality involves an examination of the 'justice and fairness' of the governmental action. See *Andrus,*

[444 U.S. 51, 65 (1979)]. That inquiry, by its nature, does not lend itself to any set formula, see *ibid.*, and the determination whether  'justice and fairness' require that economic injuries caused by public action [must] be compensated by the government, rather than remain disproportionately concentrated on a few persons, is essentially ad hoc and fact intensive, *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979) (internal quotation marks omitted)." *Eastern Enterprises, supra, at 523.*

Where a regulation places limitations on a property right that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 617-18 (2001). "These inquiries are informed by the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Id.* quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)."

The Commission challenges the regulatory takings claims of Peoples and W&SR on the basis that they did not have "reasonable investment backed expectations."  Even the courts have struggled to adequately define this term.  *See Philip Morris, Inc. v. Reilly,* 312 F.3d 24, 36 (1st Cir. 2002) *citing* R.S. Radford & J. David Breemer, *Great Expectations: Will Palazzolo v. Rhode Island Clarify the Murky Doctrine of Investment-Backed Expectations in Regulatory Takings Law?,* 99 N.Y.U. Envtl. L.J. 449, 449-50 (2001).  "Some very general contours are clear. Courts protect only *reasonable* expectations. Ideally, the relevant inquiry should recognize that not every investment deserves protection and that some investors inevitably will be disappointed. *See* Frank I. Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law,* 80 Harv. L.Rev. 1165, 1213 (1967). However, beyond the general

landscape, there is a paucity of clear landmarks that can be used to navigate the terrain." *Id.* at 36-37.

The Commission, citing *Eastern Enter. v. Chater*, 110 F.3d 150 (1st Cir. 1997) ("those who conduct business in historically regulated fields cannot object if the legislative scheme is buttressed by subsequent amendments to achieve a legislative end"), claims that Plaintiffs could not have had reasonable investment backed expectations because retail liquor is a "historically regulated field." However, the Commission misinterprets *Eastern* by implying that all new regulation in a highly regulated area is *per se* constitutional. Such an interpretation would eviscerate Fifth Amendment protection. In fact, *Eastern* and the cases it cites stand for the proposition that if an industry is highly regulated, this merely is a factor in determining whether investment backed expectations were reasonable.

W&SR and Peoples agree that the sale of alcoholic beverages is highly regulated. Nevertheless, their investment backed expectations were reasonable given the Commission's past allowance of Section 15 license holders to sell alcoholic beverages for off-premises consumption within franchise establishments. "The Commonwealth has maintained a policy relative to franchise package goods stores which allows a chain to operate more than three licenses under its 'doing business as' (dba) provided that the additional licenses are independent and no financial benefit is made between franchisor and franchisee relative to the liquor license or its operation." *White Hen Pantry, 660 Industrial Drive, Elmhurst, IL*, November 1993 (Commission determined that White Hen's loan to franchisee for purposes of buying liquor license violated G.L. c. 138, § 25; attached as **Exhibit C**). In a later decision, the Commission clarified the "no financial benefit condition" by stating that a franchisor "may not derive revenue based upon the independent owner's alcoholic beverage sales volume." *Osco Drug of MA, Inc.,*

*132 Granite Street, Quincy*, May 1994 (Osco Drug allowed to operate under its Section 15 license on the premises of a chain supermarket holding three other Section 15 licenses; attached as **Exhibit A**). Consistent with this decision, the Commission approved the sale of liquor in 7-Eleven stores with the franchisor receiving a flat fee. W&SR revised its Franchise Agreement with DW&SR of Fall River, Inc. to reflect a flat fee at the specific direction of the Commission. This agreement had been approved at the local level and was pending final approval before the Commission at the time the amendment to Section 15 was enacted.

The expectation that the franchise arrangement would be permissible was based not only on the Commission's past practices with respect to franchises, but also on the fact that independent licensees may currently obtain similar services from individual consulting, marketing, advertising or accounting firms without violating Section 15 even as amended. Additionally, the Commission has allowed MassPack to provide many of the same services to its members for years without objection. See **Section II,** *supra* **at p. 18,** (services include providing "information and advice concerning matters relevant to the beverage alcohol industry," working together to get better deals from distributors and to form purchasing strategies, and securing better deals on various business services, including insurance). Based on all of the forgoing, W&SR and Peoples did have reasonable investment backed expectations in W&SR's ability to enter into franchise agreements with independent licensees.

