No. 05-1549

IN THE

# UNITED STATES COURT OF APPEALS
### FOR THE FIRST CIRCUIT

————

WINE & SPIRITS RETAILERS, INC., *et al.*,

*Plaintiffs-Appellants,*

*v.*

STATE OF RHODE ISLAND AND
PROVIDENCE PLANTATIONS, *et al.*,

*Defendants-Appellees.*

————

ON APPEAL FROM AN INTERLOCUTORY ORDER OF THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

APPELLANTS' BRIEF

Evan T. Lawson  (20650)
Robert J. Roughsedge  (70742)
Michael Williams  (47144)
Lawson & Weitzen, LLP
88 Black Falcon Avenue
Boston, MA 02210-1736
Telephone: (617) 439-4990
Facsimile:  (617) 439-3987

April 26, 2005

## CORPORATE DISCLOSURE

Pursuant to Fed.R.App.P. 26.1, Plaintiff-Appellant Wine & Spirits Retailers, Inc. hereby makes the following disclosures:

1.     Wine & Spirits Retailers, Inc. is not a subsidiary or affiliate of a publicly owned corporation.

2.     Wine & Spirits Retailers, Inc. is not affiliated or in any way connected with a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

# TABLE OF CONTENTS

Corporate Disclosure ............................................................................. i

Table of Authorities ............................................................................ iii

Jurisdictional Statement ...................................................................... 1

  I.    Jurisdiction In The District Court ........................................... 1

  II.   Jurisdiction In This Court ...................................................... 1

  III.  Time Line ................................................................................ 1

  IV.   Form of Judgment Appealed.................................................. 1

Statement Of Issues............................................................................. 2

Statement Of The Case ........................................................................ 3

Statement Of The Facts ....................................................................... 4

Summary Of The Argument ................................................................ 8

Argument ............................................................................................ 10

  I.    Standard of Review .............................................................. 10

  II.   Standing ............................................................................... 15

  III.  Nature of W&SR's Claims (As Applied and Facial challenge) .............. 17

  IV.   First Amendment – Speech.................................................. 18

        A.   The Relationship Between the First and Twenty-First
             Amendments. .............................................................. 18

        B.   The Amendments Regulate Speech not Conduct. ........... 19

        C.   The Defendants' Burden in Justifying the Restrictions on
             Speech. ........................................................................ 26

        D.   Restrictions with an Incidental Impact on Speech............. 35

  V.    First Amendment – Association ........................................... 37

  VI.   Equal Protection .................................................................. 41

  VII.  No Evidence of Sufficiency of the Interest or of Tailoring ............ 45

  VIII. Irreparable Harm .................................................................. 47

  IX.   Balance of the Harms and Public Interest............................. 49

Conclusion........................................................................................... 49

# TABLE OF AUTHORITIES

**Cases**

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) .................................................. 11, 13, 18, 19, 28, 39, 46

*Adarand Constructors v. Peña*, 515 U.S. 200 (1995) .......................................... 47

*Ashcroft v. A.C.L.U.*, 542 U.S.__, 124 S.Ct. 2783, 159 L.Ed.2d. 690 (2004) ........................................................................ 14

*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991) .............................................. 34

*Board of Trustees of State University of New York v. Fox*, 492 U.S. 469 (1989) ........................................................... 15, 19, 27

*Buckley v. Valeo,* 424 U.S. 1 (1976) .............................................................. 34, 47

*Burson v. Freeman,* 504 U.S. 191 (1992) ............................................................. 33

*Central Hudson Gas & Electric Corp. v. Public Service Comm'n.*, 447 U.S. 557 (1980) .......................................................... 11, 28, 29

*City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993) ........................... 46

*City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985) ...................................................................................... 42

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618 (1st Cir.1995) ................................................................ 14

*Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corporation*, 990 F.2d 25 (1st Cir. 1993) .................................. 14

*Cohen v. Brown University*, 809 F.Supp. 978 (D. R.I. 1992), *aff'd* 991 F.2d 888 (1st Cir. 1993) ........................................... 49

*De Jonge v. Oregon*, 299 U.S. 353 (1937) ....................................................... 38

*Donovan v. City of Haverhill*, 311 F.3d 74 (1st Cir. 2002) ................................ 17

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ........................................................ 47

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) .......................................................... 39, 40

*Edenfield v. Fane*, 507 U.S. 761 (1993) ...................................................... 29, 45

*Elrod v. Burns*, 427 U.S. 347 (1976) ....................................................... 13, 27, 48

*Fowler v. Rhode Island*, 345 U.S. 67 (1953) ................................................ 43, 44

*Gately v  Comm. of Mass.*, 2 F.3d 1221 (1st Cir. 1993), *cert. denied*, 511 U.S. 1082 (1994) ................................................. 14

*Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539 (1963) .................................................................. 13, 42

*Greater New Orleans Broadcasting Association v. United States*, 527 U.S. 173 (1999) .......................................... 12, 15, 18, 28, 29, 30, 31, 45, 46

*Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42 (1st Cir. 2003) ........................... 14

*Kusper v. Pontikes*, 414 U.S. 51 (1973) ................................................................. 13

*Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85 (1977) ........................................................................................................... 31

*Lorillard Tobacco Co. v. Reilly/Altadis U.S.A. Inc. v. Reilly*, 533 U.S. 525 (2001) .......................................... 11, 19, 25, 28, 29, 32, 36, 39, 45, 46

*M.C. Woonsocket, Inc. v. Hittner*, 1998 R.I. Super. LEXIS 62 ............................. 4

*Martin v. City of Struthers,* 319 U.S. 141 (1943) ................................................. 32

*Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241 (1974).......................... 34

*NAACP v. Alabama,* 357 U.S. 449 (1958)....................................................... 37, 38

*New Hampshire Right to Life PAC v. Gardner*, 99 F.3d 8 (1st Cir.1996) ................................................................................................... 16

*Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972) ................... 14, 42, 43, 44

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ....................................... 18, 33, 34

*Riley v. National Fed'n of the Blind*, 487 U.S. 781 (1988) ................................. 37

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) ...................................... 38

*Schad v. Borough of Mount Ephraim*, 452 U.S. 61 (1981) ............................ 12, 42

*Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947 (1984) ................................................................................................ 16, 37

*Time, Inc. v. Pape*, 401 U.S. 279 (1971).............................................................. 11

*United States v. O'Brien*, 391 U.S. 367 (1968) .............................................. 35, 36

*United Transp. Union v. State Bar of Michigan*, 401 U.S. 576 (1971) ............................................................................................................ 40, 41

*Uno v. City of Holyoke*, 72 F.3d 973 (1st Cir. 1995)............................................ 11

*Village of Hoffman v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ............................................................................................................ 17

*Village of Schaumburg v. Citizens for a Better Environment*, 44 U.S. 620 (1980)........................................................................................... 15

*Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748 (1976)........................................................................................... 27

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)............................................ 25

*Zablocki v. Redhail*, 434 U.S. 374 (1978) ........................................................... 42

iv

## Statutes

28 U.S.C. §1292 ................................................................................................. 1

28 U.S.C. §1331 ................................................................................................. 1

28 U.S.C. §1343 ................................................................................................. 1

Massachusetts General Laws, Chapter 138 §15 ........................................... 30

Rhode Island General Laws, §3-5-1 ................................................................ 7

Rhode Island General Laws, §3-5-11 ................................... 9, 16, 20, 26, 30, 35

Rhode Island General Laws, §3-5-11.1 .................................... 9, 10, 16, 26

Rhode Island General Laws, §3-5-7 ................................................................ 7

## Other Authorities

Mothers Against Drunk Driving,  http://www.madd.org/ ................................... 44

## Rules

Federal Rules of Appellate Procedure, Rule 32(a) ............................................ 50

# JURISDICTIONAL STATEMENT

## I.      Jurisdiction In The District Court

The District Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 as a civil action arising under the Constitution and laws of the United States, and pursuant to 28 U.S.C. §1343(3) because injunctive relief is sought to redress the deprivation, under color of state law of rights secured by the Constitution.

## II.     Jurisdiction In This Court

Jurisdiction in this Court is proper pursuant to 28 U.S.C. §1292(a)(1).

## III.    Time Line

This case commenced on September 28, 2004.  The District Court for the District of Rhode Island heard Plaintiffs-Appellants' motion for a preliminary injunction on March 16, 2005.  That motion was denied on Friday, April 8, 2005. The Plaintiffs-Appellants filed a timely notice of appeal on Tuesday, April 12, 2005, simultaneously moving in the District Court for an injunction pending appeal.  On Wednesday, April 13, 2005, the Plaintiffs-Appellants moved this Court for an expedited briefing schedule, which was granted on April 19. 2005.

## IV.    Form of Judgment Appealed

The decision of the District Court appealed from is an interlocutory order denying a preliminary injunction.

1

## STATEMENT OF ISSUES

(1)     Should the District Court have applied more stringent scrutiny to statutory amendments that selectively restrict advertising and providing paid business advice?

(2)     Does a ban on joint advertising by liquor stores constitute a restriction on speech?

(3)     Does a ban on the use of a common trade names by liquor stores constitute a restriction on speech?

(4)     Does a ban on association by liquors stores in order to advertise and share ideas constitute a restriction of the First Amendment right of freedom of expressive association?

(5)     Is joint advertising by businesses speech or action, or a combination of the two, for purposes of First Amendment analysis?

(6)     Does the Equal Protection Clause require review under strict scrutiny of a state statute that singles out one class of businesses, liquor stores, to restrict their fundamental rights to freedom of speech and association?

(7)     When a state, in opposing a motion for a preliminary injunction against enforcement of restrictions on speech and association, bears the burden under strict scrutiny of showing both the sufficiency of the government's interest

and the effectiveness and narrowness of the means chosen, and fails to present any evidence of either, has the plaintiff established a strong likelihood of success?

## STATEMENT OF THE CASE

This is an action by Wine & Spirits Retailers, Inc., a Rhode Island corporation in the business of franchising liquor store operations in Rhode Island and Massachusetts and John Haronian, its owner (jointly, W&SR), against the State of Rhode Island and Jeffrey J. Greer, the Associate Director of the Rhode Island Department of Business Regulation, for declaratory and preliminary injunctive relief against the application of two recent amendments to the Rhode Island Liquor Control Act. W&SR challenges the amendments as violating their First Amendment rights to freedom of speech and expressive association, and their right to equal protection of the laws guaranteed by the Fourteenth Amendment.[1]

On February 14, 2005, a group calling itself the United Independent Liquor Retailers of Rhode Island (UILRRI) intervened to "defend the constitutionality of statutes that it was instrumental in moving to successful passage into law." *UILRRI's Motion to Intervene as a Party Defendant*, Add. 26.

---

[1] The Plaintiffs-Appellants also challenge the amendments on other grounds not at issue in the motion for a preliminary injunction addressed in this appeal.

The District Court denied W&SR's motion for a preliminary injunction on April 8, 2005.  This appeal followed.

## STATEMENT OF THE FACTS

Currently eleven retail liquor stores in Rhode Island and three in Massachusetts are franchisees of W&SR and operate under the licensed trade names Douglas Wine & Spirits and Peoples' Liquor Warehouse.  Rhode Island's Liquor Control Statute was amended to deprive the franchisees of the benefits of the franchise relationship and put W&SR out of business to protect the members of UILRRI from competition.

Rhode Island has banned chain store organizations from owning liquor stores for some time.  Determining what constitutes a chain had been delegated to the Department of Business Regulation, which defined a "chain store organization" as comprised of two or more stores with "common ownership." *M.C. Woonsocket, Inc. v. Hittner*, 1998 R.I. Super. LEXIS 62, *9.  W&SR's franchising business complied with this law and operated for seven years with Rhode Island's approval.  *District Court Opinion Denying Preliminary Injunction*, Addendum ("Add.") p. 2.

UILRRI "and its members were directly involved in the drafting and passage of the new statutes challenged by plaintiffs." *Memorandum In Support of*

4

*Intervention*, Add. 32.   When asked by the District Court what the purpose of the amendments is, counsel for UILRRI proudly acknowledged that the purpose is to eliminate a competitor of UILRRI's members.   Appendix ("A.") 153-55 (*Transcript*, 107:12-109:3).   Counsel for the State, speaking after UILRRI's counsel, did not dispute that this is the purpose of the amendments.   A. 164 (*Transcript*, 118:11-118:19).

At the evidentiary hearing on W&SR's motion for a preliminary injunction, the Defendants chose not to put on any witnesses.   W&SR presented evidence of the impact of the amendments on its speech, in the form of its advertising on behalf of its eleven franchisees in Rhode Island and the business advice it sells to them.   W&SR also showed how the amendments ban it from associating with the owners of the Rhode Island franchisees for purposes of advertising, sharing its business knowledge and licensing its recognized trade names.

The sole witness at the hearing was W&SR's owner, John Haronian.   He explained the services offered by W&SR to its franchisees:

> "We provide them the ability to advertise, the training of not only the managers, but we also have a method of training trainers. Each franchisee has a trainer in their store, so we train the trainer so that they're able to train their own employees. We provide them with layout. We believe that, like a Dunkin Donuts or any other franchise, when you go in you know where to go to stand in line, you know where to go for a particular type of brand that you're looking for. We--

along with the training, the typical layout, the plan-a-gram, a typical plan-a-gram." A. 76-77 (*Transcript*, 30:21-31:6).

*See also*, A. 61-62 (*Transcript*, 15:9-16:4) (detailing the business expertise provided by Haronian to the franchisees).

The joint activities of the W&SR franchisees are limited and are all incidental to their expressive activities. Each franchisee is an independently owned and operated store, with its own Class A liquor license. A. 64-65 (*Transcript*, 18:3-19:7). Neither W&SR nor its franchisees engage in joint purchases of alcoholic beverages. A. 66 (*Transcript*, 20:7-20:18) (franchisees do all of the purchasing); A. 73 (*Transcript*, 27:16-27:23) (franchisor does not negotiate the price of alcoholic beverages for the franchisee). Each franchisee purchases its own alcoholic beverages. A. 71-72 (*Transcript*, 25:17-26:3) (alcoholic beverages are delivered to the franchisee and billed to the franchisee); A. 107 (*Transcript*, 61:1-61:13) (franchisor cannot purchase alcoholic beverages for the franchisees because the franchisor does not have a class A license).