While the Supreme Court has not directly addressed the interaction between the state sovereign immunity recognized in Eleventh Amendment jurisprudence and the Fifth Amendment's requirement of just compensation for takings, the Court has described the Fifth Amendment as "self-executing" "with respect to compensation." *United States v. Clarke*, 445 U.S. 253, 257 (1980). *See also, First English Evangelical Lutheran Church v. Los Angeles*

*County*, 482 U.S. 304, 316 (1987) ("in the event of a taking, the compensation remedy is required by the constitution").

A motion to dismiss, should not be granted unless it is apparent beyond doubt that the plaintiffs can prove no set of facts in support of their claim that would entitle them to relief, with the Court indulging all reasonable inferences in their favor, *Greene v. State of R.I.*, 498 F.3d 45 (1st Cir. 2005). As discussed above, whether a governmental action constitutes a regulatory taking is a highly fact intensive inquiry, s*ee Eastern Enterprises, supra, at 523.* There is little guidance as to what constitutes reasonable investment backed expectations, *Philip Morris, supra*, at 36-37. In light of the foregoing, this court cannot now determine that there is no set of facts under which W&SR and Peoples can prevail. Accordingly, the Commission's motion to dismiss the plaintiffs' regulatory takings claim must be denied.

## IV.    W&SR's and Peoples' Equal Protection Claim Should Not Be Dismissed as There Is No Rational Relationship Between Section 15 and a Legitimate Governmental Interest.

Prior to the 2004 amendment to Section 15, the statute prohibited any person, firm, corporation, association or combination of persons from holding more than three licenses to sell alcoholic beverages for off-premises consumption. As a result of the 2004 amendment, the statute also now prohibits any person, firm corporation, association or combination of persons from "participat[ing] in decisions regarding the purchasing of alcoholic beverages or the purchasing of accounting or bookkeeping services, or receiv[ing] any percentage or fee derived from gross revenues in exchange for management assistance, or **participat[ing] in any other actions designed to effect common results of more than three licensees** (emphasis supplied)." By this language, the statute effectively prohibits W&SR from entering into franchise agreements with more than three licensees because the services provided as part of the franchise

arrangement could be construed as effecting common results, despite the fact that these services are provided for a flat fee. The Commonwealth has enacted no similar prohibition against effecting common results amongst licensees selling alcoholic beverages for on-premises consumption. Indeed, numerous franchise restaurants within the Commonwealth are allowed to engage in the business of selling alcohol to the public for on-premises consumption (some examples include TGI Fridays, Applebees Neighborhood Grill & Bar, 99 Restaurants) while being able to take "actions effect[ing] common results" in order to take advantage of economies of scale, greater buying power, name recognition, and other strategies to maximize liquor sales revenues and minimize costs amongst license holders. Because licensees for off-premises consumption are prohibited from doing the same, the amendment to Section 15 disadvantages the plaintiffs' businesses, with no rational basis for doing so. Clearly the amendment reflects the power of certain interests groups, rather than any rational purpose of government.

"The Equal Protection Clause requires 'that cities, states and the Federal Government must exercise their powers so as not to discriminate between their inhabitants except upon some reasonable differentiation fairly related to the object of regulation.' …'[E]qual protection of the laws means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or classes in the same place and under like circumstances (citations omitted).'" *Mills v. State of Maine*, 118 F.3d 37, 46-47 (1st Cir. 1997). Even statutes that do not restrict fundamental rights or adversely affect members of a protected class still must bear a rational relationship to a legitimate governmental interest. *See Walker v. Exeter Region Co-op. School Dist.*, 284 F.3d 42, 44 (1st Cir. 2002) (statute setting forth the percentage of votes required for a school district or municipality to issue bonds or notes rationally related to

legitimate state interest of overcoming inaction due to passive minority voters).[8]  Section 15, as amended, denies equal protection of the law to franchises selling alcohol for off-premises consumption by arbitrarily denying them certain business advantages that can be gained from entering into franchise agreements, while allowing chains selling alcohol for on-premises consumption to benefit from such arrangements.