W&SR advises the franchisees about purchasing. In advising the store owners about what purchasing strategies they should employ, W&SR gathers information from wholesalers about the array of products available and on which products wholesalers are offering incentives, and assesses their desirability for the particular franchisee. A. 71-73 (*Transcript*, 25:21-27:23).

Under Rhode Island's statutory scheme for the sale of alcoholic beverages, the retailer is the bottom level in a three tiered distribution system. Manufacturers/suppliers may only distribute their products through licensed Rhode Island wholesalers.  A.65-66 (*Transcript*, 19:13-20:6); R.I.Gen.L. §§3-5-1 and 3-5-7.  These wholesalers have State mandated monopolies over individual brands.  A.73 (*Transcript*, 27:16-27:23).  Because the wholesalers have a monopoly over the brands they sell, they set the price to retailers.  A. 65-66 (*Transcript*, 19:10-20:6) (by 1995 70% of the brands were controlled by two wholesalers).  Wholesalers do not need to negotiate price, instead they compete with each other for priority of placement of their brands within the liquor stores. A. 91-92 (*Transcript*, 45:24-46:4).  The wholesalers offer deals to all liquor stores based on the store agreeing to place the product in a particular location, or with a particular display, or where the store agrees to purchase some minimum volume. *Id*.  These promotional offers are available equally to all stores.  A. 73 (*Transcript*, 27:16-27:23).

W&SR gathers information on the various promotions and incentives offered by the wholesalers, and advises the franchisees of which deals are beneficial to their particular store.  A. 71-73 (*Transcript*, 25:21-27:23).  Any liquor store owner can take advantage of the wholesalers' offers.  It is the process of W&SR reviewing and researching the numerous offers and making

suggestions on their value to the individual liquor store that makes the franchisees more competitive.  *Id*.  The franchisees are offered the same deals as other liquor stores, but they are able to make smarter choices of which offers to accept because of the advice provided by W&SR.

Advertising is another major factor in the success of the franchisees. Rhode Island has only one widely distributed newspaper.  The cost of advertising in that paper is prohibitive for one store alone.  A. 74-75  (*Transcript*, 28:7-29:1) (it costs from $^{\$}$11,000.00 to $^{\$}$13,000.00 for a full page ad).  W&SR provides advertising services to the eleven Rhode Island stores, allowing them to jointly speak to their consumers in a way they could not afford to do separately.  *Id*.

## SUMMARY OF THE ARGUMENT

W&SR provides management and marketing advice (for a fee) to liquor stores.  It licenses the use of two established trade names – Douglas Wine & Spirits and Peoples' Liquor Warehouse, through the mechanism of franchise agreements.    W&SR also provides advice on how to manage and market effectively an independently owned liquor store, and provides advertising services to the franchisees.  These services are provided through a franchise arrangement that has been reviewed and approved annually by the Rhode Island Department of Business Regulation for the past seven years.  *Opinion*, Add. 2.

8

*See also*, A. 69 (*Transcript*, 23:9-23:25) (the franchise agreements have been submitted annually to the State for its approval).

Giving advice (for a fee) is speech protected by the First Amendment. Advertising is commercial speech, also protected by the First Amendment (although subject to a different standard). Getting together to speak to prospective customers is association for an expressive purpose, which is also protected by the First Amendment. The paid marketing and management advice and advertising services provided by W&SR, as franchisor, are now prohibited by the amendments to Rhode Island General Laws §§3-5-11 and 3-5-11.1, enacted in July 2004 with an effective date of April 1, 2005. *Opinion*, Add. p.3.[2]

Because W&SR's claims involve restrictions of the right to freedom of speech, freedom of expressive association and the denial of fundamental rights, the District Court erred in denying W&SR's motion for a preliminary injunction by failing to subject the restrictions to heightened scrutiny. Instead, the District Court concluded that these restrictions on advertising and giving paid advice did not constitute even an incidental restriction on speech and applied only the rational relationship standard of review.

---

[2] The Defendants had agreed to delay implementation of the amendments until the District Court ruled on the motion for a preliminary injunction.

Had the Court applied heightened scrutiny under the speech, commercial speech, incidental restriction on speech, expressive associations, or denial of fundamental rights standards of review, the Defendants would have utterly failed to meet their burden of identifying a substantial governmental interest justifying the restrictions, showing that the restrictions directly advance that interest, that the restrictions are sufficiently narrowly drawn, and that the classification for their application only to liquor stores directly served a substantial legitimate government interest. Despite being questioned on the subject by the District Court, the Defendants offered nothing to establish either the interest served or that the restrictions are narrowly tailored directly to advance the interest.

The record before the Court required a finding that W&SR has a strong likelihood of success and that it will suffer irreparable harm if an injunction does not issue. The Defendants offered no evidence of any harm to them. The District Court should have entered a preliminary injunction for W&SR preserving the status quo pending a final resolution of the constitutionality of §§3-5-11 and 3-5-11.1.

## ARGUMENT

### I.    Standard of Review

This appeal is subject to *de novo* review. The District Court erred in denying preliminary injunctive relief because, as a restriction on speech,

commercial speech, incidental restriction on speech, and restriction on fundamental rights, the amendments must be subjected to the significantly higher level of judicial review required by the First Amendment and Equal Protection Clause.  The burden is on the Defendants to show that the amendments satisfy all aspects of the tests.  Such errors of law are subject to plenary review.  *Uno v. City of Holyoke*, 72 F.3d 973, 978 (1st Cir. 1995) (error in rulings of law are reviewed *de novo*).  *See also*, *Time, Inc. v. Pape*, 401 U.S. 279, 284 (1971) (no deference is owed to District Court's fact finding in First Amendment context).

Protected speech under the First Amendment is categorized as either "speech" or "commercial speech."  *Central Hudson Gas & Electric Corp. v. Public Service Comm'n.*, 447 U.S. 557 (1980).  Commercial speech is subject to a lower, yet still stringent level of scrutiny.  *Lorillard Tobacco Co. v. Reilly/Altadis U.S.A. Inc. v. Reilly*, 533 U.S. 525, 555 (2001).  The commercial speech doctrine requires the State to justify its restrictions on advertising a lawful activity by proving that the advertising is (1) misleading, or (2) the government interest in regulation is substantial, and (3) the regulation directly advances that interest, and (4) the regulation is not more extensive than necessary to serve the interest.  *Central Hudson*, 447 U.S. at 566; *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505-08 (1996); *Lorillard Tobacco*, 533 U.S. at 555.

The protections afforded to commercial speech by *Central Hudson* are necessary because, without them, "'a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.'" *Greater New Orleans Broadcasting Association v. United States*, 527 U.S. 173, 188 (1999). Here, Rhode Island is using restrictions on speech and expressive association to advance the protectionist interest of UILRRI in their "direct[] ivolv[ment] in the drafting and passage of the new statutes challenged by the plaintiffs." *UILRRI's Motion to Intervene*, Add. 26. That is: protecting UILRRI's members from competing with more efficient competitors by outlawing them. A. 153-155 (*Transcript*, 107:12-109:3).

The standard of review for restrictions on "speech" places an even higher burden of justification on the State. The reviewing court "must not only assess the substantiality of the governmental interests asserted but also determine whether those interests could be served by means that would be less intrusive on activity protected by the First Amendment." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61 (1981).

In assessing the substantiality of the governmental interest asserted it must be shown that the interest is "paramount, one of vital importance, and the burden

is on the government to show the existence of such an interest." *Elrod v. Burns*, 427 U.S. 347, 362 (1976). Even when such an interest is established by the State, the State "may not choose means that unnecessarily restrict constitutionally protected liberty" in order to achieve the interest. *Elrod*, 427 U.S. at 362, *quoting*, *Kusper v. Pontikes*, 414 U.S. 51, 59 (1973).

In reviewing restrictions on association for an expressive purpose a reviewing court must require the State to justify its restrictions by "convincingly show[ing] a substantial relation" between the restriction and a "compelling governmental interest." *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539 (1963).

The fact that selling alcoholic beverages is involved does not alter any of the First Amendment analyses. "The Twenty-first Amendment cannot save an otherwise invalid restriction on speech. Nothing in the Amendment's text or history justifies its use to alter the application of the First Amendment." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 532-533 (1996) (O'Connor, J. concurring).

Even if the State could meet its burden under the commercial speech or "speech" standards, the discriminatory application of restrictions on fundamental rights must also be reviewed under strict scrutiny. "If the statute burdens

'fundamental rights' such as voting rights or employs 'suspect' classifications such as race, a 'strict scrutiny' test is utilized in determining its constitutionality." *Opinion*, Add. p.14, *citing*, *Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 47 (1st Cir. 2003). *See also*, *Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972).

The failure of the District Court to apply these constitutionally mandated standards is an error of law.  The standard for issuing a preliminary injunction is, "whether the plaintiff is likely to succeed on the merits, whether the plaintiff will otherwise suffer irreparable harm, whether the benefits of an injunction will on balance outweigh the burdens, and whether an injunction is consistent with the 'public interest.'" *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corporation*, 990 F.2d 25, 26 (1st Cir. 1993). *See also, Gately v. Comm. of Mass.*, 2 F.3d 1221, 1224 (1st Cir. 1993), *cert. denied*, 511 U.S. 1082 (1994).

"The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 620 (1st Cir.1995). *See also, Ashcroft v. A.C.L.U.*, 542 U.S.__, 124 S.Ct. 2783, 2791, 159 L.Ed.2d. 690 (2004) (sustaining granting  a preliminary injunction against the enforcement of a statute, where the defendant failed to prove that the restriction on speech did not

14

encompass more speech than was necessary to achieve the offered governmental interest).  Accordingly, the District Court erred in concluding that W&SR had not shown a strong likelihood of success because it did not hold the State to the correct burden.

## II.    <u>Standing</u>

Standing is not an issue in this case and has not been raised by the Defendants or the District Court.  W&SR, as the franchisor, is directly injured by the amendments, which affect its rights to Freedom of Speech, Association and Equal Protection, and deprive it of income from the fees charged to the franchisees for the advice given, the advertising services provided and licensing its trade names.  Even without this direct harm, W&SR has standing to challenge the amendments.  *Fox*, 492 U.S. at 482-83 (a plaintiff can challenge a statute that "infringes protected speech even if the statute constitutionally might be applied to him"); *Greater New Orleans Broadcasting Assn.*, 527 U.S. at 180 (association of broadcasters brought successful action to protect expressive rights of its members); *Village of Schaumburg v. Citizens for a Better Environment*, 44 U.S. 620, 634-35 (1980) ("We agree with the Court of Appeals that CBE was entitled to its judgment of facial invalidity if the ordinance purported to prohibit canvassing by a substantial category of charities to which the 75-percent limitation could not be applied consistently with the First and Fourteenth

Amendments, even if there was no demonstration that CBE itself was one of these organizations"); *New Hampshire Right to Life PAC v. Gardner*, 99 F.3d 8, 13-14 (1st Cir.1996).

In *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947 (1984), the Court invalidated a municipal ordinance prohibiting the solicitation of contributions by a charitable organization that did not use at least 75% of its receipts for charitable purposes. Joseph H. Munson Co., was a "professional for-profit fundraiser in the business of promoting fundraising events and giving advice to customers on how those events should be conducted." *Id*. at 950. The Court rejected the State's argument that Munson could not challenge restrictions that applied to the charities Munson contracted with, rather than Munson itself.

> "Munson is a professional fundraising company. Because its contracts call for payment in excess of 25% of the funds raised for a given event, it is subject, under §103L, to civil restraint and criminal liability. Prior to initiation of the present lawsuit, the Secretary informed Munson that if it refused to comply with §103D, it would be prosecuted . . . Munson has suffered both threatened and actual injury as a result of the statute." *Id*. at 954-55.

Before bringing this case, W&SR asked the Rhode Island Department of Business Regulation what is the effect of §§3-5-11 and 3-5-11.1 on its operations. The DBR responded that W&SR's contracts with its eleven Rhode Island franchisees would become "null and void and illegal as of the effective date." A. 206 (letter from DBR).

**III.    Nature of W&SR's Claims (As Applied and Facial challenge)**

W&SR challenges the amendments as applied and on their face. W&SR is in the business of selling management and marketing advice through franchises. Its complaint is that its previously approved franchise agreements with its eleven Rhode Island franchisees are rendered void by the amendments. Essentially, the relationship between W&SR and its franchisees is buying and selling management and marketing advice, licensing an established trade name, and joint advertising. W&SR challenges the amendments because they ban this relationship.

W&SR also challenges the amendments as facially unconstitutional. Unlike most facial challenges, when the challenge is based on the First Amendment, the normal presumptions of constitutionality do not apply. *Cf. Donovan v. City of Haverhill*, 311 F.3d 74, 77 (1st Cir. 2002) ("To prevail in a facial challenge to an ordinance that does not regulate constitutionally protected conduct, plaintiff must surmount a dauntingly high hurdle" (emphasis added)), *citing*, *Village of Hoffman v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) ("perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply").

17

Instead of the normal presumptions in a facial challenge, there is a presumption of invalidity in the First Amendment context.  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (restrictions on speech are "presumptively invalid" – holding hate speech law to be facially unconstitutional).

## IV.   First Amendment – Speech

### A.   The Relationship Between the First and Twenty-First Amendments.

The fact that liquor stores are involved in this litigation does not alter any of the First Amendment analyses.  "The Twenty-first Amendment cannot save an otherwise invalid restriction on speech.  Nothing in the Amendment's text or history justifies its use to alter the application of the First Amendment."  *44 Liquormart,* 517 U.S. at 532-533 (O'Connor, J. concurring).

The reach of the Twenty-First Amendment is limited to granting states the ability to control distribution of alcoholic beverages into the state despite the effects of the "dormant" Commerce Clause.  *Id*. at 516 ("although the Twenty-first Amendment limits the effect of the dormant Commerce Clause on a State's regulatory power over the delivery or use of intoxicating beverages within its borders, 'the Amendment does not license the States to ignore their obligations under other provisions of the Constitution'").  *C.f.*, *Greater New Orleans Broadcasting Assn.*, 527 U.S. at 193 ("the power to restrict speech about certain

socially harmful activities is not as broad as the power to prohibit such conduct"),
*citing, 44 Liquormart*, 517 U.S. at 513-14.