The Commission argues that the amendment to Section 15 is merely an extension of the original three-license limit which survived an equal protection challenge in 1978, *see Johnson v. Martignetti,* 371 Mass. 784 (1978), and that the same reasonably conceivable rationales apply. However, during the 27 years since *Johnson*, it has become clear that the interests cited therein by the court bear no rational relationship to the prohibition of franchise arrangements. Additionally, the amendment to §15 does not address the same concerns at issue in *Johnson*. The amendment does not address ownership of beneficial interest, it addresses business relationships between independently owned stores.

With respect to state interests, the *Johnson* court stated:

"Concentration of retailing in the hands of an economically powerful few has been thought to intensify the dangers of liquor sales stimulations, thereby threatening trade stability and promotion of temperance.  Regulation of the number of licenses issued, therefore, aims at controlling the tendency toward concentration of power in the liquor industry, preventing monopolies; avoiding practices such as indiscriminate price cutting and excessive advertising; and preserving the right of small independent liquor dealers to do business."  *Id.* at 792.

These concerns do not apply to franchises because each franchise is independently owned

---

[8] In the present case, the statute does restrict fundamental rights to speech and assembly as discussed above.  This Court need only reach the Equal Protection issue if it concludes that the First Amendment rights addressed above are not implicated in this case.

and operated with its own financial records, managers and employees, and individual accounts with distributors. Prices are independently set by each franchisee and there is no commingling of revenue or inventory amongst franchisees. As a result, practices such as indiscriminate price cutting do not occur, and monopolies are no more likely to be created (even if a less competition were the result, the effect would be artificially high prices which some argue tends to promote the goal of temperance).

The intent of the franchise arrangement is to allow independent owners/licensees to benefit from certain competitive advantages designed to attract existing business from competing stores. These advantages include a store name with name recognition, with advertising under same, as well as access to advice and training on proven marketing and operations strategies. The amendment to Section 15 does nothing to further temperance where advertising content is not regulated and store owners are not prohibited from launching individual campaigns to create new business or increase sales. Additionally, there is no basis for the proposition that people who abstain from drinking alcoholic beverages will be compelled to start merely because a package store name is familiar to them, or that name recognition alone induces customers already in the store to buy more than they otherwise intended. This is akin to the ridiculous notion that people who do not smoke cigarettes are more likely to start smoking if they pass by a CVS store selling cigarettes than if they pass by an individually owned convenience store selling cigarettes. Finally, franchising cannot affect trade stability where it has no impact on the number of licenses issued, and the number of licenses issued is based on a quota system directly related to the population in any particular geographical area. *See* M.G.L. c.138, §17.

Since W&SR and Peoples intend to prove facts at trial demonstrating that the Commission has in fact allowed franchises to sell liquor for years without any of the adverse

impacts on a legitimate state interest expressed by the *Johnson* court, *see Greene, supra*, the Court should not dismiss their claim that Section 15 as amended violates their equal protection rights.

## V.    Commerce Clause

Although this case involves the sale of alcoholic beverages, the Twenty-First Amendment will play no role in the outcome of the Plaintiffs' Commerce Clause claim.    The Commonwealth's power under the Twenty-First Amendment is limited to restrictions on "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof."    All other restrictions on commerce within the alcoholic beverage industry are subject to the Commerce Clause.    *Healy v. Beer Institute, Inc*., 491 U.S. 324 (1989) (statute requiring wholesalers to post prices and forbidding prices higher than charged by the wholesaler in neighboring state violates commerce clause); *Brown-Forman Distillers Corp. v. New York State Liquor Auth*., 476 U.S. 573 (1986) (price schedule unconstitutional as attempt to put in state consumers at a competitive advantage); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984) (invalidating Hawaii statute exempting locally produced form of alcohol from tax).    Because the "Transportation or Importation" of alcohol is not at issue, only the regulation of retail sales, the Commonwealth's Twenty-first Amendment power to regulate the importation of alcohol is not implicated.

The commodity being sold by the Plaintiff Franchisor is advice, not liquor.  The Twenty-First Amendment does not apply to the selling of advice.  The Franchisor does not own any liquor stores or liquor licenses, does not buy or sell any alcoholic beverages, and does not import or transport alcoholic beverages.  The Commission's effort to extend the reach of the Twenty-First Amendment to include the sale of marketing and management advice demonstrates the

absurdity of the position that the Twenty-First Amendment is a complete repeal of the Commerce Clause with regard to any commercial activity connected to the sale of alcoholic beverages.