### B.    The Amendments Regulate Speech not Conduct.

The District Court avoided requiring the Defendants to meet the burden imposed by the First Amendment by holding that the challenged amendments regulate conduct, not speech. *Opinion*, Add. 6. However, W&SR engages in very little conduct. Its business is selling advertising services, licensing the use of an established trade name and selling business advice. Exhibit 2 at the preliminary injunction hearing (A. 206) establishes that the Rhode Island Department of Business Regulation, interprets the amendments to preclude the speech sold by W&SR.

Giving management and marketing advice (for a fee) is protected speech, not conduct. *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 482 (1989) (using "tutoring, legal advice, and medical consultation provided (for a fee)" as examples of speech protected by the First Amendment). Advertising is protected speech, not conduct. *44 Liquormart*, *supra*. The content of marketing material and signage is protected speech, not conduct. *Lorillard*, *supra*.

The conduct verses speech distinction relied upon by the District Court fails because speech is the central activity being restricted. The new restrictions added to §3-5-11, which prohibits "chain store organizations" from holding Class A licenses, are:

> "The term 'chain store organization' is defined to include, but not limited to:
>
> (1) Any group of one or more holders of Class A liquor licenses who engage in one or more of the following practices with respect to the business conducted under such licenses, either directly or indirectly, or have any direct or indirect beneficial interest in the following practices:
>
>> (a) Common, group, centralized or coordinated purchases of wholesale merchandise.
>>
>> (b) Common billing or utilization of the services of the same person or the same entity in the management or operation of more than one liquor licensed business.
>>
>> (c) Participation in a coordinated or common advertisement with one or more liquor licensed business in any advertising media.
>>
>> (d) Coordinated or common planning or implementation of marketing strategies.
>>
>> (e) Participation in agreed upon or common pricing of products.
>>
>> (f) Any term or name identified as a chain or common entity."

§3-5-11, Add. p.22-23.

Sub-section (a) prohibits joint purchases of alcohol, something neither W&SR nor its franchisees engage in. A. 66 (*Transcript*, 20:7-20:18) (franchisees do all of the purchasing); A. 71-72 (*Transcript*, 25:17-26:3) (alcoholic beverages are delivered to the franchisee and billed to the franchisee); A. 73 (*Transcript*,

27:16-27:23) (franchisor doesn't negotiate the price for the franchisee); A. 107 (*Transcript*, 61:1-61:13) (franchisor cannot purchase alcoholic beverages for the franchisees because the franchisor does not have a class A license).  However, it could be argued that W&SR "coordinates" purchases by selling advice to liquor store owners about what purchasing strategies they should employ and gathering information from wholesalers about the products available, their desirability, and what products wholesalers are offering incentives on.  A. 71-73 (*Transcript*, 25:21-27:23) (W&SR gathers information on various promotions and incentives and advise the franchisees on purchasing); A. 73 (*Transcript*, 27:16-27:23) (wholesalers have state sponsored monopolies over individual brands, the wholesalers set prices based on volume that are available equally to all stores); A. 65-66 (*Transcript*, 19:13-20:6) (same).  Selling information and advice is protected speech, not conduct.

Sub-section (b) prohibits "Common billing or utilization of the services of the same person or the same entity in the management or operation of more than one liquor licensed business."  The District Court held that W&SR could continue to provide advice, but the franchisees cannot use it.  Add. 6.  To the extent that sub-section (b) is read to include W&SR's giving advice, it is too broad and applies to protected speech.

Sub-section (c) prohibits, "[p]articipation in a coordinated or common advertisement with one or more liquor licensed business in any advertising media." Advertising is protected speech. Joining together to speak to potential customers is association for an expressive purpose. The District Court characterized this as a restriction on conduct only, apparently concluding that it does not even have an incidental impact on speech. *See* Section IV.C. below for discussion of regulations that have an incidental impact on speech.

The District Court gave as an example of conduct the coordination of what products and prices to include in joint advertising. The District Court opined that the individual franchisees could still place their own advertisements. The inability to jointly advertise takes away from the effect and strength of the message in joint advertising. The District Court's observation also ignores the uncontested testimony that it is too expensive for one store to place the advertising. A. 74-75 (*Transcript*, 28:7-29:1) ($11,000. to $13,000.00 per ad). Moreover, the determination that these restrictions affect action without impinging upon speech is the equivalent of saying that a law restricting protestors of the war on terror from communicating with each other to coordinate the speakers, time and place of the protest does not impinge upon their First Amendment rights of freedom of speech and association.

Sub-section (d) prohibits, "[c]oordinated or common planning or implementation of marketing strategies." This sub-section, like sub-section (c) bars W&SR and its franchisees from working together to speak to their customers. This section bars sharing ideas, not conduct. The franchisees share ideas with each other and W&SR shares its ideas with the franchisees.

Sub-section (e) prohibits "[p]articipation in agreed upon or common pricing of products." While this one provision does restrict conduct, setting a common price, it clearly has an incidental impact on speech. It is established that liquor stores can advertise prices. *44 Liquormart*, *supra*. Effective advertising requires joint advertising. A. 100-01 (*Transcript*, 54:21-55:4). Individual stores cannot afford to effectively advertise. A. 74-75 (*Transcript*, 28:7-29:1). Joint advertising requires agreeing to a price. Because sub-section (e) has an incidental impact on speech, it should have been subjected to the *O'Brien* standard described below in Section IV.D of this brief. Like the other forms of First Amendment review, the *O'Brien* standard requires a showing by the state that the restriction furthers a substantial governmental interest, unrelated to the suppression of free expression. *See infra*. Neither the State nor UILRRI presented any evidence to meet this burden.

Even if this restriction were to be upheld, it does not justify banning joint advertising, to the extent those ads do not include agreed upon prices. Additionally, this provision has only a limited applicability to W&SR and its franchisees. The franchisees do not agree on prices for most products within their stores, they only set an agreed upon price for those few products that are included within their ads. A. 84-85 (*Transcript*, 38:13-39:3).

Sub-section (f) prohibits "[a]ny term or name identified as a chain or common entity" by making the use of a common name evidence of a chain store organization. Add. 23. The common brand name licensed to the franchisees by W&SR to its franchisees is speech. It conveys a message to potential customers in the same way that the name McDonald's on the outside of a restaurant speaks volumes to potential customers about what they will find inside. Just as a picture can be worth a thousand words, a familiar brand name can communicate more than could be explained in a thousand words.

> "We built up a brand in the Douglas name. Douglas Wine & Spirits is a well-known name in Rhode Island. And what it does mean to the customer is that they're going to have the consistency no matter what store they go into in finding the product that they're looking for, well-lit, clean, well-merchandised store and knowledgeable employees. That's what you sell when you're selling a name, a brand. And as a franchisor, we want to make sure that it's kept the same way. It's like going to a McDonald's, you know what you're going to get when you go into a McDonald's. So that's the main reason why we all use the same name, it's a brandage of selling." A. 66-67 (*Transcript*, 20:19-21:7).

24

Rhode Island's ban on name use must be analyzed as any other content-based restriction on signage. The State can impose reasonable restrictions on the size of signs. *Ward v. Rock Against Racism*, 491 U.S. 781 (1989) (reasonable "time, place, or manner" restrictions, but only if they are "justified without reference to the content of the regulated speech"). But, restrictions that consider the content of the sign are subject to heightened scrutiny. *44 Liquormart*, 517 U.S. at 501-08 (finding unconstitutional a Rhode Island ban on including liquor prices on signs and in advertising). Moreover, if a restriction on the size of the sign is limited to signs that convey a certain message, it must be reviewed as a content-based restriction on speech. *Lorillard Tobacco*, 533 U.S. 573-74 (invalidating height restrictions applicable only to tobacco signs because they singled out a specific message – those concerning tobacco products – for different treatment). This is not to say that government may never regulate the content of signs placed on a business – only that any time government chooses to regulate content, it must be able to justify that restriction on protected speech. The prohibition of using the names Douglas Wine & Spirits and Peoples' Liquor Warehouse is a restriction of content, not a generally applicable time, place and manner restriction addressing such issues as size or placement of the signs.

The other amendment that was adopted by Rhode Island is specifically targeted at eliminating W&SR from the Rhode Island market. A. 153-55

(*Transcript*, 107:12-109:3). A.153-55 (*Transcript*, 107:12-109:3) (purpose of the amendments is to protect stores from competing against other stores advised by a franchisor). Section 3-5-11.1 bans selling advice through the franchising mechanism. This ban is targeted only at advice to liquor stores and no other industry. Add. 23 (§3-5-11.1(b)). This is an infringement upon the associational rights of the franchisor and franchisees. A state may place restrictions upon these relationships, but it may not ban them entirely without proving it has a substantial interest, which is directly advanced by the ban, and the restriction is no broader than necessary. Moreover, a state may not single out a segment of an industry (liquor stores and not bars or restaurants) for banning franchising without similar justification.

### C.    The Defendants' Burden in Justifying the Restrictions on Speech.

In order for the Defendants to overcome the presumption of invalidity, the District Court should have required them to establish that they meet the heavy burden of justification:

> "It is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny . . . Thus encroachment 'cannot be justified upon a mere showing of a legitimate state interest.' The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest . . . Moreover, it is not enough that the means chosen in furtherance of the interest be rationally related to that end. The gain to the subordinating interest provided by the means

26

must outweigh the incurred loss of protected rights, and the government must 'emplo(y) means closely drawn to avoid unnecessary abridgment. . . .' '(A) State may not choose means that unnecessarily restrict constitutionally protected liberty. 'Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.' If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties.'" *Elrod*, 427 U.S. at 362-63 (citations and footnote omitted).

The Defendants chose not to offer any evidence concerning either the interest motivating the amendments or of narrow tailoring beyond UILRRI's bald assertion that it caused the amendments to be enacted to protect its members from more efficient competition.   A. 149-50 (*Transcript*, 103:24-104:19); A. 156-57 (*Transcript*, 110:2-111:4).

Some of the speech involved in this case could be characterized as commercial speech (advertising).[3]   Restrictions on commercial speech are subject

---

[3] Commercial speech is "speech which does '*no more than* propose a commercial transaction.'"   *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 762 (1976) (emphasis added).   Addressing a prohibition on commercial activities in state university dormitory rooms, the Supreme Court noted that the regulation: "would prohibit tutoring, legal advice, and medical consultation provided (for a fee) in students' dormitory rooms.   While these examples consist of speech for a profit, they do not consist of speech that *proposes* a commercial transaction, which is what defines commercial speech."   The marketing and management advice provided by a franchisor to a franchisee is indistinguishable from "tutoring, legal advice, and medical consultation provided (for a fee)" used by the Court as examples of speech for profit that is accorded full First Amendment Protection and therefore would not be subject to the lower commercial speech standard.   *Fox*, 492 U.S. at 482 (emphasis in original).

to a lower level of review, but even under this lower standard the burden is on the Defendants to show: (1) the advertising is misleading, or (2) the government interest in regulation is substantial, and (3) the regulation directly advances that interest, and (4) the regulation is not more extensive than necessary to serve the interest. *Central Hudson*, 447 U.S. at 566; *44 Liquormart*, 517 U.S. at 505-08; *Lorillard Tobacco*, 533 U.S. at 555. *See also*, *Greater New Orleans Broadcasting Assn.*, 527 U.S. at 185 ("even if the broadcasters' interest in conveying these messages is entirely pecuniary, the interests of, and benefit to, the audience may be broader").

As the Supreme Court recently noted in a case concerning restrictions on advertising tobacco products:

> "The third step of *Central Hudson* concerns the relationship between the harm that underlies the State's interest and the means identified by the State to advance that interest. It requires that 'the speech restriction directly and materially advanc[e] the asserted governmental interest. 'This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.'" *Lorillard Tobacco*, 533 U.S. at 555 (alterations in original), *quoting, Greater New Orleans Broadcasting Assn.*, 527 U.S. at 188.

The Defendants offered no evidence of how the elimination of paid business advice in the liquor retail industry advances any legitimate governmental interest. "A regulation cannot be sustained if it 'provides only ineffective or

remote support for the government's purpose . . . or if there is 'little chance' that the restriction will advance the State's goal." *Lorillard Tobacco*, 533 U.S. at 566, *quoting, Edenfield v. Fane*, 507 U.S. 761, 770 (1993) and *Greater New Orleans Broadcasting Assn.*, 527 U.S. at 193. *See also, Central Hudson*, 447 U.S. at 564 ("the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose"). The Defendants made no effort to show that the restrictions are no more restrictive than is necessary to serve its interest. *Lorillard Tobacco*, 533 U.S. at 561 ("The final step of the *Central Hudson* analysis . . . requires a reasonable fit between the means and ends of the regulatory scheme"); *Lorillard Tobacco*, 533 U.S. at 563 ("the range of communications restricted seems unduly broad. For instance, it is not clear from the regulatory scheme why a ban on oral communications is necessary to further the State's interest").

In *Greater New Orleans Broadcasting Assn.*, the Court addressed restrictions on broadcasters carrying advertisements about privately operated commercial casino gambling. The restrictions permitted advertisements for Indian owned casinos, for state sponsored gambling, gambling for charitable purposes, and other exceptions. 527 U.S. at 190. The Court could find no justification for restricting advertising based solely on who owned the casino. *Id.* at 191. The same question arises here: why does Rhode Island permit advertising

by liquor stores, but not if those ads are paid for by more than one liquor store? Why does Rhode Island permit joint advertising by groups of bars and restaurants such as Applebee's (*i.e.* franchises), but not by more than one liquor store? "Even under the degree of scrutiny that we have applied in commercial speech cases, decisions that select among speakers conveying virtually identical messages are in serious tension with the principles undergirding the First Amendment." *Greater New Orleans Broadcasting Assn.*, 527 U.S. at 193-94. The Defendants offered no justification for this distinction, suggesting instead that the District Court should think one up. A. 149-50 (*Transcript*, 103:24-104:19) ("I believe there does have to be a showing of a rational basis, and I believe that showing can be made either by the state or the court that it can be a hypothetical rational basis"); A. 156-57 (*Transcript*, 110:2-111:4).