What the Commission must justify is a statute that bans an out of state franchise from operating in a particular industry; and a statute that precludes a Rhode Island business from contracting with more than three Massachusetts businesses for the sale of its services.

Similarly, the individual Plaintiff, Haronian, a Rhode Island Resident and precluded from freely selecting the members of the board of directors for his Massachusetts liquor stores. He is required to maintain a majority of Massachusetts residences on the Board.

The Plaintiffs' Commerce Clause claims will be informed by the soon to be announced decisions in *Granholm v. Heald*, S.Ct. No. 03-1116; *Michigan Beer & Wine Wholesalers Assoc. v. Heald*, S.Ct. No. 03-1120; and *Swedenburg v. Kelly*, S.Ct. No. 03-1274 (all argued Dec. 7, 2004). The Plaintiffs ask this Court to wait for the Supreme Court's pending guidance on this issue.

## VI.    ERISA.

One of the typical ways franchisors benefit their franchisees is by offering them significantly cheaper benefits packages for their employees. As a franchisor, W&SR offers umbrella insurance policies to the franchisees. These polices provide health insurance and life insurance to the employees of the franchisees. W&SR does not have umbrella insurance policies provided "solely for the purpose of complying with applicable workmen's compensation laws or unemployment compensation or disability insurance laws." *Defendants' Memorandum in Support of Motion to Dismiss*, p.17, *citing* 29 U.S.C. §1003(b)(3) (excluding state workmen's

compensation, unemployment compensation or disability insurance laws from ERISA's preemption).  The joint insurance being prohibited by the amended statute, as applied to the Plaintiffs, is an "employee welfare benefit plan," which is defined by Section 3(1) of ERISA as:

> "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death . . ."  29 U.S.C. §1002(1).

W&RS's umbrella health and life insurance policies do constitute an employee welfare benefit plan under ERISA.  The Commission's effort to ban W&SR from providing this employee welfare benefit to more than three franchisees clearly falls within ERISA Section 514's preemption, found at 29 U.S.C. §1144(a) ("the provisions of this subchapter . . . shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan").

Unlike the suggestion of the Commission that the term "relate to" in  §514(a) should be read narrowly, the Supreme Court has held that the phrase should be construed expansively.  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983) ("A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan" – holding that state law against pregnancy discrimination was preempted by ERISA).  The amendment relates to an employee benefit plan in this case because it bans certain entities from offering health insurance.  The *Shaw* Court went on to note that:

> "Congress used the words 'relate to' in §514(a) in their broad sense.  To interpret §514(a) to preempt only state laws specifically designed to affect employee benefit plans would be to ignore the remainder of §514.   It would have been unnecessary to exempt generally applicable state criminal statutes from pre-emption in §514(b), for example, if §514(a) applied only to state laws dealing specifically with ERISA plans."  *Shaw*, 463 U.S. at 98.

The Commission's defense against the ERISA claim seems almost entirely based on the misperception of the Plaintiffs' claims as facial challenge, rather than a challenge to how the amended statute is being applied to the Plaintiffs to block the addition of more franchisees, including the banning of W&SR from providing health and life insurance for the employees of more than three franchisees. The savings for the prospective franchisee that comes from the umbrella insurance policy offered by a franchisor is one of the major benefit that attracts store owners towards becoming franchisees.

The numerous store owners who make up MassPack also "participate in decisions regarding. . . the purchasing of insurance" in violation of the amended statute. **Exhibit E**, p.14 (MassPack webpage explaining the insurance benefits available to its members, including workmens' compensation insurance). While the insurance benefits offered by MassPack would not fall under ERISA (*see* 29 U.S.C §1002(5)), the efforts of MassPack's multiple package store owners to work together to purchase insurance does apparently fall within the amendment's prohibition. It is precisely this type of state meddling in the availability of employee benefit plan that ERISA forbids.

## CONCLUSION

For the foregoing reasons, the plaintiffs respectfully submit that the Commission's motion to dismiss should be denied.

By their Attorneys,

       /s/  Evan Lawson
Evan T. Lawson        (BBO# 289280)
Robert J. Roughsedge  (BBO# 638180)
Michael Williams      (BBO# 634062)
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210-1736
Telephone: (617) 439-4990
Facsimile:  (617) 439-3987