Rhode Island, in addition to permitting joint advertisements from bars and restaurants, also permits joint advertising in Rhode Island by liquor stores located just across the border in Massachusetts. Massachusetts allows the holders of liquor store licenses to own up to three stores. *See* M.G.L. c. 138 §15. Since these groups of stores are permitted to advertise in Rhode Island, every Rhode Island licensee must compete with more powerful advertising, which they are unable to do individually. §3.5.11(1)(c) at Add.23. So groups of Massachusetts liquor stores located near the border are able to place a joint advertisement in the

30

Providence Journal, but W&SR's franchisees, that must compete with those stores, cannot. "[T]he regulation distinguishes among the indistinct, permitting a variety of speech that poses the same risks the Government purports to fear, while banning messages unlikely to cause any harm at all." *Greater New Orleans Broadcasting Assn.*, 527 U.S. at 195

Even if Rhode Island may choose to disfavor cooperation among liquor store owners, that objective cannot be achieved by "sacrifice[ing] an intolerable amount of truthful speech about lawful conduct." *Id.* at 194. *C.f. Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85 (1977) (holding that a township ordinance prohibiting the posting of real estate "For Sale" and "Sold" signs for the purpose of stemming what the township perceived as the flight of white homeowners from a racially integrated community violated the First Amendment).

In *Lorillard Tobacco*, the Commonwealth of Massachusetts sought to restrict, *inter alia*, the placement of signs advertising tobacco products and the location of tobacco products to behind the counter, out of the reach of customers. The lower courts were not sure if these restrictions required First Amendment scrutiny. The Supreme Court held that the restrictions did impinge upon First

Amendment rights and applied First Amendment scrutiny. *See* 533 U.S. at 566-70. To paraphrase the Supreme Court for application in this case:

> "The First Amendment also constrains state efforts to limit advertising of [alcohol] products, because so long as the sale and use of [alcohol] is lawful for adults, the [alcohol] industry has a protected interest in communicating information about its products and adult customers have an interest in receiving that information." *Lorillard Tobacco*, 533 U.S. at 571.

Indeed, adult consumers in Rhode Island and the franchisees have a constitutional right to receive information. *Id.* at p.565 ("a speech regulation cannot unduly impinge on the speaker's ability to propose a commercial transaction and the adult listener's opportunity to obtain information about products."); *see also Martin v. City of Struthers,* 319 U.S. 141 (1943) (government may enforce "no soliciting" signs that homeowners and businesses put up, but may not enact law banning all soliciting because that would cut off residents who wanted to receive the information). "Massachusetts [was] not concerned with any 'secondary effects' of tobacco advertising—it [was] concerned with the advertising's primary effect, which [was] to induce those who view the advertisements to purchase and use tobacco products. In other words, it seeks to suppress speech about tobacco because it objects to the content of that speech." *Lorillard Tobacco*, 533 U.S. at 574 (Thomas, J., concurring) (internal citations omitted).

Rhode Island has not prohibited franchising, use of common name, marketing plan, or advertising, in any other industry. Rhode Island does not object to joint advertising in general, it objects to the message of selling alcoholic beverages by liquor stores. This necessarily involves a consideration of the content of the message. "[N]onverbal expressive activity can be banned because of the action it entails, but not because of the ideas it expresses—so that burning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not." *R.A.V.*, 505 U.S. at 385-86 (1992) (internal citations omitted).

The Supreme Court has consistently subjected laws that consider the content of speech in determining whether that speech is prohibited to the highest First Amendment test. *Burson v. Freeman,* 504 U.S. 191, 197-98 (1992) ("Whether individuals may exercise their free-speech rights near polling places depends entirely on whether their speech is related to a political campaign . . . as a facially content-based restriction on political speech in a public forum, §2-7-111(b) must be subjected to exacting scrutiny"). In this case, whether individuals may exercise their speech and associational rights is dependant upon whether their speech or association involves the sale of alcoholic beverages in liquor stores. Laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference. *Buckley v. Valeo,*

424 U.S. 1, 48-49 (1976) ("the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment"). *See also, Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 256 (1974) (striking down law triggered only when newspaper articles concerned a political candidate).

The District Court's decision hinges upon its erroneous conclusion that the amendments restrict conduct unrelated to speech. However, even if correct, this conclusion does not mean that First Amendment scrutiny need not have been applied. The District Court relies on *R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377 (1992), for the proposition that "words can in some circumstances violate laws directed not against speech but against conduct." Add.8 (internal quotes omitted). That proposition does not support the District Court's denial of a preliminary injunction. The relevant portion of the *R.A.V.* decision (505 U.S. at 389) cites to *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 571 (1991), for this proposition. The significance of these two decisions to this case is not the recognition that some regulations have only a secondary effect on speech. The significance is that both of these cases apply full First Amendment scrutiny. *R.A.V.*, 505 U.S. at 396; *Glen Theatre,* 501 U.S. at 571. This is the analysis the District Court should have performed. The failure of the Defendants to offer any

evidence to meet their burden means that the District Court should have concluded that W&SR had a strong likelihood of success.

**D.    Restrictions with an Incidental Impact on Speech.**

Even if the amendments have only an incidental impact on speech, a proposition not supported by the record (with two possible exceptions) given that speech is clearly a target of the amendments, the standard applied by the District Court was too low.   Two provisions of §3-5-11(1) could be considered restrictions of conduct rather then of speech.   Section 3-5-11(1)(a), at Add. 22, includes a ban on joint purchases.   Neither W&SR, nor its franchisees engage in joint purchases.   *See* discussion in Section IV.B., *supra*.   Section 3-5-11(1)(e), at Add. 23, restricts agreements on pricing.   W&SR franchisees agree to a common price only as to those few products to be included in ads.   A.84-85 (*Transcript*, 38:13-39:3).   As discussed above, this restriction has at least an incidental impact on speech (advertising), and therefore should have been reviewed under the *O'Brien* standard.

In *United States v. O'Brien*, 391 U.S. 367 (1968) the Supreme Court held that statutes that are designed to regulate conduct rather than speech, but which have an incidental impact on speech, are to be treated differently from those that directly regulate speech, but even in those cases, the restriction are subject to a form of heightened scrutiny not applied by the District Court here.   Under the

35

standard articulated in *O'Brien*, a regulation of conduct that has an incidental impact on speech will only survive:

> "if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of the interest." *O'Brien*, 391 U.S. at 377.

Even under the *O'Brien* standard, Rhode Island did not and cannot show that the restrictions on speech do not go further than is necessary in order to accomplish its, as yet unidentified, interests (*O'Brien*, 391 U.S. at 377 ("the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of the interest")), or that the interests advanced by the amendments are sufficiently important to justify the impact on speech (*Id.* (the incidental restriction on speech "furthers an important or substantial governmental interest")).

In order "[t]o qualify as a regulation of communicative action governed by the scrutiny outlined in *O'Brien,* the State's regulation must be unrelated to expression." *Lorillard Tobacco,* 533 U.S. at 567 (applying the lower Commercial Speech standard). Here, most of the restrictions contained in the amendments are targeted directly at speech, making the appropriate standard, full First Amendment scrutiny.

To the extent that joint advertising of an agreed upon price includes conduct as well as speech, where conduct and speech are so intertwined as to make them inseperable, full strict scrutiny applies. *Riley v. National Fed'n of the Blind*, 487 U.S. 781, 789 (1988) ("where, as here, the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an endeavor would be both artificial and impractical. Therefore, we apply our test for fully protected expression"); *Munson*, 467 U.S. at 959 ("charitable solicitations are so intertwined with speech that they are entitled to the protections of the First Amendment").

## V.     First Amendment – Association

W&SR demonstrated a strong likelihood of success on its expressive association claims. The amendments ban W&SR and its franchisees from getting together to speak to their prospective customers and each other. Getting together to speak collectively is the very definition of an expressive association. "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. Alabama,* 357 U.S. 449, 460 (1958). "[I]t is immaterial whether the beliefs sought to be advanced by association pertain to political,

*economic*, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *Id.* at 460-61 (emphasis added).

The franchisees of W&SR associate with W&SR so that they can benefit from its paid advice and the advantages of joint advertising, including the use of a recognizable name. It is this association to obtain paid advice and joint advertising that the amendments target. The amendments do not have a mere incidental impact on association for purposes of speech. The purpose of the amendments and their effect is the elimination of association for the expressive purpose of joint advertising and jointly developing marketing and management strategies with the assistance of the franchisor.

> "It follows from these considerations that, consistently with the Federal Constitution, peaceable assembly for lawful discussion cannot be made a crime. The holding of meetings for peaceable political action cannot be proscribed. Those who assist in the conduct of such meetings cannot be branded as criminals on that score. The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects." *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937).

Rhode Island did not and cannot show that the amendments are narrowly tailored to achieve a sufficiently compelling interest. *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984) ("Infringements on that right may be justified

by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms").

The forms of association protected by the First Amendment include those that provide services of a commercial nature to their members, where those services encompass fundamental rights. Speaking to prospective customers, while classified as commercial speech, is still a fundamental right protected by the First Amendment. *44 Liquormart*, *supra*; *Lorillard*, *supra*. Providing paid business advice is a fundamental right protected by the First Amendment. *Fox*, *supra*.

The freedom of association extends to associations between business entities. As part of a battle between the railroads and the trucking industry for the control of the long distance freight business, a group of railroad companies worked together to lobby for passage of truck weight limits and for higher tax rates on heavy trucks. Several trucking companies challenged this joint lobbying activity as a violation of the Sherman Anti-Trust Act. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc*., 365 U.S. 127, 131 (1961). The Court held that even though the lobbying activity of the railroads could be seen to violate the Sherman Act, the Act could not reach such an association for

an expressive purpose. *Id.* at 136-39.[4] This is why it is not an anti-trust violation for the members of UILRRI to associate together so that they could be "directly involved in the drafting and passage of the new statutes," for the purpose and effect of eliminating a competitor from the marketplace. In the same way that the business entities that make up UILRRI can associate together for an expressive purpose, even if that purpose is anti-competitive, W&SR and the eleven Rhode Island business entities with which it associates for the purpose of advertising and providing advice fall within the protection of the First Amendment's freedom of association.

In *United Transp. Union v. State Bar of Michigan*, 401 U.S. 576 (1971) the Supreme Court addressed a challenge to a railroad union policy under which the union maintained an approved list of attorneys, limited the fees those attorneys could charge and required the approved attorneys to pay union officials for their time spent in making the referrals by the Michigan Bar Association. The Court held that the union's associational right was paramount.

> "The common thread running through our decisions in *NAACP* v.
> *Button, Trainmen*, and *United Mine Workers* is that collective activity
> undertaken to obtain meaningful access to the courts is a fundamental
> right within the protection of the First Amendment. However, that

---

[4] Clearly W&SR's franchise does not amount to a monopoly given that its franchisees make up only eleven out of 253 Class A licensees in Rhode Island. A.152 (*Transcript*, 106:3).

right would be a hollow promise if courts could deny associations of workers or others the means of enabling their members to meet the costs of legal representation." *United Transp. Union*, 401 U.S. at 586.

W&SR associates with its franchisees for the purpose of exercising the fundamental rights of speech, commercial speech and expressive association. The failure of the District Court to apply the appropriate standard to Rhode Island's restrictions on expressive association is an error of law warranting reversal of the District Court's denial of W&SR's motion for a preliminary injunction. The failure of the Defendants to present any evidence to meet the heavy burden of justification for such restrictions supports ordering preliminary injunctive relief.

## VI.    Equal Protection

Even if Rhode Island could meet its burden under the First Amendment, the District Court should still have found for W&SR. Because a fundamental right is involved, Rhode Island must also justify the amendments' selective application of the restriction to retail liquor stores under the Equal Protection version of strict scrutiny.

> "[W]hen the government intrudes on one of the liberties protected by the Due Process Clause of the Fourteenth Amendment, 'this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation.' Because the ordinance challenged in this case significantly limits communicative activity within the Borough, we must scrutinize both the interests advanced by the Borough to justify

41

this limitation on protected expression and the means chosen to further those interests." *Schad*, 452 U.S. at 70.

Although the general rule applying the Equal Protection Clause is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest, when a statute classifies by race, alienage, national origin, or the classification impinges on a fundamental right, the general rule gives way to much stricter scrutiny. *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440 (1985). Where a state imposes a limitation on a fundamental right, "'critical examination' of the state interests . . . is required." *Zablocki v. Redhail*, 434 U.S. 374, 383 (1978) (addressing the fundamental right to marry). The State must demonstrate, first, that it has "sufficiently important state interests" and, second, that the statute "is closely tailored to effectuate only those interests." *Id.*, at 388. Freedom of speech and expressive association are fundamental rights. *Gibson*, 372 U.S. at 544 ("rights of free speech and free association are fundamental").

In *Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972), the Court addressed a restriction on protesting near school buildings, which contained an exception for labor disputes. *Id.* at 92-93. Mosley, who had been protesting against race-based school assignments outside a Chicago high school for several months before the enactment of the restriction, challenged the restriction on both

freedom of speech and equal protection grounds. *Id*. at 93-94. While the Seventh Circuit decided the case on First Amendment grounds, the Supreme Court, instead, found a violation of Equal Protection. *Id*. 94-95 ("Because Chicago treats some picketing differently from others, we analyze this ordinance in terms of the Equal Protection Clause of the Fourteenth Amendment").

When a statute restricts speech, the State must justify that restriction under the First Amendment, when the statute also discriminates as to whom the restriction applies, the State must also justify the restriction under the Equal Protection Clause. *Id*. at 98.

> "The central problem with Chicago's ordinance is that it describes permissible picketing in terms of its subject matter. Peaceful picketing on the subject of a school's labor--management dispute is permitted, but all other peaceful picketing is prohibited. The operative distinction is the message on a picket sign. But, above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content . . . Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Id*. at 95-6.

The Supreme Court has previously addressed this issue in a case from Rhode Island. In *Fowler v. Rhode Island*, 345 U.S. 67 (1953), the Court invalidated a restriction prohibiting Jehovah's Witnesses from holding services in

Slater Park, while permitting other religious groups to use the park for their services. 345 U.S. at 69.

The restrictions on fundamental rights imposed by the amendments apply only to retail liquor stores and cannot withstand any but the most indulgent scrutiny. They do not apply to other industries. They do not even apply to other retailers of alcoholic beverages, like bars and restaurants. The State did not justify this unequal application. Even if it is supposed that the State was targeting alcohol abuse, or trying to promote temperance, the greater threat to society is the drunk driver who leaves a bar, not the consumer who purchases alcohol and brings it home. "[W]e have frequently condemned such discrimination among different users of the same medium for expression." *Mosley*, 408 U.S. at 97.[5]

Because the amendments limit fundamental rights of free speech and expressive association, the District Court should have reviewed the selective application of those limitations under the strict scrutiny standard as opposed to the lesser standard of rational relationship. *Mosley*, 408 U.S. at 99 ("Because

---

[5] The Defendants will be unable to justify this selective application of the restrictions. *See* http://www.madd.org/stats/1,1056,1789,00.html (Nationally, "[I]n 2002, an estimated 17,419 people died in alcohol–related traffic crashes—an average of one every 30 minutes"); http://www.madd.org/stats/ 1,1056,8716,00.html (55% of Rhode Island's traffic deaths in 2003 were related to drunk driving). *See Memorandum In Support of Plaintiffs' Motion for a Preliminary Injunction*, p. 6.

picketing plainly involves expressive conduct within the protection of the First Amendment, discriminations among pickets must be tailored to serve a substantial governmental interest" (internal citations omitted)).

## VII.    No Evidence of Sufficiency of the Interest or of Tailoring

The only interest in enacting the amendments was identified by UILRRI as limited to protecting UILRRI's members from competition by more efficient competitors who are being advised by a franchisor.  A. 153-55 (*Transcript*, 107:12-109:3) (identifying the interest as preventing "competitive disadvantage" and "to save the independent Class A retailer in the State of Rhode Island").  The UILRRI offered no evidence to support this or any interest as significant or compelling to the State, and offered no evidence that the restrictions directly advance a legitimate state interest, and are tailored to achieve it.  A. 156-57 (*Transcript*, 110:2-111:4).  Addressing a height restriction on tobacco advertising, the Supreme Court held that, "[a] regulation cannot be sustained if it 'provides only ineffective or remote support for the government's purpose . . . or if there is 'little chance' that the restriction will advance the State's goal."  *Lorillard Tobacco*, 533 U.S. at 566, *quoting, Edenfield*, 507 U.S. at 770 and *Greater New Orleans Broadcasting Assn.*, 527 U.S. at 193.

Rhode Island's attempt in the District Court to identify its interest only made clear that the State simply has no idea what interest, if any, is being served.

"I don't believe the state is putting this statute forward as promoting temperance per se. I think it's more the reasonable control of the traffic, and I think that is found in -- the cases that we cited acknowledged that fractionalization of the industry is a lawful objective, and that these sort of laws promote competition and don't protect the competitors and that that would be the objective of the state in this case." A. 164 (*Transcript*, 118:11-118:19).

The State certainly did not establish that the restrictions serve any significant or compelling interests. And, like UILRRI, the State failed to present any evidence supporting an interest or showing that the restrictions are tailored to achieve the interest. "The broad sweep of the regulations indicates that [the State] did not 'carefully calculate the costs and benefits associated with the burden on speech.'" *Lorillard Tobacco*, 533 U.S. at 561, *quoting, City of Cincinnati v. Discovery Network*, 507 U.S. 410, 417 (1993). *See also*, *Greater New Orleans Broadcasting Assn.*, 527 U.S. at 193 ("the availability of other regulatory options which could advance the asserted interests 'in a manner less intrusive to [petitioners'] First Amendment rights,' we found that the Government could not satisfy the *Central Hudson* test").

The protectionist interest offered is similar to the "interest" in hiding the prices of alcoholic beverages from consumers, so that the consumer will not be aware of the better prices (when compared to the inflated prices of competitors) some stores offer. *See 44 Liquormart*, 517 U.S. at 507. That interest, offered as promoting temperance, simply cannot justify the restriction of speech,

46

commercial speech, incidental restriction on speech, or restriction on fundamental rights. Nor can Rhode Island reduce the amount of speech engaged in by some stores, in order to enhance the relative voice of others stores in the market. *Buckley,* 424 U.S. at 48-49 ("the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment").

While it is possible for a State to justify restrictions on speech, association and fundamental rights as sufficiently tailored to achieve a sufficiently important governmental interest in some cases (*see Adarand Constructors v. Peña*, 515 U.S. 200, 237 (1995) ("we wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact'")), no evidence of either was presented to the District Court by the Defendants in this case. Therefore, the Defendants could not have met their burden under the requisite heightened scrutiny applicable to such restrictions. The District Court should have held that W&SR had a strong likelihood of success on the record before it and granted the motion for a preliminary injunction.

## VIII. <u>Irreparable Harm</u>

Violations of fundamental constitutional rights always constitute irreparable harm. *Dunn v. Blumstein*, 405 U.S. 330, 351 (1972). The constitutional injuries suffered by the Plaintiffs are, as a matter of law,

47

irreparable.  *See Elrod*, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").

Here, the Court is not being asked to address a theoretical harm.  As the District Court acknowledged, "if the existing franchise arrangement is dismantled, it would be difficult or impossible to put it back together again." *Opinion*, Add. 19-20.  John Haronian explained at the preliminary injunction hearing:

> "Q.  Let's talk a little bit about the harms to the franchisee or the franchisor should this preliminary injunction not be granted and the law go into effect.  If you were successful ultimately in this case, could you put the franchisor/franchisee relationships back together?
>
> A.  If it had to be dismantled, there's no way you could possibly put it together again because it takes years to build a relationship with the customer.  It takes years to put a team together of people to understand the principles.  This industry's not a very difficult industry to organize -- not organize -- but to maintain.  But to understand it, it takes years of experience because of all of the unique laws and regulations that are involved, so that takes years.
>
> We have a team of approximately ten people that -- you would -- if you had to fire these people, because you would have no need for them, it would take many, many years to rebuild that type of a team together.
>
> Q.  Are you referring to the people that work for the franchisor?
>
> A.  That work for the franchisor.  On the franchisee side --
>
>             ***
>
> A.  If franchisees had to create their own name, their own method of training, their own computer system, I don't think they could maintain it, let alone develop it.  These are all the things that we do as a franchisor to help the franchisee, so that they can spend their time

concentrating on the most important segment, the customer.  We take that all away from them." A. 77-79 (*Transcript*, 31:24-33:12).

## IX.    Balance of the Harms and Public Interest

No evidence was presented of any harm to the State or to the intervenors that would result if the injunction were granted.

In comparison to the prohibition of W&SR's business, the State will suffer no irreparable effects if the enforcement of the amendments is delayed.  Rhode Island has approved liquor franchises since 1991.  A postponement in the application of the amendments during the duration of this lawsuit will not harm the State's interest.

Of course, the vindication of constitutional rights is always in the public interest. *See Cohen v. Brown University*, 809 F.Supp. 978, 1001 (D. R.I. 1992), *aff'd* 991 F.2d 888 (1st Cir. 1993).

## CONCLUSION

Because the District Court failed to apply the heightened scrutiny required for restrictions on speech, commercial speech, incidental restriction on speech, expressive associations, or denials of fundamental rights, each of which shift the burden to the State, the District Court improperly denied W&SR's motion for a preliminary injunction. As the Defendants failed to offer any compelling or significant interests to justify the amendments, W&SR respectfully submits that

49

the District Court's denial of a preliminary injunction should be reversed with

instructions to enter the requested injunction.

By their Attorneys,

Evan T. Lawson  (20650)
Robert J. Roughsedge  (70742)
Michael Williams  (47144)
Lawson & Weitzen, LLP
88 Black Falcon Avenue
Boston, MA 02210-1736
Telephone: (617) 439-4990
Dated: April 26, 2005        Facsimile:  (617) 439-3987

## Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed.R.App.P.
32(a)(7)(B) because this brief contains 11,263 words, excluding the parts of the
brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed.R.App.P.
32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this
brief has been prepared in a proportionally spaced typeface using WordPerfect
11.0 in 14 point Times New Roman.

Michael Williams (47144)
Attorney for Plaintiffs-Appellants
Dated: April 26, 2005

50

# Addendum

Memorandum and Order denying Plaintiffs'
Motion for a Preliminary Injunction ............................................................. Add.1

R.I.Gen.L. §3-5-11 .................................................................................... Add.22

R.I.Gen.L. §3-5-11.1 ................................................................................. Add.23

UILRRI's Motion to Intervene .................................................................... Add.26

Memorandum In Support of UILRRI Motion to
Intervene .................................................................................................... Add.28

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

WINE AND SPIRITS RETAILERS, INC. and
JOHN HARONIAN


                    v.                            C.A. No. 04-418-T

STATE OF RHODE ISLAND AND PROVIDENCE
PLANTATIONS, and JEFFREY J. GREER, in
his capacity as Associate Director of
the Rhode Island Department of Business
Regulation


**MEMORANDUM AND ORDER**

ERNEST C. TORRES, Chief Judge.

Wine & Spirits Retailers, Inc. (W&S) brought this action to declare unconstitutional a Rhode Island statute prohibiting the retail sale of alcoholic beverages by chain stores and/or franchise businesses. The case, presently, is before this Court for consideration of W&S's request for a preliminary injunction prohibiting the State from enforcing the statute.

The issue presented is whether the statute violates W&S's First Amendment right to freedom of speech or its Fourteenth Amendment right to equal protection. After an evidentiary hearing and for the reasons hereinafter stated, this Court answers those questions in the negative; and, therefore, denies W&S's motion for a preliminary injunction.

1

Add.1

### Background Facts

Since 1933, Rhode Island, like many other states, has statutorily prohibited the retail sale of alcoholic beverages by "chain store organizations." R.I. Gen. Laws § 3-5-11; see Granite State Grocers Assoc. v. State Liquor Comm'n, 289 A.2d 309, 402 (N.H. 1972) (observing that at least twenty states, plus New Hampshire, restrict the number of alcoholic beverage permits that may be held by a single person or group). The prohibition applies to holders of Class A licenses issued to those who operate liquor stores but it does not apply to holders of other classes of licenses issued to restaurants and private clubs. Until recently, Rhode Island's statute did not define the term "chain store organization" but the Department of Business Regulation which was charged with responsibility for enforcing the statute interpreted that term to mean two or more stores having common ownership.

Approximately seven years ago, W&S, which, itself, does not hold a Class A license, began enlisting independently-owned liquor stores to operate as its franchisees under the name Douglas Wine & Spirits. The terms of the franchise arrangement are set forth in the Uniform Franchise Offering Circular filed by Wine & Spirits with the Department of Business Regulation and in W&S's standard franchise agreement. Those terms include provisions that authorize W&S to designate the geographical territory in which the franchisee may operate; the inventory items that the franchisee is allowed or

2

Add.2

required to carry; the vendors from which the franchisee may purchase those items; and the layout of the franchisee's store. The franchisee is required to pay an annual franchise fee and to contribute to an advertising and promotion fund controlled by W&S. In exchange, W&S agrees to grant the franchisee exclusive franchise rights within the assigned territory; to help the franchisee train its employees; and to advise the franchisee with respect to advertising, marketing, and other aspects of the franchisee's business.

On July 8, 2004, the Rhode Island General Assembly amended the statute to specify the kinds of activities that would cause a business to be classified as a "chain store organization" and, also, to prohibit the retail sale of alcoholic beverages by franchise operations. The effective date of the amendments was delayed until April 1, 2005, apparently, in order to afford existing franchisees an opportunity to bring themselves into compliance.

On September 29, 2004, W&S brought this action against the State of Rhode Island and Jeffrey Greer, in his capacity as Associate Director of the Rhode Island Department of Business Regulation, seeking to declare the statute unconstitutional. Several months later, in January 2005, W&S filed its motion for a preliminary injunction and shortly after the motion was scheduled for hearing, United Independent Liquor Retailers of Rhode Island

3

Add.3

(UILR), an association of independent liquor stores, was granted
leave to intervene as a defendant. On March 16, 2005, this Court
conducted an evidentiary hearing and heard arguments by all
parties.

### The Preliminary Injunction Standard

A preliminary injunction is considered an extraordinary remedy
because it involves the granting of interim relief before the facts
are fully developed by a full-blown trial on the merits. In
determining whether a preliminary injunction should be granted, the
Court must assess and balance the probability that the movant
ultimately will succeed on the merits; any irreparable harm that
the movant is likely to suffer if the injunction does not issue;
any irreparable harm that the opposing party is likely to suffer if
the injunction does issue; and the effect that the issuance or
failure to issue an injunction may have on the public interest.
Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 221 (1st Cir.
2003); S.E.C. v. Fife, 311 F.3d 1, 8 (1st Cir. 2002).

### Analysis

I.    Likelihood of Success

W&S mounts a two-pronged challenge to the statute. First, W&S
argues that the statute violates its First Amendment right to
freedom of speech and association because the statute prevents W&S
from "[p]roviding paid marketing and management advice" to its
franchisees and prohibits the retail sale of alcoholic beverages by

4

Add.4

franchise organizations. W&S Mem. Supp. Mot. Prelim. Inj. at 8-9, 13, and 15. W&S also argues that the prohibition against franchising violates its Fourteenth Amendment right to equal protection because the prohibition applies to Class A licensees who sell alcoholic beverages for off-premises consumption but not to other categories of licensees who sell for on-premises consumption.

A.   The First Amendment Claim

1.   The Speech Claim

W&S's claim that the statute violates its freedom of speech is directed at R.I. Gen. Laws § 3-5-11(b)(1) which provides:

> (b)   The term "chain store organization" is defined to include, but [*sic*] not limited to:
> (1)   Any group of one or more holders of Class A liquor licenses who engage in one or more of the following practices with respect to the business conducted under such licenses, either directly or indirectly, or have any direct or indirect beneficial interest in the following practices:
>    (i)  Common, group, centralized or coordinated purchases of wholesale merchandise.
>    (ii) Common billing or utilization of the services of the same person or the same entity in the management or operation of more than one liquor licensed business.
>    (iii) Participation in a coordinated or common advertisement with one or more liquor licensed business in any advertising media.
>    (iv) Coordinated or common planning or implementation of marketing strategies.
>    (v)  Participation in agreed upon or common pricing of products.
>    (vi) Any term or name identified as a chain or common entity.

More specifically, in its memorandum, W&S argues that the

5

Add.5

prohibition against common planning or implementation of marketing strategies contained in subsection (b)(1)(iv) prevents W&S from "providing paid marketing and management advice" to its franchisees. W&S Mem. Supp. Mot. Prelim. Inj. at 8-9, 13, and 15. During oral argument, W&S also contended, for the first time, that its freedom of speech is infringed by the prohibition against "coordinated or common advertisement" contained in subsection (b)(1)(iii).

The short answer to W&S's challenge to the prohibition against common planning or implementation of market strategies is that subsection (b)(1)(iv) does not, in any way, prevent W&S from "providing paid marketing and management advice." What it prohibits is concerted activity on the part of Class A licensees to engage in such practices. W&S does not hold a Class A license and remains free to provide licensees with planning and/or marketing advice which, during the hearing, it described as advice regarding marketing, methods of doing business, what products to sell, and how to set up a store. The fact that the statute may have the collateral effect of rendering less valuable any marketing advice that suggests common advertising does not infringe on W&S's freedom of expression any more than a prohibition against the sale of liquor to minors would infringe on W&S's "right" to dispense advice on how a licensee could more effectively market liquor to minors. While the Constitution may protect one's right to counsel others

6

Add.6

regarding the conduct of their affairs, it does not guarantee that particular kinds of conduct that one might desire to recommend must be sanctioned by the law.

W&S relies on <u>Bd. of Trustees of the State Univ. of New York v. Fox</u>, 492 U.S. 469 (1989) but that case is readily distinguishable from this one. <u>Fox</u> involved a regulation that directly prohibited private commercial enterprises from operating on state university campuses, <u>Fox</u>, 492 U.S. at 471, and was interpreted to prevent tutoring, medical consultations and the rendition of legal advice to students in their dormitories, <u>id.</u> at 482. By contrast, subsection (b)(1)(iv) does not contain any such prohibition. It leaves W&S free to provide marketing and management advice and even advice regarding coordinated planning and implementation of marketing strategies. It merely prevents Class A licensees from acting in concert to engage in such activities.

Nor does the prohibition against coordinated or common advertisement contained in subsection (b)(1)(iii) restrict W&S's freedom of speech. That subsection, too, applies only to common advertising by Class A licensees. W&S describes its role with respect to such advertising as, simply, presenting proposed ads to franchisees and assisting in placing the ads. Indeed, the prohibition against common advertising does not prevent even the licensees, themselves, from advertising. In this respect, the

7

Add.7

prohibition is distinguishable from the ban on the advertisement of liquor prices that was held unconstitutional in <u>44 Liquormart, Inc. v. Rhode Island</u>, 517 U.S. 484 (1996) because, here, no restrictions have been placed on the right of individual Class A licensees to advertise or on the content of their advertisements.  What subsection (b)(1)(iii) prohibits is the <u>concerted activity</u> of placing <u>common</u> advertisements which the evidence shows requires agreement among licensees with respect to what products will be advertised and what price will be charged for those products.  In this regard, the prohibition against common advertising has no greater impact on licensees' freedom of expression than "an injunction against price fixing" may have on "the freedom of businessmen to talk to one another about prices."  <u>Nat'l Soc'y of Prof'l Engineers v. United States</u>, 435 U.S. 679, 697 (1978).

Put another way, a statute that prohibits certain types of conduct does not run afoul of the First Amendment simply because words may be among the means used in furtherance of that conduct.  See <u>R.A.V. v. City of St. Paul, Minnesota</u>, 505 U.S. 377, 389 (1992). ("[W]ords can in some circumstances violate laws directed not against speech but against conduct.").  That is especially true when the conduct consists of what might be perceived as anti-competitive commercial practices.  Thus, boycotts by the members of a professional association may violate anti-trust laws even though they have an expressive component or are based on statements

8

Add.8

contained in the association's code of ethics. See, e.g., Fed. Trade Comm'n v. Superior Court Trial Lawyers' Ass'n, 493 U.S. 411, 430-32 (1990) (attorney association's boycott of assignment to cases involving indigent defendants); Nat'l Soc'y of Prof'l Engineers, 435 U.S. at 697 (ban on competitive bidding by engineering association); Wilk v. American Medical Ass'n, 895 F.2d 352, 357-58, 371 (7th Cir. 1990) (medical association's boycott of chiropractors based on association's code of ethics). Similarly, a newspaper's First Amendment rights are not infringed by an anti-trust law prohibition against refusing advertisements from businesses that also advertise with competing radio stations. Loraine Journal Co. v. United States, 342 U.S. 143, 155-56 (1951).

2. The Association Claim

W&S's claim that the Rhode Island statute violates its freedom of association is directed primarily[1] at R.I. Gen. Laws § 3-5-11.1(a) which provides:

> To promote the effective and reasonable control and regulation of the Rhode Island alcoholic beverage industry and to help the consumer by protecting their choices and ensuring equitable pricing. Class A liquor license authorized by this title shall not be granted, issued, renewed or transferred to or for the use of any liquor franchisor or franchisee. Class A liquor license holders are expressly prohibited from utilizing the provisions of the Franchise Investor Act, § 19-28-1 et seq.

---

[1] W&S also contends that the restrictions in § 3-5-11(b) violate its associational rights. However, for the reasons previously stated in rejecting W&S's "speech" claim, § 3-5-11(b) does not violate its association rights either.

9

The arguments in support of this claim are not as well developed as the arguments regarding W&S's speech claim. W&S describes the associational right at stake as the right of a franchisor and franchisees to associate for economic purposes. However, W&S concedes that there is little authority on the subject and this Court does not find W&S's arguments persuasive for several reasons.

First, the kinds of association most clearly protected by the First Amendment are associations "for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion." City of Dallas v. Stanglin, 490 U.S. 19, 24 (1989). While the First Amendment also may protect the rights of businesses to associate for economic purposes, it does not confer any right to engage in particular kinds of concerted economic activity. Rather, the constitutional limitations on a state's power to regulate such activity derives from other provisions, such as the due process and equal protection clauses.

The source of Constitutional protection is important because state regulation affecting First Amendment rights is subject to greater scrutiny than the regulation of economic activity and the burden is on the state to justify the regulation.[2]  By contrast,

_____

[2]With exceptions for certain categories of speech, such as obscenity, pornography, and "fighting" words, content-based regulations of (noncommercial) speech are "presumptively invalid,"

10

under the equal protection clause, the constitutionality of state regulation of economic activity is judged under a rational relationship test and the party challenging the regulation must overcome the presumption of rationality enjoyed by state statutes. Hodel v. Indiana, 452 U.S. 314, 331-32 (1981).

Here, the ban on the franchise sale of liquor does not prevent W&S and/or Class A licensees from associating for the purpose of exchanging or expressing ideas or for any other purpose except engaging in concerted economic activity. In this respect, the ban on franchise sales of alcoholic beverages is similar to the ban on the sale of alcoholic beverages by chain stores which has been upheld by nearly every court in which the constitutionality of such bans have been challenged. See, e.g., Johnson v. Martignetti, 375 N.E.2d 290 (Mass. 1978) (upholding statute establishing limit of three liquor licenses per "person or combination of persons" against equal protection and due process challenges); Granite State Grocers Assoc., 289 A.2d 399 ( N.H. 1972) (upholding prohibition

_____

R.A.V., 505 U.S. at 382-83, and the government bears the burden of establishing that the regulations are necessary to serve a compelling state interest, id. at 395. Even content-neutral regulation of the time, place and manner of speech must be "narrowly tailored to serve a significant governmental interest" and "leave open alternative channels for communication." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). Restrictions on commercial speech that is not misleading and advertises lawful activity also are subject to heightened scrutiny: the government must establish that its interest in the restrictions is substantial, that the regulation directly advances the asserted interest, and that the regulation is not more extensive than necessary to serve that interest. Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 554 (2001).

against any person holding more than two "off-sale" beverage permits against equal protection challenge under New Hampshire constitution); Grand Union Co. v. Sills, 204 A.2d 853 (N.J. 1964) (upholding statute designed to limit retail liquor licenses to two per person against due process and equal protection attacks). But see Casey's General Stores, Inc. v. Nebraska Liquor Control Comm'n, 369 N.W.2d 85 (Neb. 1985) (holding statutory prohibition on acquiring beneficial interest in more than two alcoholic beverage retail licenses violated equal protection clause).

There is no basis in either law or logic for prohibiting a single person or entity from operating multiple liquor stores and engaging in common purchasing and marketing activity while, at the same time, permitting franchisees, who independently own liquor stores, to do the same. Indeed, there is even less reason for allowing a number of independently operated licensees to engage in such joint activity because it may have the effect of reducing competition. As previously stated, in order to place common advertisements, W&S's franchisees must agree upon the price to be charged for the products advertised and W&S's franchisee arrangement restricts the territory in which a franchisee may operate.

B.    The Equal Protection Claim

W&S claims that the prohibition against franchise sales of alcoholic beverages violates its Fourteenth Amendment right to

12

Add.12

equal protection because it irrationally discriminates. Specifically, W&S points to the fact that the prohibition applies only to Class A licensees who sell alcoholic beverages for off-premises consumption and not to holders of other classes of licenses who sell for on-premises consumption. W&S Mem. Supp. Mot. Prelim. Inj. at 16.

The Equal Protection clause protects against governmental classifications that are arbitrary and treat some groups of individuals less favorably than others who are similarly situated. See Tapalian v. Tusino, 377 F.3d 1, 5 (1st Cir. 2004) ("The Equal Protection clause contemplates that similarly situated persons are to receive substantially similar treatment from their government."). Of course, that does not mean that any regulation that treats one group differently from another violates equal protection. Courts have recognized that classifications are not only permissible but necessary in any form of governmental regulation. See Cotter v. City of Boston, 323 F.3d 160, 168 (1st Cir. 2003) (the equal protection clause "does not mandate that every citizen be treated identically, rather, it requires an adequate explanation for treating groups differently."); United States v. Craveiro, 907 F.2d 260, 265 (1st Cir. 1990) ("Legislative classification or 'drawing lines' does not violate equal protection when it distinguishes persons as dissimilar on some permissible basis in order to advance the legitimate interests of society.").

13

Add.13

The test for determining whether a state statute violates the Equal Protection clause depends on the type of classification and the nature of the activity regulated. If the statute burdens "fundamental rights" such as voting rights or employs "suspect" classifications such as race, a "strict scrutiny" test is utilized in determining its constitutionality. Kittery Motorcycle, Inc. v. Rowe, 320 F.3d 42, 47 (1st Cir. 2003). On the other hand, if the statute simply regulates economic activity conducted by business entities, it is judged under the less stringent rational basis test. Id. As the Supreme Court has said:

> Social and economic legislation . . . that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate government purpose. Moreover, such legislation carries with it a presumption of rationality that can only be overcome by clear showing of arbitrariness or irrationality.

Hodel, 425 U.S. at 331-32. Put another way, such a statute passes muster under the Equal Protection clause unless the party challenging it demonstrates that there is no legitimate purpose for the statute or that it does not amount to a reasonable means of achieving that purpose. See Fed. Communications Comm'n v. Beach Communications, Inc. ("F.C.C."), 508 U.S. 307, 315 (1993) (on rational basis review, "those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it" (internal quotation

14

omitted)); <u>Kittery Motorcycle</u>, 320 F.3d at 47 (under rational basis standard, the government's classifications "bear[] a strong presumption of validity" and "the state . . . need only articulate some 'reasonably conceivable set of facts' that could establish a rational relationship between the challenged laws and the government's legitimate ends." (internal quotations and citations omitted)).

It is clear that the Rhode Island statute at issue in this case is purely "social and economic legislation" and that it "does not employ suspect classifications or impinge on fundamental rights." Therefore, it must be evaluated in accordance with the rational basis test.

As a threshold matter, W&S fails to carry its burden of explaining why it is arbitrary or irrational to prohibit franchise sales of alcoholic beverages by Class A licensees but not by other classes of licensees. Here, the failure to tender such an explanation is especially important because it seems apparent to even a casual observer that significant differences exist between the relatively small number of retailers who exclusively sell unlimited quantities of alcoholic beverages for off-premises consumption to persons who may or may not be the ultimate consumers and the much larger number of restaurants and clubs that dispense alcoholic beverages in measured quantities, often accompanied by food, for on-premises consumption.

15

Even if restaurants and clubs are viewed as comparable to liquor stores, the fact that the ban on franchise sales applies only to liquor stores does not, by itself, establish a denial of equal protection.  It is settled law that, in addressing what it may perceive as a problem, a state legislature may proceed "'one step at a time,'" Montalvo-Hueras v. Rivera-Cruz, 885 F.2d 971, 981 (1st Cir. 1989)(quoting Williamson v. Lee Optical, 348 U.S. 483, 489 (1955)), and that "'[i]t is no requirement of equal protection that all evils of the same genus be eradicated or none at all,'" Mills v. State of Maine, 118 F.3d 37, 47 (1st Cir. 1997) (quoting Railway Exp. Agency, Inc. v. People of State of New York, 336 U.S. 106, 110 (1949)).  See Montalvo-Hueras, 885 F.2d at 981 ("The legislature need not approach goals on an all-or-nothing basis . . . .  'The legislature may select one phase of one field and apply a remedy there, neglecting the others.'"  (quoting Williamson, 348 U.S. at 489)).  In assessing an equal protection challenge under the rational basis test, the relevant inquiries are whether the regulation has a legitimate governmental purpose and whether it is a rational means of achieving that purpose.

Because of the broad police powers that states possess, "[p]ublic safety, public health and public morals are legitimate government purposes, but they are not the only ones.  Virtually any goal that is not forbidden by the Constitution will be deemed sufficient to meet the rational basis test."  See Erwin

16

Add.16

Chemerinsky, <u>Constitutional Law</u>, § 9.2 (2d ed. 2002). The difficulty arises in identifying the purpose of a particular regulation and determining whether the regulation is rationally related to the achievement of that purpose.

The Supreme Court has been extremely deferential to states in addressing both of these questions. In deciding whether a statute has a legitimate governmental purpose, the Supreme Court has gone so far as to state that, when it adopts legislation, a legislature need not "articulate its reasons for enacting a statute" as long as some legitimate purpose can be identified. <u>F.C.C.</u>, 508 U.S. at 315. Furthermore, the classification chosen "may be based on rational speculation unsupported by evidence or empirical data." <u>Id.</u> at 315. That standard has been criticized as overly deferential and dissenters have urged a less deferential standard for determining whether a statute has a legitimate purpose when no purpose is expressed at the time of enactment. <u>See</u> <u>id.</u> at 323 n.3 (Stevens, J., dissenting) ("Judicial Review under the 'conceivable set of facts' test is tantamount to no review at all."); <u>Schweiker v. Wilson</u>, 450 U.S. 221, 244-45 (1981) (5-4 decision) (Powell, J., dissenting) ("[T]he Court should receive with some skepticism <u>post hoc</u> hypotheses about legislative purpose, unsupported by the legislative history. When no indication of legislative purpose appears other than the current position of the [government], the Court should require that the classification bear a 'fair and

17

substantial relation' to the asserted purpose.").

Here, § 3-5-11.1(a) does express the purposes of the prohibition on franchise sales of alcoholic beverages. Those purposes are stated to be:

> To promote the effective and reasonable control and regulation of the Rhode Island alcoholic beverage industry and to help the consumer by protecting their choices and ensuring equitable pricing.

While rather general, those purposes seem clearly legitimate, on their face. The more difficult task is ascertaining whether the prohibition is rationally related to achieving those purposes.

For the most part, the parties simply make conflicting assertions about the impact or lack of impact that they maintain franchising has on liquor sales, the market power of wholesalers and competition among Class A retailers. W&S Mem. Supp. Mot. Prelim. Inj. at 17-18; UILR Memo. in Opp. at 11-12. Most of those assertions are nothing more than unsupported conclusions. Moreover, they do not address the effect of franchising on consumer choices and the prices charged to consumers which are two of the principal objectives recited in the statute.

The scant evidence that has been presented indicates that joint buying enables franchisees to obtain volume discounts from liquor wholesalers. However, there is no evidence as to whether those discounts are passed on to consumers in the form of lower prices; or, if so, what effect reduced prices may have on

18

Add.18

consumption or the ability of independent retailers to compete with franchisees.

There, also, is some evidence that franchising may restrict consumer choice. Thus, the evidence shows that W&S controls many aspects of the manner in which franchisees conduct their businesses ranging from what products they may sell to the territories in which they may operate. In addition, in order to place common advertising, all participating franchisees must agree as to what products are advertised and what prices will be charged for those products.

In short, given the considerable deference accorded to legislative judgments regarding regulation of economic matters and the absence of any evidence, in this case, that the Rhode Island statute is arbitrary or not rationally related to achieving a legitimate governmental purpose, the likelihood that W&S, ultimately, will succeed on the merits of its claim appears rather remote.

II.   Balancing the Harms

The evidence is equally sparse with respect to what harm W&S might suffer if a preliminary injunction does not issue and what harm the state and independent retailers might suffer if a preliminary injunction does issue. Mr. Haronian, W&S's principal, did testify that, like Humpty Dumpty, if the existing franchise arrangement is dismantled, it would be difficult or impossible to

19

Add.19

put it back together again.  However, once again, little evidence was presented to support that assertion.  On the other hand, neither the State nor UILR presented any evidence regarding the impact that the failure to issue a preliminary injunction might have on consumers or independent retailers.

Since a scintilla of evidence outweighs an utter lack of evidence, the balance of harms tips in favor of W&S.  However, the degree to which the scale tips is reduced by the fact that the harm is, at least partially, self induced.  As already noted, the statute was adopted on July 8, 2004 but did not become effective until April 1, 2005.  Presumably, W&S was aware even before the date of enactment that the legislation was being seriously considered but waited until January 18, 2005 to seek a preliminary injunction.  While W&S's actions certainly cannot be characterized as dilatory, the delay, nevertheless, has contributed to the present sense of urgency.  See Jordache Enterprises, Inc. v. Levi Strauss & Co., 841 F.Supp. 506, 521 (S.D.N.Y. 1993) (party's delay in bringing motion for preliminary injunction "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." (internal quotation omitted)).

III. The Public Interest

In this case, the public interest does not perceptibly weigh either in favor of or against granting a preliminary injunction.

20

Add.20

Clearly, the public has an interest in the proper regulation of competition and alcoholic beverage sales; but, it also has an interest in the freedom of businesses to conduct their affairs lawfully, efficiently and in a manner that best serves consumers. What is not so clear is whether these interests will be served or disserved by the issuance of a preliminary injunction. If anything, given the improbability that W&S ultimately will succeed on the merits of its claim, this factor appears to weigh in favor of the defendants.

## **Conclusion**

For all of the foregoing reasons, W&S's motion for a preliminary injunction is denied.


IT IS SO ORDERED:


_____
Ernest C. Torres
Chief Judge

Date: April 8, 2005

Add.21

2004 -- S 2554  SUBSTITUTE B AS AMENDED

========
LC02572/SUB B
========

# S T A T E   O F   R H O D E   I S L A N D

### IN GENERAL ASSEMBLY

### JANUARY SESSION, A.D. 2004

_____

## A N   A C T

## RELATING TO ALCOHOLIC BEVERAGES -- LICENSES

<u>Introduced By:</u> Senator Maryellen  Goodwin

<u>Date Introduced:</u> February 11, 2004

<u>Referred To:</u> Senate Constitutional & Gaming Issues

It is enacted by the General Assembly as follows:

1      SECTION 1. Section 3-5-11 of the General Laws in Chapter 35 entitled "Licenses

2  Generally" is hereby amended to read as follows:

3      **3-5-11. Licensing of chain stores. --** (a) Licenses, except retailer's Class E, Class B,

4  Class B-H, Class B-L, Class B-M, and Class B-V licenses, authorized by this title shall not be

5  granted, issued, or transferred to or for the use of any "chain store organization," which term shall

6  ~~mean~~ consist of any chain of retail or wholesale business or business organizations, and more

7  specifically defined herein, including, without limitation, grocery stores, markets, department

8  stores, and convenience stores, as well as retailers of alcoholic beverages, and which include

9  chains in which one or more stores are located outside of the state.

10      (b) ~~What is a chain store organization is declared to be a question of fact, and the~~

11  ~~department is empowered to determine finally whether any applicant for the issuance, grant or~~

12  ~~transfer of a license is acting for or on behalf of a chain store organization or a store unit of a~~

13  ~~chain store organization.~~ The term "chain store organization" is defined to include, but not limited

14  to:

15      (1) Any group of one or more holders of Class A liquor licenses who engage in one or

16  more of the following practices with respect to the business conducted under such licenses, either

17  directly or indirectly, or have any direct or indirect beneficial interest in the following practices:

18      (a) Common, group, centralized or coordinated purchases of wholesale merchandise.

19      (b) Common billing or utilization of the services of the same person or the same entity in

1   the management or operation of more than one liquor licensed business.

2   (c) Participation in a coordinated or common advertisement with one or more liquor

3   licensed business in any advertising media.

4   (d) Coordinated or common planning or implementation of marketing strategies.

5   (e) Participation in agreed upon or common pricing of products.

6   (f) Any term or name identified as a chain or common entity.

7   (2) Any group of one or more liquor license holders who share any of the following

8   common features, either directly or indirectly or acquire any direct or indirect beneficial interest

9   in the following practices:

10   (a) The same director of a corporation, member of a LLC, LLP, partner in a general or

11   limited partnership, trustee or beneficiary of a trust.

12   (b) The same individual or corporate owners.

13   (3) Any group of one or more license holders that is found to be a "chain store

14   organization" as a factual matter by the department, as a result of an evidentiary hearing in

15   connection with any application for the issuance, grant or transfer of a license, or upon the filing

16   of a complaint by any member of the public.

17   (4) Upon a finding of violation of this section, the department shall be empowered to set

18   a fine up to the amount of ten thousand dollars ($10,000) per violating licensee, revoke the

19   license of the violator, or suspend the license of the violator for a period of time to be determined

20   by the department. Additionally, the department shall issue a cease and desist order against the

21   violating chain store entity(s) and may further order the dissolution of the violating chain store

22   entity(s).

23   SECTION 2. Chapter 3-5 of the General Laws entitled "Licenses Generally" is hereby

24   amended by adding thereto the following section:

25   **3-5-11.1. Liquor franchises prohibited. –** (a) To promote the effective and reasonable

26   control and regulation of the Rhode Island alcoholic beverage industry and to help the consumer

27   by protecting their choices and ensuring equitable pricing. Class A liquor license authorized by

28   this title shall not be granted, issued, renewed or transferred to or for the use of any liquor

29   franchisor or franchisee. Class A liquor license holders are expressly prohibited from utilizing

30   the provisions of the Franchise Investor Act, 19-28-1 et seq.

31   (b) Any franchise agreements involving the retail sales of alcoholic beverages are hereby

32   declared null and void and illegal as of the effective date of this section.

33   (c) Any franchise agreements involving the retail sales of alcoholic beverages shall be

34   terminated by the franchisor or the franchisee within thirty (30) days of the effective date of this

Add.23

1    section.

2    (d) Upon finding of a violation of this section by either the franchisor or the licensee, the

3    department shall be empowered to set a fine up to the amount of ten thousand dollars ($10,000)

4    per violating franchisor or licensee, revoke the license of the violator or suspend the license of the

5    violator for a period of time to be determined by the department.  Additionally, the department

6    shall have the power to revoke or suspend the franchise registration in accordance with section

7    19-28.1-18 and to order it to cease and desist from all operations that are violative of the

8    provisions of this section.

9    Notwithstanding anything contained in this chapter to the contrary, this act shall not be

10    construed as to prevent the utilization of duly licensed professionals rendering services as

11    independent contractors.

12    SECTION 3. This act shall take effect on ~~March~~ April 1, 2005.

=======
LC02572/SUB  B
=======

Add.24

EXPLANATION

BY THE LEGISLATIVE COUNCIL

OF

A N   A C T

RELATING TO ALCOHOLIC BEVERAGES -- LICENSES

***

1       This act would clarify the prohibition against chain liquor stores and expressly declares

2    that Class A liquor license holders cannot enter into franchise agreements.

3       This act would take effect on March 1, 2005.

=======
LC02572/SUB  B
=======

Add.25

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

WINE AND SPIRITS RETAILERS, INC.
and JOHN HARONIAN,
                        Plaintiffs

v.                                                          C.A.NO. 04-418T

STATE OF RHODE ISLAND AND PROVIDENCE
PLANTATIONS, and JEFFREY J. GREER, in his
capacity as Associate Director of the Rhode Island
Department of Business
                        Defendants

## MOTION OF UNITED INDEPENDENT LIQUOR RETAILERS
## OF RHODE ISLAND TO INTERVENE AS A PARTY DEFENDANT

The United Independent Liquor Retailers of Rhode Island ("UILR"), pursuant to

Fed. R. Civ. P. 24(a) and (b), moves for leave to intervene in this action as a party

defendant. The UILR wishes to assert the defenses set forth in its proposed Answer, a

copy of which is attached as *Exhibit A*, and defend the constitutionality of statutes that it

was instrumental in moving to successful passage into law. As fully set forth in the

accompanying memorandum of law, the UILR seeks to intervene as of right pursuant to

Fed. R. Civ. P 24(a) or, alternatively, to intervene permissively under Fed. R. Civ. P 24(b).

Counsel for the UILR has been in contact with counsel for defendants and for

plaintiffs and has been advised that the Attorney General, representing defendants, has no

objection to UILR's intervention. Plaintiffs, however, object to any participation

in this case by the UILR, even as amicus curiae.

Respectfully submitted,

UNITED INDEPENDENT LIQUOR
RETAILERS OF RHODE ISLAND

By its attorney,

Joseph S. Larisa, Jr., Esq. #4113
Larisa Law and Consulting, LLC
One Citizens Plaza, Suite 1100
Providence, RI 02903
(401) 743-4700
(401) 633-7296 (fax)

DATED: February 11, 2005

## CERTIFICATION

I hereby certify that I sent by first class mail postage prepaid and fax a true copy of the attached Motion to Intervene on this 11th day of February 2005 to the following:

Rebecca Tedford Partington #3890
Assistant Attorney General
150 South Main Street
Providence, RI 02903

Robert J. Roughsedge, Esq.
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210-1736

Add.27

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

WINE AND SPIRITS RETAILERS, INC.
and JOHN HARONIAN,
                              Plaintiffs

v.                                                          C.A. NO. 04-418T

STATE OF RHODE ISLAND AND PROVIDENCE
PLANTATIONS, and JEFFREY J. GREER, in his
capacity as Associate Director of the Rhode Island
Department of Business
                              Defendants

## MEMORANDUM IN SUPPORT OF MOTION OF
## UNITED INDEPENDENT LIQUOR RETAILERS OF
## RHODE ISLAND TO INTERVENE AS PARTY DEFENDANT

The United Independent Liquor Retailers of Rhode Island ("UILR"), pursuant to

Fed. R. Civ. P. 24(a) and (b), submit this memorandum in support of their motion to

intervene in this action as a party defendant in order to assert the defenses set forth in its

proposed Answer, a copy of which is attached as *Exhibit A*, and defend the

constitutionality of the State statutes challenged by plaintiffs. The UILR was instrumental

in gaining passage of the key statutes at issue. For the reasons expressed below, the UILR

seeks to intervene as of right pursuant to Fed. R. Civ. P 24(a) or, alternatively, to

intervene permissively under Fed. R. Civ. P 24(b).

### INTRODUCTION

The United Independent Liquor Retailers Association of Rhode Island, Inc. is a

nonprofit corporation formed to promote and represent the common business interests of

and improve business conditions among members of the independent retail liquor industry

operating in Rhode Island. The UILR represents dozens of licensed liquor retailers

throughout Rhode Island. The UILR is charged with the duty of protecting its members'

interests by seeking legislative action, and sponsors and participates in legislative enactments dealing with liquor laws and, as appropriate, also becomes involved in litigation where the constitutionality of those laws are at issue.

The UILR was instrumental in helping to ensure that the newly-enacted statutes, R.I. Gen. Laws § 3-5-11 and R.I. Gen. Laws § 3-5-11.1 – the statutes challenged by plaintiffs – became law. In addition, with respect to the other statute challenged by plaintiffs – R.I. Gen. Laws § 3-5-10 – the UILR was the leader in demanding its enforcement through the Department of Business Regulation ("DBR") and the Office of Attorney General.

Indeed, the UILR is referred to by plaintiffs by name in their memorandum in support of their motion for a preliminary injunction. In sum, plaintiffs and the UILR are on opposite sides of the fence with respect to the challenged statutes. The UILR fights for enforcement, urges their passage and contends they are constitutional; plaintiffs argue against enforcement, lobby for their defeat, and contend they are unconstitutional. If plaintiff Haronian and the Wine and Sprits Retailers, Inc. have standing to challenge the subject statutes, the United Independent Liquor Retailers must likewise possess standing sufficient to intervene to defend the challenged statutes.

### I. The UILR is Entitled to Intervene as a Matter of Right

Rule 24 of the Federal Rules of Civil Procedure provides for both intervention as of right and permissive intervention. It is well established that qualification for intervention as of right depends on four factors: (1) the application must be timely, (2) the applicant must claim an interest relating to the property or transaction which is the subject of the

## Add.29

action, (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest, and (4) the applicant must show its interest will not be adequately represented by existing parties. *See, e.g., Travelers Indem. Co. v. Dingwell*, 884 F.2d 629, 637 (1st Cir. 1989).

## A.   UILR intervention is timely

The UILR's motion to intervene is clearly timely. The only pleadings to date have been plaintiffs' complaint and the Attorney General's answer. Plaintiffs just recently filed a motion for a preliminary injunction and no discovery has been undertaken. Plaintiffs would not suffer any prejudice if the motion to intervene is granted, and the UILR will abide by any scheduling deadlines imposed by the Court.

## B.   The UILR possesses a substantial legal interest

The UILR has a direct and substantial interest in the statutory provisions challenged by plaintiffs, an interest at least equal to that of plaintiffs. Throughout Rhode Island there are over 250 alcoholic beverage retailers who possess the statutorily required Class A license to sell. All stores, except those directly and indirectly controlled by plaintiffs, purchase alcohol from wholesalers and advertise prices independently. The UILR supports the independent liquor retailer and the statutes designed to ensure that all Class A retailers compete without collusion. Plaintiffs oppose that long-standing public policy and the statutes designed to promote it.

The first statute challenged by plaintiffs concerns the statutory chain store prohibition in R.I. Gen. Laws § 3-5-10, a statute in effect for over 70 years. The next two statutes, R.I. Gen. Laws § 3-5-11 and 11.1, were passed into law by the General Assembly

Add.30

last year. The chain store prohibition, buttressed by the new laws, ensures a level playing field for all liquor retailers. Each Class A retailer can negotiate the purchase of alcohol and merchandise from wholesalers, price advertise and employ and receive business advice from whomever they wish, however they wish. What no Class A liquor retailer can do, however, is team up with one or more other liquor retailers either directly or through a third party (such as plaintiffs , who hold no Class A license) to gain a competitive advantage by coordinating their activities through collaborative wholesale purchasing, price advertising, planning or implementation of joint marketing strategies.

In the last few years, plaintiffs have tried schemes to maneuver around the strictures of the chain store prohibition and to exploit section 10. They have done this in an attempt to provide legal legitimacy to collaborative purchasing of wholesale alcohol and collaborative price advertising – precisely what the chain store prohibition was designed to protect against. The enforcement and regulation proceedings at DBR featured plaintiffs on one side and the UILR and its members on the other. DBR never resolved the regulatory issue; the General Assembly did by statute. To clarify the sweeping prohibition on common, group, centralized and/or coordinated purchases of wholesale merchandise, price advertising, marketing strategies and coordinated Class A liquor license holder activities, the legislature passed into law sections 11 and 11.1.

It is therefore beyond peradventure that the members of the UILR are directly affected by the trio of Class A liquor regulation statutes challenged by plaintiffs. *See New York Public Interest Research Group, Inc. v. Regents*, 516 F.2d 350, 352 (2nd Cir. 1975) (pharmacists and their association permitted to intervene as of right to defend their financial interest with respect to a state regulation prohibiting the advertisement of

Add.31

prescription drug prices that was under attack by a lawsuit by consumers); *Nynex Corporation v. Federal Communications Commission*, 153 F.R.D. 1, 3 (D. Me. 1999) (noting that sufficient interest more easily found where public law disputes affecting regulatory programs at issue).

Of particular importance is the fact that the UILR and its members were directly involved in the drafting and passage of the new statutes challenged by plaintiffs. In *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240 (6th Cir. 1997), the Court considered a proposed intervenor's interest in the validity of legislation, and its involvement in the process leading to the adoption of legislation, as creating "a cognizable interest in defending that legislation." *Id.* at 1247. The UILR's legal interest in defending the constitutionality of the challenged statutes before this Court is at least at strong as plaintiffs' legal interest in urging that they be stricken.[1]

The UILR is committed to serving the legislative, regulatory and legal needs of its members which comprise the Class A licensed retail liquor industry. One of the major

---

[1]     Trade associations whose members are subject to alcohol laws and regulations have been permitted to intervene when the state's alcohol laws are challenged. *See Healey v. Beer Inst., Inc.*, 491 U.S. 324 (1989); *Brown-Forman Corp. v. Tennessee Alcoholic Beverage Comm'n*, 492 U.S. 902 (1989); *Cooper v. McBeath*, 11 F.3d 547 (5th Cir. 1994); *Battipaglia v. New York State Liquor Auth.*, 745 F.2d 166 (2d. Cir. 1984). Most importantly, this Court, in a different constitutional challenge to the State's liquor laws, allowed the Allied Beverage Council to intervene as of right to assist in defense of the constitutionality of a newly-passed Rhode Island liquor statute. *See Woolfson v. Carcieri*, 03-463S (D.R.I. 2004) (Smith, J.).

In *Heald v. Engler*, 2001 U.S. Dist. LEXIS 24826 *rev'd on other grounds*, 342 F.3d 517 (6th Cir. Aug. 28, 2003), the District Court permitted the a liquor wholesalers association trade group to intervene. In the Report and Recommendation, the Magistrate Judge concluded that the group had more than merely an economic interest to intervene when Michigan's alcohol laws were challenged, finding a sufficiently direct and substantial interest in the litigation because "it is the validity of the regulations which govern its members' businesses that is being challenged." *Heald*, No. 00-71438, Report and Recommendation filed July 12, 2002, at 8, *accepted and adopted* Aug. 17, 2008. There is no reason in law or fact to arrive at a different conclusion in the present case.

missions of the UILR is to support legislation that will benefit, and oppose legislation which will injure, the members of the retail alcohol beverage license holders and the citizens of Rhode Island. Plaintiffs' complaint seeks to destroy the level playing field among all Class A license holders, to the great detriment of the independent liquor retailer.

The purpose and effect of the laws challenged here is to prevent any owner of a retail liquor store from joining with other retail owners in the purchase or sale of alcoholic beverages. In this manner, no retail owner has an unfair advantage over another, but is constrained to negotiate pricing and promote its business on an even playing field. The use of chain stores and franchise relationships to purchase and sell liquor to consumers breaks this rule, cutting off local independent retailers at the knees. The UILR and its members clearly have a substantial legal interest in defending the constitutional validity of the challenged statutes.

## C. Impairment of Interest

Rhode Island independent alcoholic beverage retailers (which the UILR represents) clearly benefit from and, are subject to, the statutory alcoholic beverage provisions challenged in this case. If this Court were to strike those provisions down as unconstitutional, thereby permitting unlimited collusion, franchising and chain store activity, Rhode Island's independent alcoholic beverage retailers would be placed at an enormous competitive disadvantage, would face devastating consequences to the investment they have made in their businesses in reliance on the prohibition on such activities, and in due time cease to exist.

Add.33

Potential economic harm to a would-be intervenor is a factor that warrants serious
consideration in the impairment of interest inquiry. *See Public Serv. Co. v. Patch*, 136
F.3d. 197, 205 (1st Cir. 1998). The economic interest, however, must not be general,
speculative or contingent. *Id.* Here the detriment to the UILR is not contingent on the
uncertain outcome of later determinations. The adverse effect is immediate and certain.
The UILR members who fight for a level playing field are the real targets of the suit, and
are the subjects of plaintiffs' challenge. *See Conservation Law Found., Inc. v. Mosbacher*,
966 F.2d 39, 43 (1st Cir. 1992). *New York Pub. Interest Research Group*, 516 F.2d at 351-
52 (pharmacists had interest in challenge to law prohibiting advertising price of
prescription drugs because statute could significantly change conduct of business); *Kleisler
v. United States Forest Service*, 157 F.3d 964, 972 (3rd Cir. 1998) (timber companies have
direct and substantial interests in a lawsuit aimed at halting logging or, at a minimum,
reducing the efficiency of their method of timber-cutting.").

Disposition of this action without the UILR's participation would indeed impact
and impede its ability to protect the interests of its members.

### D.  Inadequacy of Representation

An applicant for intervention need only make a minimal showing that the
representation by existing parties likely will prove inadequate. *Patch*, 136 F.3d 208;
*Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972). While the burden of
persuasion may be "ratcheted upward" when a governmental entity is involved, an analysis
of "inadequacy" necessarily requires a consideration of the strength of the interests the
would-be intervenors present and the tests of inadequacy may vary with the strength of

those interests. *See Maine v. Dir., United States Fish & Wildlife Serv.* 262 F.3d 13, 20 (1st
Cir. 2001).

As courts have moved from formalistic restrictions to a practical "interest"
requirement for intervention as of right, so tests of "inadequacy" tend to vary depending
on the strength of the interests. Courts may require very little "inadequacy" if the would-
be intervenor's have significant interests at stake and a great deal if the interest were thin
and widely shared. *See Dagget v. Comm'n on Governmental Ethics and Election Practices*,
172 F.3d 104, 113-114 (1st Cir. 1999).

As set forth above, the very livelihood of UILR members are threatened by an
adverse ruling in this matter. Members of the UILR have direct private interests which are
at stake in this matter for which the other defendants have no interest in protecting. *See
Maine*, 262 F.2d at 20.

Moreover, the UILR brings to this action a unique perspective and unique interests
that are not adequately represented by the existing defendants. The UILR will make
arguments that may not be made by the other parties, and the UILR fears that the existing
defendants may not appeal an adverse ruling and/or may sacrifice certain provisions of the
statutes which benefit Rhode Island retailers for other portions of the statute.

Perhaps most importantly, plaintiffs appear to be making a as applied, as opposed
to a facial challenge to the subject statutes. As such, the facts surrounding plaintiffs'
business practices become of vital importance. The UILR has unique knowledge of
plaintiffs' business practices, its members having been the direct victims of those practices.

Although, the State defendants and the UILR both seek to preserve the
constitutionality of Rhode Island alcoholic beverage laws, their reasons are different.

While the State has numerous legitimate reasons for safeguarding the integrity of the chain
store and franchise prohibition, the UILR members are concerned with their own
economic welfare and investments within the independence-guarantying statutory
framework and in maintaining healthy competition in the marketplace within that
regulatory framework. Without intervention, the economic interests of the UILR
members will be under-represented or unrepresented. *See Conservation Law Found., Inc.
v. Mosbacher*, 966 F.2d 39, 45 (1st Cir. 1992) (noting that governmental entity charged by
law to represent public interests might not advance narrow interests of private entity).

It is beyond dispute that the UILR and its members bring a unique perspective to
this litigation. They may provide evidence, unavailable from the State defendants, that
may be of importance to this Court in analyzing the apparent as applied constitutional
challenge before it. Simply put, plaintiffs' relationship with Class A liquor license holders
is far greater than their claimed role as nothing more than business advisor.

State defendants are focused on the public interest; they will not represent the
property interests of the members of the UILR. While both the State and the UILR seek
to defend the challenged statutory provisions, the State's primary interest lies with the
public interest and in enforcing Rhode Island law, not the economic concerns of the UILR
or Class A license holders.

If denied the right to participate as a party to this action, the interests of the UILR,
and its constituent members, will go undefended. The UILR, in its representative capacity,
has the absolute right to intervene in this action.

Add.36

## II.     In the Alternative, the UILR Should Be Allowed to Intervene Permissively

If this Court were to find that the UILR should not be allowed to intervene as of

right, this Court should permit ABC to intervene because it has satisfied all the

requirements of permissive intervention under Fed. R. Civ. P. 24(b). Rule 24(b) provides

that permissive intervention may be allowed "when the applicant's claim or defense in the

main action have a question of law or fact in common." Permissive intervention is

discretionary with the Court and the primary consideration in determining whether or not

to grant such intervention is whether such intervention (where there are common issues of

law or fact) would unduly "delay or prejudice the adjudication or the rights of the original

parties." *See Dagget,* 172 F.3d at 113-114.

In the instant case, this Court should allow the UILR to intervene in this action

because common questions of law and fact abound and the UILR, like the State

defendants, is committed to defending the constitutionality of the statutory provisions at

issue here, and because the UILR's unique economic interest is a valid ground for

intervention. *See, e.g., Brooks v. Flagg Bros.,* 63 F.R.D. 409, 415 (S.D.N.Y. 1994). The

UILR's participation will not delay, and could well assist the Court in expediting

adjudication of the ultimate constitutional issues.

### CONCLUSION

The United Independent Liquor Retailers respectfully requests that this Court grant

its Motion to Intervene.

Respectfully submitted,

UNITED INDEPENDENT LIQUOR
RETAILERS OF RHODE ISLAND

By its attorney,

Joseph S. Larisa, Jr., Esq. #4113
Larisa Law and Consulting, LLC
One Citizens Plaza, Suite 1100
Providence, RI 02903
(401) 743-4700
(401) 633-7296 (fax)

DATED: February 11, 2005

## CERTIFICATION

I hereby certify that I sent by first class mail postage prepaid and fax a true copy of the attached Memorandum in Support of Motion to Intervene on this 11th day of February 2005 to the following:

Rebecca Tedford Partington #3890
Assistant Attorney General
150 South Main Street
Providence, RI 02903

Robert J. Roughsedge, Esq. #5876
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210-1736

Add.38