UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                    )
PEOPLES SUPER LIQUOR STORES,        )
INC., WINE & SPIRITS RETAILERS,     )
INC. & JOHN HARONIAN,               )
                                    )
              Plaintiffs,           )
                                    )
         v.                         )  CIVIL NO. 04-12219-PBS
                                    )
EDDIE J. JENKINS, in his            )
capacity as Chairman of the         )
Alcoholic Beverages Control         )
Commission, et al.,                 )
                                    )
              Defendants.           )
_____)
```

**MEMORANDUM AND ORDER**

May 8, 2006

Saris, U.S.D.J.

## I.  INTRODUCTION

Plaintiffs, two liquor retailers, and their owner, seek to invalidate parts of the Massachusetts statute governing ownership of retail liquor stores, Mass. Gen. Laws ch. 138, §15 (2005), on numerous grounds, constitutional and statutory.  Specifically, Plaintiffs argue that the statute violates their First Amendment rights to freedom of speech and freedom of association, their right to equal protection of the laws under the Fourteenth Amendment, and their right not to have property taken for public use without just compensation under the Fifth Amendment. Plaintiffs also argue that § 15 should be preempted by ERISA and that it violates the dormant Commerce Clause.  Defendants,

members of the Commonwealth's Alcoholic Beverage Control
Commission ("ABCC"), move to dismiss the complaint.  After
hearing and review of the briefs, the motion is **ALLOWED** with
respect to all claims except for the ERISA claim and the dormant
Commerce Clause claim.

## II.  FACTUAL BACKGROUND

Plaintiff John Haronian ("Haronian"), an individual residing
in Rhode Island, owns two corporations engaged in the liquor
business in New England, both of which are plaintiffs in this
action: Peoples Super Liquor Stores, Inc. ("Peoples") and Wine &
Spirits Retailers, Inc. ("W&SR").  Peoples is a Massachusetts
corporation holding licenses to operate three liquor stores
within the Commonwealth, the maximum allowed under state law.
Peoples currently operates stores in Fall River, Fairhaven, and
New Bedford.  W&SR is a Rhode Island corporation and is the
franchisor of the three Peoples stores.  Plaintiffs challenge
various aspects of the Massachusetts statute governing liquor
store licensing, Mass. Gen. Laws ch. 138, § 15, which was amended
in July 2004.  In part, § 15 prevents any entity from being
granted an interest in more than three liquor "package store"
licenses in the Commonwealth.

One of Haronian's daughters, Shirley Santoro ("Santoro")
used money from a trust set up for her by her father to purchase
a liquor store, Douglas Wine & Spirits-Fall River ("DW&S").

Santoro subsequently applied to the Massachusetts ABCC for a license to operate a liquor store.  After hearing on December 8, 2004, the ABCC granted Santoro's application on the grounds that her father was only an unpaid advisor.  As such, the ABCC did not at that time believe that Santoro's purchase would result in Haronian having a direct or indirect interest in more than three liquor stores; his interest in Santoro's license would constitute the forbidden fourth for Haronian.  Thereafter, DW&S sought to become a franchisee of W&SR, joining the three stores owned by Peoples.

The proposed franchise agreement between Santoro and W&SR included an intricate set of provisions.  The agreement allowed Santoro the use of the name "Douglas Wine & Spirits," an area of protected territory, and a store design and layout.  The agreement also provided computers and training for Santoro's use.  Beyond these basic elements of structuring the business, the agreement also included an advertising fee of 1.2 percent of gross sales, which Haronian later stated at an ABCC hearing was mandatory.  Also of note, the agreement allowed W&SR, as the franchisor, complete access to the financial records and tax returns for Santoro's store, including the right to inspect and audit those records without prior notice.  Moreover, the agreement included a right of prior approval for W&SR before any transfer of the interest in DW&S.

On October 5, 2005, the ABCC held a hearing regarding the

3

legality of this franchise agreement, given W&SR's, and
Harnoian's, existing interests in the three Massachusetts stores
owned by Peoples.  The ABCC, on November 7, 2005, issued a
decision declining to approve the agreement between W&SR and
Santoro on grounds that it created a direct or indirect
beneficial interest in a fourth liquor store license for Haronian
under § 15.  After an extensive review of the facts and the law,
the ABCC denied the application, finding that the terms of the
agreement, coupled with the familial ties between Haronian and
Santoro, gave a combination of persons an interest in more than
three licenses.  The ABCC also cited a violation of the terms of
the 2004 amendment to § 15, which prohibits any person or
combination of persons from "receiv[ing] any percentage or fee
derived from gross revenues in exchange for management
assistance, or participate in any other action designed to effect
common results of more than three licenses under this section."
Mass. Gen Laws ch. 138, § 15 (2005).

### III. DISCUSSION

**A. <u>The Statutory Scheme</u>**

The statute, which is now codified as § 15, was passed in
1933 following the repeal of prohibition and regulates the
licensing of liquor stores in Massachusetts.  It requires each
license to be approved by the ABCC.  Mass. Gen. Laws ch. 138, §
15 (2005).  The statute has always contained a three-license

limit for liquor store operators in the Commonwealth.  Until

2004, this portion of the statute simply read:

> No person, firm, corporation, association, or other
> combination of persons, directly or indirectly, or
> through any agent, employee, stockholder, officer, or
> other person or any subsidiary whatsoever, shall be
> granted, in the aggregate, more than three licenses in
> the commonwealth, or be granted more than one such
> license in a town or two in a city.

Mass. Gen. Laws ch. 138, § 15 (2003).

In 2004, the statute was amended to prohibit certain

specific behaviors, some of which the Supreme Judicial Court of

Massachusetts had already cited as evidence of holding an

interest in a liquor license.  See, e.g., Johnson v. Martignetti,

374 Mass. 784, 787, 375 N.E.2d 290, 294 (1978) (citing as

"indicia of common operations," participating in "a common scheme

of advertising, bookkeeping, pension plans, liability and

insurance policies, discounting techniques, pricing, hiring, and

financing corporate debt").  Following the 2004 amendments, this

portion of the statute now reads:

> No person, firm, corporation, association, or other
> combination of persons, directly or indirectly, or
> through any agent, employee, stockholder, officer, or
> other person or any subsidiary whatsoever, shall be
> granted, in the aggregate, more than three such licenses
> in the commonwealth, or participate in decisions
> regarding the purchasing of alcoholic beverages or the
> purchasing of insurance or accounting or bookkeeping
> services, or receive any percentage or fee derived from
> gross revenues in exchange for management assistance, or
> participate in any other action designed to effect common
> results of more than 3 licensees under this section, or
> be granted more than one such license in a town or two in
> a city.

Mass. Gen. Laws ch. 138, § 15 (2005).  Most of the plaintiffs'
challenges attack this language in the statute.

Section 15 also contains a residency requirement for liquor
store license holders, which Plaintiffs allege violates the
dormant Commerce Clause.  That portion of the statute reads:

> The local licensing authorities . . . may grant licenses
> for the sale at retail of such alcoholic beverages or
> wines or malt beverages, as the case may be, not to be
> drunk on the premises, to applicants therefor who are
> citizens and residents of the commonwealth, or
> partnerships composed solely of such citizens and
> residents, or to corporations organized under the laws of
> the commonwealth and whereof all directors shall be
> citizens of the United States and a majority residents of
> the commonwealth or to limited liability companies or
> limited liability partnerships organized under the laws
> of the commonwealth . . . .

Id.

Haronian, W&SR, and Peoples challenge § 15 on numerous
grounds.  The plaintiffs' challenges are "as applied."[1]
Plaintiffs' challenges attack numerous aspects of § 15, some of
which, like the three-license limit and in-state residency
requirement for license-holders, existed before the statute's
2004 amendment.  Some of the plaintiffs' challenges attack the

---

[1] There has been confusion throughout this litigation as to
whether the plaintiffs' challenges are "facial" or "as applied."
The plaintiffs made their intentions clear in their opposition to
Defendants' motion to dismiss, in which they stated,
unequivocally that their challenges were as applied: "The
Plaintiffs' [sic] challenge the amended statute as it is applied
to them, not on its face."  (Pls.' Opp. to Mot. to Dismiss 7.)
Plaintiffs also state: "Put simply, there is nothing facial about
the Plaintiffs' claims."  (Id.)

statute as it was recently amended.  The Court will note which part of the statute the plaintiffs attack in its discussion of each individual claim.

## B. **Standard of Review**

For purposes of this motion, the Court takes as true "the well-pleaded facts as they appear in the complaint, extending [the] plaintiff every reasonable inference in his favor."  Coyne v. City of Somerville, 972 F.2d 440, 442-43 (1st Cir. 1992) (citing Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 51 (1st Cir. 1990)).  A complaint should not be dismissed under Fed. R. Civ. P. 12(b)(6) unless "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Roeder v. Alpha Indus., Inc., 814 F.2d 22, 25 (1st Cir. 1987) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

Many of these facts are taken from the opinion of the ABCC dated November 7, 2005 which rejected the franchise agreement at issue in this case (hereinafter cited as ABCC Decision).  As the ABCC opinion is a public record submitted to the Court by both parties, I take judicial notice of its contents under Fed. R. Evid. 201.  See Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) ("Ordinarily, of course, any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into

one for summary judgment under Rule 56.  <u>See</u> Fed. R. Civ. P. 12(b)(6).  However, courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.").

## C. <u>Freedom of Association</u>

Plaintiffs claim that § 15 prevents them from forming an expressive association in violation of the First Amendment.  U.S. Const. amend I.  In essence, Plaintiffs contend that the prohibition on "participa[tion] in any action designed to effect common results of more than 3 licensees under this section" violates the freedom of association.  Mass. Gen. Laws ch. 138, § 15.  The language exists in the statute to effectuate the Commonwealth's longstanding limit on holding a direct or indirect beneficial interest in more than three liquor store licenses.

The First Circuit, however, recently dealt a fatal blow to the plaintiffs' claim in <u>Wine & Spirits Retailers, Inc. v. Rhode Island</u>, 418 F.3d 36, 50-53 (1st Cir. 2005).  In that case, two of the plaintiffs in this action, W&SR and Haronian, sought a preliminary injunction against the enforcement of Rhode Island's recently enacted statute banning the operation of franchised or "chain store organization" liquor stores.  <u>See</u> R.I. Gen. Laws §§ 3-5-11; 3-5-11.1 (2006).  In <u>Wine & Spirits</u>, the plaintiff

franchisor argued that the Rhode Island statutes, "by directly and indirectly prohibiting the holders of Class A liquor licenses from engaging in franchise relationships, impinge on its First Amendment right to associate with its franchisees for the purposes of joint advertising and development of common management and marketing strategies."  418 F.3d at 50.

The court proceeded to reject that claim, stating that: "Business entities have no First Amendment right to combine operations or coordinate market activities for the purpose of obtaining a greater market share for each participant.  The fact that communication serves as the primary instrument of conducting business among separate enterprises does not alter this conclusion."  Id. at 51.  The court cited Supreme Court opinions upholding antitrust laws against First Amendment challenges, explaining that the First Amendment cannot serve as a shield against the application of general business regulations.  Id. (citing Cal. Motor Transp. Co. v. Trucking Unltd., 404 U.S. 508, 515 (1978) (noting that "the constitutionality of the antitrust laws is not open to debate")).  Analogizing the Rhode Island statute to an antitrust law, the court remarked, "While the State cannot regulate the right of speakers to band together to convey a common message in the marketplace of ideas, it most assuredly can exercise control over the efforts of market players to exploit the principle of strength in numbers in the marketplace of goods."  Id. at 51-52. The court concluded:

9

> Here, it is nose-on-the-face plain that W&S's commercial
> conduct exhibits nothing that even the most vivid
> imagination might deem uniquely expressive.  Certainly
> the mere fact that the joint activities that define the
> business relationship between the franchisor and
> franchisee have some communicative component cannot, in
> and of itself, establish an entitlement to the
> prophylaxis of the First Amendment.  Consequently, that
> conduct does not warrant overriding the State's historic
> right to regulate market forces in the retail liquor
> industry.

Id. at 53.

If Rhode Island may ban franchised liquor stores,
participation in any common liquor advertisement, use of a name
identified with a common entity, or common ownership of multiple
liquor licenses, R.I. Gen. Laws §§ 3-5-11; 3-5-11.1, then a
fortiori, Massachusetts may limit participation in action
designed to effect common results of more than three liquor
licenses.  The freedom of association claim in this case is not
fundamentally different from the claim in Wine & Spirits, and the
Commonwealth's statute is not as restrictive as Rhode Island's.

As such, the motion to dismiss the freedom of association
claim is **ALLOWED**.

## D. **Freedom of Speech**

Plaintiffs argue that § 15, as amended, violates their First
Amendment right to freedom of speech in two ways: (1) the statute
precludes giving management and marketing advice for a fee, and
(2) it prohibits joint advertising activities.  The Court notes
that the statute does neither of these things by its terms.  The

portion of the statute with which Plaintiffs take offense reads:

> No person, firm, corporation, association, or other
> combination of persons, directly or indirectly, or
> through any agent, employee, stockholder, officer, or
> other person or any subsidiary whatsoever, shall be
> granted, in the aggregate, more than three such licenses
> in the commonwealth, or participate in decisions
> regarding the purchasing of alcoholic beverages or the
> purchasing of insurance or accounting or bookkeeping
> services, or receive any percentage or fee derived from
> gross revenues in exchange for management assistance, or
> participate in any other action designed to effect common
> results of more than 3 licensees under this section, or
> be granted more than one such license in a town or two in
> a city.

Mass. Gen. Laws ch. 138, § 15 (2005) (emphasis added).

Plaintiffs' challenges based on management advice and joint
advertising are slightly different, although the analysis of each
is similar.  As to each count, Defendants vigorously argue that
Plaintiffs lack standing under the ABCC's recent decision denying
Santoro's license, and that the statute is constitutional under
the First Circuit's recent decision in Wine & Spirits, 418 F.3d
35.

1. The ABCC Decision

As noted above, the ABCC issued an opinion denying Santoro's
application for a license on November 7, 2005.  In that opinion,
the ABCC, for the first time, interpreted the meaning of the
amended § 15, making several statements relevant to the claims in
this case.  These statements confirm Defendants' persistent
contentions that § 15 is not as broad as Plaintiffs have made it
out to be.  In particular, the ABCC confirmed that the amended

11

statute does not, as Plaintiffs initially contended, work a complete ban on package store franchising, management advising, or joint advertising activities.  See ABCC Decision at 3, 6-7.

More specifically, the ABCC attempted to clarify its position regarding franchising and advertising activities. Explaining that it did "not hold, nor have we ever held, that § 15 'package store' franchises are illegal per se," the ABCC confirmed that § 15's primary concern is with arrangements that result in an entity holding a beneficial interest in three or more liquor stores.  As such, the ABCC interpreted the statute to mean that:

> Section 15 appears to permit fixed fees that do not create a direct or indirect beneficial interest in a person or combination of persons when such fixed fees are paid for services not specifically prohibited by section 15, so long as sufficient revenue to pay all such fixed fees is derived from the license holder from a source other than the sale of alcoholic beverages.

Mass. Gen. Laws ch. 138, § 15 (2005).  Ostensibly, fees for management advice would have to come from sales of other items, such as food, non-alcoholic beverages, and dry goods.

The ABCC also offered an explanation of its likely stance with regard to joint advertising activities.  A pre-existing statute explicitly allows up to seven package stores to jointly or cooperatively advertise product prices.  Mass. Gen. Laws ch.

12

138, § 24 (2005).[2]  The ABCC opined as to the impact of amended

§ 15 on § 24:

> The Commission may read these statutes together to prohibit third parties and section 15 licensees from receiving or paying a fee above the actual cost of publication of the joint advertisement conducted in compliance with section 24 of chapter 138.  But this application did not present this question to the Commission for resolution.

ABCC Decision at 7.  The above blend has the flavor of the

advisory opinion varietal, but it is part of the terroir[3]

infusing this case.

     Although the ABCC's interpretation of the statute is not

nearly as broad as Plaintiffs predicted at the outset of this

case, and is certainly not as broad as the challenged Rhode

Island statute in Wine & Spirits, which banned franchising and

joint advertising outright, Plaintiffs still contend that the

---

[2] In pertinent part, § 24 reads:

The commission shall . . . make regulations . . . regulating all advertising of alcoholic beverages, except such advertising . . . wherein licensees jointly or cooperatively advertise product prices; provided, however, that the number of licensees participating in any such advertisement shall not exceed seven . . . .

Mass. Gen. Laws ch. 138, § 24 (2005).

[3] *Terroir*, n., Translated literally as *soil*, this French term describes not only the terrain on which the vines are grown, but also encompasses soil, slope, orientation to the sun, elevation and effects of climate. Can be used for earth characteristics found in a wine. See Wine Glossary, http://winegeeks.com/resources/glossary/T/63/terroir/ (last visited May 5, 2006).

ABCC's take on § 15 violates the First Amendment.

2. <u>Standing</u>

    Defendants argue that none of the plaintiffs have standing
to assert either of the free speech claims.  In essence,
Defendants claim that because the ABCC denied Santoro's
application on grounds that it would create a beneficial interest
in a fourth package store license for her father, Haronian,
Plaintiffs have not been injured by the amendments to § 15.  In
other words, the ABCC rejected the license application based on
factors unrelated to Plaintiffs' assertions that § 15 restricts
free speech, namely the familial ties between Haronian and
Santoro and the extent of control the franchise agreement gave
W&SR over DW&S, its franchisee.  <u>ABCC Decision</u> at 6-7.

    To have standing, "[a] plaintiff must allege personal injury
fairly traceable to the defendant's allegedly unlawful conduct
and likely to be redressed by the requested relief."  <u>Raines v.
Byrd</u>, 521 U.S. 811, 818 (1997) (quoting <u>Allen v. Wright</u>, 468 U.S.
737, 751 (1984)).  "The injury alleged must be, for example,
distinct and palpable, and not abstract or conjectural or
hypothetical.  The injury must be fairly traceable to the
challenged action, and relief from the injury must be likely to
follow from a favorable decision."  <u>Allen</u>, 468 U.S. at 751
(internal citations omitted).  The Court must determine, with
respect to each of the First Amendment claims, whether the
Plaintiffs have standing to assert them.

3. <u>Management Advice</u>

    a. Standing

Plaintiff W&SR argues that it is deprived of its right to free speech because § 15 restricts fees for management advice. Initially, Plaintiff argued that § 15 completely barred giving management advice for a fee. Following the ABCC decision, which explicitly allowed fixed fees for management advice as long as the revenue is derived from a source other than the sale of alcoholic beverages (<u>ABCC Decision</u> at 7), Plaintiff changed tack slightly. Plaintiff now argues that the limitation on the source of the fee for advice is an unlawful financial restriction on speech. W&SR's franchise agreement with DW&SR included a fee of 1.2% of gross sales that the franchisee had to pay, and the ABCC cited this fee as a violation of § 15. <u>ABCC Decision</u> at 7.

Although the ABCC discussed numerous aspects of the Haronian-Santoro relationship in arriving at its conclusion that the franchise agreement served to give Haronian and W&SR control over a fourth package store license (disclosure and access to financial records, right to prior approval of a transfer, the familial relationship between Haronian and Santoro), the Commission specifically cited the fixed percentage fee as a violation of § 15. <u>Id.</u> The decision is ambiguous as to whether, but for this provision of the statute, the Commission would have approved the Santoro license. However, the converse is clear; even if there were none of the other factors involved in this

15

case, the fee would have invalidated the franchise agreement because it is in direct violation of § 15.  As such, W&SR has suffered an injury fairly traceable to the statute.  Whether or not the injury would be redressed by the injunctive relief sought here is at least questionable because regardless of the provision for a percentage fee, the ABCC might not approve the franchise agreement as written.  That said, the agreement might have been saved in other ways; the injury worked by the prohibition against the percentage fee is certain.  Wine & Spirits, 418 F.3d at 45.  As such, W&SR has standing to pursue this aspect of its First Amendment claim.

b. Free Speech Analysis

The free speech question this Court must resolve on the merits is whether it is a violation of the First Amendment for the Commonwealth to require that a fee for management advice be fixed and from a source other than alcoholic beverage sales if that advice is designed to effect common results of more than three licensees.  Plaintiffs contend that the statute, as interpreted by the ABCC, "places severe restrictions on the amount that can be paid for management and marketing advice provided by franchisors," and is therefore unconstitutional. (Supp. Opp. to Mot. to Dismiss 3.)  The First Circuit's holding in Wine & Spirits, however, compels the opposite result.

In Wine & Spirits, two plaintiffs involved in this case, Haronian and W&SR, challenged the recent amendments to the Rhode

16

Island liquor licensing laws which explicitly banned franchise
package stores.  418 F.3d at 41.  Plaintiffs collectively sought
a preliminary injunction against enforcement of the statutes on
First Amendment grounds, arguing that the statute "adversely
affects its ability to sell business advice."  Id. at 47.  The
Rhode Island statutes explicitly ban franchised liquor stores and
common ownership of multiple stores.  R.I. Gen. Laws §§ 3-5-11;
3-5-11.1 (2006).  The First Circuit upheld the Rhode Island
statute, stating that the "plain, hard fact is that [the statute]
simply does not prohibit the communication of advice between a
franchisor and the holders of Class A liquor licenses."  Wine &
Spirits, 418 F.3d at 47.  Although the statute had "the
incidental effect of suppressing or eliminating market demand for
the particular type of business advice that W&S offers," the
Court found that this "did not hoist the red flag of
constitutional breach: the First Amendment does not guarantee
that speech will be profitable to the speaker or desirable to its
intended audience."  Id. at 47-48.  The First Circuit concluded
its analysis by noting that "the First Amendment does not
safeguard against changes in commercial regulation that render
previously profitable information valueless."  Id. at 48.

It would be an anomaly for the Rhode Island statutes, which
completely ban franchise agreements between liquor stores, to
stand, and for Massachusetts's statute restricting the source of
fees to violate the First Amendment.  Nothing in the

17

Massachusetts law prohibits the communication of a recipe for business success from W&SR to a Massachusetts licensee, or the amount which a package store can pay for it. There are no restrictions at all so long as the advisor does not have a beneficial interest in three liquor stores. Once an advisor has an interest in three liquor stores, the fee must be fixed and not come from liquor sales revenue, because a fee derived from a percentage of gross liquor sales would constitute a beneficial interest in a fourth license. Any supposed burden on Plaintiffs' speech only kicks in at the point the advisor acquires a fourth beneficial interest by taking a fee linked to gross sales.

Plaintiffs seek support for their theory in the notion that the First Amendment prohibits the government from suppressing disfavored speech by placing a financial burden upon it. "If the government were free to suppress disfavored speech by preventing potential speaker from being paid, there would not be much left of the First Amendment." See Pitt News v. Pappert, 379 F.3d 96, 106 (3d Cir. 2004) (Alito, J.) (holding that a state law preventing a student newspaper from accepting any fee for printing alcohol advertisements violated the free speech rights of the newspaper). Moreover, the Supreme Court has recognized that some profit-directed speech, such as tutoring, legal advice and medical consultation provided for a fee, is entitled to First Amendment protection. Wine & Spirits, 418 F.3d at 47 (citing Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 482 (1989)).

18

However, unlike the _Pappert_ case, the Massachusetts statute places no limit on the amount of the fixed fee a package store owner might pay a consultant for management advice, and the restriction on a fee based on gross sales is only effective once a person owns a beneficial interest in three liquor stores.

Rather, Plaintiffs' real quarrel in this case is with the Commonwealth's restriction of holding a beneficial interest in more than three licensed liquor stores.  The First Circuit made clear in _Wine & Spirits_ that such a general commercial regulation, like the antitrust laws, would not offend the free speech clause.  Finding Rhode Island's law banning franchised liquor stores to not infringe freedom of association, the court stated that their "conclusion that otherwise valid regulation of commercial interactions between business entities does not offend the First Amendment merely because such interactions have a communicative component would apply with equal force [to our free speech analysis] had we found that [the statute] did in fact impede communications."  418 F.3d at 53 n.5.  The same reasoning which led the court to reject the plaintiffs' freedom of association claim also puts a cork in their free speech bottle.

4. _Joint Advertising_

At different points in this litigation, Plaintiffs W&SR and Peoples have asserted, albeit in only sparse briefing, that § 15, as amended, creates an unconstitutional restriction on joint advertising activities.  After the ABCC issued its opinion

rejecting the Santoro license, the Plaintiffs argued that its interpretation of § 15, which "prohibit[s] third parties and section 15 licensees from receiving or paying a fee above the actual cost of publication of the joint advertisement," places an unconstitutional burden on the exercise of free speech. <u>ABCC Decision</u> at 7. After examining the claims in this case, the Court concludes that Peoples does not have standing to assert this claim, and that W&SR, though it has standing, cannot prevail on the merits under <u>Wine & Spirits</u>.

a. Standing

Plaintiff W&SR argues that it has standing to assert a claim because the ABCC invalidated the mandatory advertising fee of 1.2 percent of gross sales in its franchise agreement with Santoro. Indeed, the ABCC Decision did find that the "plain language of the M.G.L. ch. 138, § 15 as amended in 2004 prohibits this provision of the franchise agreement." <u>ABCC Decision</u> at 7. This fee transgresses the likely proscription against fees above the actual cost of publication. As explained above, although there were other reasons for denying the license application, it is clear that the statutory violation was an insurmountable obstacle to the approval of this franchise agreement. As such, the Court finds that W&SR has standing.

Peoples, on the other hand, does not possess standing because it has not suffered an injury from the statute. The gravamen of the claim is that by restricting the source and

amount of fees that can be paid to engage in joint advertising, the statute infringes on its freedom of speech. However, Peoples has not challenged the statute as restricting its First Amendment rights to communicate with its customers. The statute does not place a prohibition on any of Peoples' activities. As the Court reads the ABCC Decision, up to seven licensees may join together to advertise product prices so long as no one entity controls more than three licenses. Peoples does not challenge the pre-existing § 24 seven-license limit because is apparently does not affect them. Furthermore, the ABCC indicated that § 15 does not preclude more than three liquor stores from using the same name so long as the stores do not violate the three-license limit. Peoples has not claimed it suffered any injury with respect to its joint advertising activities.

b. Free Speech Analysis

The Court is left with W&SR's First Amendment challenge to the restriction on fees for joint advertising, which I must resolve on the merits. The First Circuit resolved a similar claim against W&SR in the <u>Wine & Spirits</u> case. W&SR challenged the provision of the Rhode Island statute prohibiting "[p]articipation in a coordinated or common advertisement with one or more liquor licensed business in any advertising media." R.I. Gen. Laws § 2-5-11(b)(iii) (2006). Again, Rhode Island's statute is more potent than the Massachusetts vintage, and the First Circuit's decision upholding the Rhode Island statute

21

spells doom for Plaintiffs in this case.

The Court notes, as did the First Circuit, that "commercial speech, including truthful liquor advertising, is entitled to a measure of protection under the First Amendment." Wine & Spirits, 418 F.3d at 48 (citations omitted).  However, the First Circuit rejected W&S's claims because "in performing its role in the activities in question, it does not engage in commercial speech." Id. at 49.  Rather than impeding its right to communicate with potential customers, the Rhode Island statute interfered with W&S's right to provide certain services, such as designing advertisements, arranging for their publication, and licensing the use of trade names. Id.  The court held that the "provision of advertising and licensing services is not speech that proposes a commercial transaction and therefore does not constitute commercial speech," and that "W&S has offered no plausible argument as to why the provision of advertising services is an inherently expressive activity." Id.[4]  The First Circuit's reasoning applies with equal force here.  If the services W&S provides do not qualify for First Amendment protection, it cannot sustain a claim, especially given that the

---

[4] The First Circuit also held that W&S could not assert third party standing on behalf of franchisees, noting that "any assertion that the advertising and common naming provisions substantially overreach would fail because the overbreadth doctrine is inapplicable in the commercial speech context." Wine & Spirits, 418 F.3d at 50 (citing Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 496-97 (1982)).

Massachusetts restrictions on joint advertising are less draconian that the Rhode Island ban.[5]

The motion to dismiss the free speech claim is **ALLOWED**.

**E. Equal Protection**

Plaintiffs also launch a challenge to § 15 on equal protection grounds, but its demise is also foretold by the First Circuit's decision in Wine & Spirits.  418 F.3d at 53-54. Plaintiffs assert, as they did in Wine & Spirits, that § 15's restriction on participation in action designed to effect common results of more than three licensees applies only to liquor stores, not establishments that serve liquor to be drunk on the premises, like bars and restaurants.  This unequal treatment, Plaintiffs allege, allows restaurants, for instance, to take advantage of economies of scale related to concerted action that liquor stores may not.  According to Plaintiffs, this unequal treatment must be struck down under the Fourteenth Amendment because there is no rational basis for it.

The First Circuit rejected this argument as well in Wine & Spirits, finding that the Rhode Island statutes banning liquor store franchises, survived rational basis scrutiny.  418 F.3d at

---

[5] As a caveat, ABCC's suggestion of a reading of § 15 and § 24 together to ban a franchisee from paying more than the "actual cost of production" for advertising would arguably preclude any payment for advertising services.  I do not express an opinion on whether, in another case, that interpretation would be an improper suppression of disfavored speech by Peoples.

53-54.  The rules for rational basis scrutiny when a statute does not use suspect classifications or infringe on fundamental rights are familiar.[6]  Under rational basis scrutiny, "an inquiring court must uphold the legislation as long as the means chosen by the legislature are rationally related to some legitimate government purpose."  Id. at 53 (quoting Hodel v. Indiana, 452 U.S. 314, 331 (1981)).  A state's legislative enactments carry a strong presumption of validity, and the plaintiff can only overcome this presumption by showing "that there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals."  Eulitt v. Me. Dep't of Educ., 386 F.3d 344, 356 (1st Cir. 2004).

Plaintiffs' attack on this front can be distilled to an argument that there is no rational basis for prohibiting franchise relationships.  There are two flaws in this argument. First, the First Circuit, in Wine & Spirits, upheld against equal protection challenge Rhode Island's complete ban of franchised liquor stores on grounds that it is rationally related to the state's goal of maintaining a competitive retail liquor industry, and that restaurants were not similarly situated entities.  Wine & Spirits, 418 F.3d at 54.  Second, as noted above, the ABCC

---

[6] Plaintiffs, of course, assert that § 15 violates their First Amendment rights.  I, however, have allowed Defendants' motion to dismiss those claims.

stated that the amended § 15 does not ban franchised liquor stores per se. ABCC Decision at 3. Section 15 allows franchises as long as the franchise relationship does not give any entity a direct or indirect beneficial interest in more than three licenses. Id. at 7.

The Supreme Judicial Court of Massachusetts has already upheld the Commonwealth's three-license limit against an equal protection challenge. See Johnson, 374 Mass. at 792. Among other reasons, the SJC noted that, "Regulation of the number of licenses issued, therefore, aims at controlling the tendency toward concentration of power in the liquor industry; preventing monopolies; avoiding practices such as indiscriminate price cutting and excessive advertising; and preserving the right of small, independent liquor dealers to do business." Id. These reasons suffice. Defendants' motion to dismiss the equal protection claim is **ALLOWED**.

## F. Takings

Plaintiffs argue that the 2004 amendment to § 15 amounted to a regulatory taking under the Fifth Amendment. U.S. Const. amend. V ("nor shall private property be taken for public use, without just compensation"). Their claim is based on the assumption that certain franchise agreements were legal prior to the 2004 Amendment to § 15, and now they are not, washing away their reasonable investment backed expectations. Specifically,

25

plaintiff Peoples argues that it, as a current franchisee of W&SR, expected its franchise fees to decrease in the future as W&SR added Massachusetts franchises to the fold.  For its part, plaintiff W&SR argues that it had a franchise agreement with DW&SR which it had to void as a result of the new legislation.[7]

"A regulatory taking transpires when some significant restriction is placed upon an owner's use of his property for which 'justice and fairness' require that compensation be given." Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d 294, 306 (1st Cir. 2005) (quoting Philip Morris, Inc. v. Reilly, 312 F.3d 24, 33 (1st Cir. 2002)).  In deciding whether a particular regulation constitutes a regulatory taking, a court should analyze "the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action."  Kaiser Aetna v. United States, 444 U.S. 164, 175 (1979).  In this case, Plaintiffs argue only that the amendments to § 15 interfere with reasonable investment backed expectations.

To begin, there is some question as to whether the arrangement Plaintiffs allege was "taken" by the amendments to § 15 was legal even before the amendment.  Prior to the statute's

_____

[7] There is some question as to whether what the plaintiffs claim to have lost constitutes "property" under the Fifth Amendment.  Moreover, it is unclear exactly what has been "taken" for public use, but the defendants have not argued these points at this stage of litigation.

amendment, the ABCC had allowed under § 15 a franchised "chain to operate more than three licenses . . . provided that the additional licenses are independent and no financial benefit is made between franchisor and franchisee relative to the liquor license and its operation."  See ABCC Decision, White Hen Pantry, 660 Industrial Dr., Elmhurst, IL, November 1993.

In its opinion denying approval of the franchise agreement in this case, the ABCC stated that the reason for its decision was that the agreement would create a direct or indirect beneficial interest in more than three licenses for John Haronian.  ABCC Decision at 6-7.  The ABCC based its decision on the amount of control Haronian would be able to assert over his daughter Santoro's store.  Id. at 7.  The ABCC also noted that the franchise agreement's required payment for advertising of 1.2 percent of gross sales flies in the face of § 15's contravention on "receiv[ing] any percentage or fee derived from gross revenues in exchange for management assistance . . . designed to effect common results for more than 3 licensees under this section." Id.  The ABCC's opinion does not state whether the franchise agreement in the case at bar would have been illegal under the old version of § 15.  Even though the Commission concluded that the agreement gave Mr. Haronian a beneficial interest in a fourth license (something which would have been prohibited before 2004), it also made plain that the franchise agreement violated the statute in its amended form.  Id.  There is a significant

27

question as to whether this contract was legal before the amendment. As such, the plaintiffs' claim of a reasonable investment backed expectation is more suspect.

"[A] party challenging a governmental action as an unconstitutional taking bears a substantial burden." E. Enters. v. Apfel, 524 U.S. 498, 523 (1998). Additionally, the Supreme Court has emphasized that "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense." Armstrong v. United States, 364 U.S. 40, 48 (1960). To boot, this case involves personal property, the value of which the Supreme Court "cautioned could be wiped out without triggering the strictures of the Takings Clause." Reilly, 312 F.3d at 35 (citing Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1027-28 (1992)).

In this case, however, the plaintiffs could not have had a reasonable investment backed expectation that the agreement would be sustained. First, as discussed above, there is a significant question as to whether the agreement would have been legal under the pre-amendment § 15. Second, to the extent that some formerly legal franchise arrangements have been invalidated by the amendment, the amendment does not completely eliminate the ability of a liquor store to operate as a franchise. See ABCC Decision at 3 (stating "we do not hold, nor have we ever held, that § 15 package store franchises are illegal per se"). This is not a situation where all economically viable use of property has

28

been eliminated by a regulation.  <u>Cf.</u> <u>Lucas</u>, 505 U.S. at 1035.

Third, any expectation of the ground rules for liquor stores

remaining unchanged must have been tenuous given the nature of

this heavily regulated area.  The Supreme Court has admonished

that "those who do business in [a] regulated field cannot object

if the legislative scheme is buttressed by subsequent amendments

to achieve the legislative end."  <u>Concrete Pipe & Prods. of Cal.,</u>

<u>Inc. v. Constr. Laborers Pension Trust</u>, 508 U.S. 602, 645 (1993)

(finding no reasonable investment backed expectation when ERISA

regulation was changed to increase liability for employers)

(quoting <u>FHA v. The Darlington, Inc.</u>, 358 U.S. 84, 91 (1958));

<u>Reilly</u>, 312 F.3d at 36 ("Courts protect only reasonable

expectations.  Ideally, the relevant inquiry should recognize

that not every investment deserves protection and that some

investors inevitably will be disappointed.").

One would be hard-pressed to find a field more traditionally

and heavily regulated than the liquor industry, particularly in

Massachusetts.  <u>See</u> <u>Johnson</u>, 374 Mass. at 793 (upholding § 15

against equal protection and due process challenges, noting that

"although package store owners are subject to distinct

restrictions within c. 138's statutory scheme, they do not stand

alone as a highly regulated segment of the liquor industry").

Section 15 and its limit on holding more than three licenses have

long been part of that regulatory scheme.  <u>See</u> <u>Powers v. Sixty</u>

<u>Broadway</u>, 371 Mass. 296, 300, 356 N.E.2d 704, 706 (1976)

29

(affirming denial of license under § 15); <u>Connolly v. Alcoholic Beverages Control Comm'n</u>, 334 Mass. 613, 617, 138 N.E.2d 131, 134 (1956) (noting that legislative history of the statute "clearly shows that the powers of the commission [in the approval or disapproval of the action of local licensing authorities] were not intended to be perfunctory or limited"). <u>See also</u> <u>Everard's Breweries v. Day</u>, 265 U.S. 545, 563 (1924) (upholding national prohibition acts against takings challenge).

Given the heavy regulation of this field by the legislature, the caselaw, and the continuous statements by the ABCC that control of more than three licenses would not be tolerated, it could not have come as a shock that the legislature would act as they did in the amendment to § 15.  As such, any averment of a reasonable investment backed expectation of this franchise agreement's viability is insufficient to support a regulatory takings claim. <u>See</u> <u>Rowe</u>, 429 F.3d at 315 (Boudin, J., concurring) ("Given the absence of a full-scale taking and the presence of a traditional regulatory interest, it is enough to defeat the takings claim that no reasonable investment-backed expectation is present at all.").  "Justice and fairness" do not require that Plaintiffs be compensated for the effects of the amendments to § 15 on their franchise agreement.  <u>See</u> <u>Goldblatt v. Hempstead</u>, 369 U.S. 590, 594 (1962).

The motion to dismiss the takings claim is **ALLOWED**.

30

**G. <u>ERISA Preemption</u>**

Plaintiffs claim that the portion of the statute, added in the 2004 Amendment, which prevents any entity from participating in decisions regarding the purchasing of insurance for more than three licensees is preempted by ERISA, 29 U.S.C. § 1001, *et seq*. The relevant portion of the statute reads: "No person, firm, corporation, association, or other combination of persons, directly or indirectly . . . shall . . . participate in decisions regarding . . . the purchasing of insurance . . . designed to effect common results of more than 3 licensees . . . ." Mass. Gen. Laws ch. 138, § 15. The gravamen of Plaintiffs' claim is that because § 15 prevents franchisors and franchisees from taking advantage of purchasing group insurance, the law intrudes into an area already staked out by ERISA. Plaintiffs further contend that their claim is as applied to them since they may not purchase or benefit from insurance plans covering more than three licenses. Plaintiffs' claim is potentially intoxicating.

The Court declines to resolve the close issue at this time for the following reasons. First, the issue has not been extensively briefed. Second, the Court does not have an opinion from the ABCC concerning the question of whether §15 applies to ERISA plans. Finally, there is a factual question which may obviate the harder statutory one.

The motion to dismiss the ERISA preemption claim is **<u>DENIED.</u>**

31

## H.  <u>Dormant Commerce Clause</u>

Plaintiffs' final challenge attacks a different part of § 15, alleging that the portion of the statute which restricts the awarding of liquor licenses based on residency violates the dormant Commerce Clause, U.S. Const., Art. I, § 8, cl. 3.  In relevant part, the statute reads:

> The local licensing authorities . . . may grant licenses for the sale at retail of such alcoholic beverages . . . to applicants therefor who are citizens and residents of the commonwealth, or partnerships composed solely of such citizens and residents or to corporations organized under the laws of the commonwealth and whereof all directors shall be citizens of the United States and a majority residents of the commonwealth or to limited liability companies or limited liability partnerships organized under the laws of the commonwealth, subject to such conditions as the commission may prescribe by regulation . . . .

Mass. Gen. Laws ch. 138, § 15 (2005).  First, the Court will determine whether the plaintiffs have standing to assert the claim.  Finding that the plaintiffs do have standing, the Court will then address whether they have stated a claim for a violation of the dormant Commerce Clause.  If the plaintiffs surmount that hurdle, the Court will decide whether the statute is rescued by the Twenty-first Amendment, as the defendants claim.  <u>See</u> <u>Capital Cities Cable, Inc. v. Crisp</u>, 467 U.S. 691, 698 (1984) (noting the appropriateness of determining whether the statute conflicts with federal law before addressing the impact of the Twenty-first Amendment).

1.  <u>Standing</u>

As stated above, to have standing, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." <u>Raines</u>, 521 U.S. at 818.  Plaintiffs meet all of these requirements.  The statute prevents Haronian, a resident of Rhode Island and sole owner of the other two plaintiff corporations, from personally obtaining a package store license in Massachusetts.  W&SR cannot possess a Massachusetts liquor license because it is a corporation organized under the laws of Rhode Island.  Peoples is a Massachusetts corporation, but the statute requires that the majority of its board of directors be residents of Massachusetts.  Therefore, Haronian, as sole owner of Peoples, may not freely select the board of directors.  These are all distinct injuries arising directly from the existence of the arguably unconstitutional statute which would be redressed by the relief sought.  <u>See</u> <u>Houlton Citizens' Coal. v. Town of Houlton</u>, 175 F.3d 178, 183 (1st Cir. 1999) (noting standing of the "classic plaintiff asserting his own economic interests under the Commerce Clause – a constitutional provision specifically targeted to protect those interests").

2. <u>Dormant Commerce Clause</u>

Plaintiffs argue that the residency requirement violates the dormant Commerce Clause.  The Commerce Clause provides Congress the power "[t]o regulate Commerce with foreign Nations and among the several States, and with the Indian Tribes."  U.S. Const.,

Art. I, § 8, cl. 3. However, the Commerce Clause does not embody only an affirmative grant of power. "It has long been accepted that the Commerce Clause not only grants Congress the authority to regulate commerce among the States, but also directly limits the power of the States to discriminate against interstate commerce." New Energy Co. v. Limbach, 486 U.S. 269, 274 (1988); see also Dennis v. Higgins, 498 U.S. 439, 447 (1991) (holding that the Commerce Clause is "also a substantive restriction on permissible state regulation of interstate commerce"). This "negative aspect" of the Clause has been recognized for over 150 years and is known as the "dormant Commerce Clause." See Walgreen Co. v. Rullan, 405 F.3d 50, 55 (1st Cir. 2005) (citing Laurence H. Tribe, 1 American Constitutional Law 1030 (3d ed. 2000)).

The Supreme Court has held that the dormant Commerce Clause

> reflects a central concern of the Framers that was an immediate reason for the calling of the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.

Hughes v. Oklahoma, 441 U.S. 322, 325-26 (1979). As Justice Jackson wrote, "No other federal power was so universally assumed to be necessary, no other state power was so readily relinquished." H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 534 (1949). Justice Cardozo's words reflect the importance the Court has placed on the doctrine: "The Constitution was framed

34

under the dominion of a political philosophy . . . that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." <u>Baldwin v. G.A.F. Seelig, Inc.</u>, 294 U.S. 511, 523 (1935); <u>Houlton</u>, 173 F.3d at 188 ("The core purpose of the dormant Commerce Clause is to prevent states and their political subdivisions from promulgating protectionist policies.").

As such, "the first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it 'regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce'" <u>Or. Waste Sys., Inc. v. Dep't of Envtl. Quality</u>, 511 U.S. 93, 99 (1994) (quoting <u>Hughes</u>, 441 U.S. at 335). If the Court finds that a state statute discriminates against interstate commerce, "it is virtually *per se* invalid." <u>Or. Waste Sys.</u>, 511 U.S. at 99; <u>Alliance of Auto. Mfrs. v. Gwadosky</u>, 430 F.3d 30, 35 (1st Cir. 2005) ("A state statute that . . . discriminates against interstate commerce on its face . . . receives a form of strict scrutiny so rigorous that it is usually fatal."). A facially discriminatory law may only be redeemed if the state can "show that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." <u>New Energy</u>, 486 U.S. at 278. However, this "burden of justification is so heavy that 'facial discrimination

35

by itself may be a fatal defect.'" Or. Waste Sys., 511 U.S. at 101 (quoting Hughes, 441 U.S. at 337).

In this case, the Massachusetts residency requirement discriminates against interstate commerce on its face. The Supreme Court has defined "discrimination" as "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Or. Waste Sys., 511 U.S. at 99. In this case, the discrimination against out-of-state liquor retailers is obvious. Non-resident individuals and corporations are categorically barred from obtaining package store licenses. A statute facially discriminates if "it overtly prevents foreign enterprises from competing in local markets." Lewis v. BT Inv. Managers, Inc., 447 U.S. 27, 35 (1980) (striking down Florida law preventing out-of-state holding companies from owning business providing investment advice); Nat'l Revenue Corp. v. Violet, 807 F.2d 285, 289 (1st Cir. 1986) (invalidating Rhode Island statute foreclosing out-of-state debt collectors from collecting debts from Rhode Island citizens). Cf. Houlton, 175 F.3d at 188 (noting that "if local legislation leaves all comers with equal access to the local market, it does not offend the dormant Commerce Clause"). Furthermore, the section of the statute requiring corporations to have majority Massachusetts directors is a per se statement of in-state favoritism. The extent of the discrimination "is of no relevance," only its existence. Wyoming v. Oklahoma, 502 U.S. 437, 455 (1992).

36

Even though a finding of facial discrimination is usually the death knell for state legislation under the dormant Commerce Clause, such a finding does not end the inquiry.  Rather, the burden then shifts to the state to "demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means."  Maine v. Taylor, 477 U.S. 131, 138 (1986) (quoting Hughes, 441 U.S. at 336).  At this stage, the Commonwealth argues only that the statute is redeemed by the Twenty-first Amendment and does not take the position that § 15 serves a legitimate local purpose that could not be served as well by nondiscriminatory means. If the Court decides that the Twenty-first Amendment does not immunize the statute from dormant Commerce Clause attack, the plaintiffs' claim survives the motion to dismiss.

 3. <u>Twenty-first Amendment</u>

Section 2 of the Twenty-first Amendment states: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."  U.S. Const. amend. XXI, § 2.  The Commonwealth contends that even if the statute would otherwise run afoul of the dormant Commerce Clause, it is authorized under the Twenty-first Amendment.

The interaction between the Twenty-first Amendment and the

dormant Commerce Clause has been a source of some confusion.  The
Supreme Court's language shortly after the Amendment's
ratification lends some credence to the Commonwealth's position:
to say a state must "let imported liquors compete with the
domestic on equal terms . . . would involve not a construction of
the Amendment, but a rewriting of it".  See State Bd. of
Equalization of Cal. v. Young's Market, 299 U.S. 59, 62 (1936)
However, the Court's more recent caselaw has demonstrated that
while the Twenty-first Amendment provides states with broad
latitude to regulate the importation and distribution of liquor,
it does not supersede other important constitutional interests.
See, e.g., 44 Liquormart v. Rhode Island, 517 U.S. 484, 516
(1996) (First Amendment freedom of speech); Larkin v. Grendel's
Den, Inc., 459 U.S. 116, 122 n.5 (1982) (Establishment Clause);
Craig v. Boren, 429 U.S. 190, 204-05 (1976) (Equal Protection
Clause); Wisconsin v. Constantineau, 400 U.S. 433, 436 (1971)
(Due Process Clause).

     More specifically, for over twenty years, the Supreme Court
has rejected the argument that the Twenty-first Amendment has
vitiated the Commerce Clause for alcoholic beverages.  In Bacchus
Imports, Ltd. v. Dias, the Court struck down a Hawaii statute
which exempted locally produced liquor from excise taxes.  468
U.S. 263 (1984).  In so doing, the Court noted that "[i]t is by
now clear that the [Twenty-first] Amendment did not entirely
remove state regulation of alcoholic beverages from the ambit of

38

the Commerce Clause." Id. at 275.  Describing the purview of the
Twenty-first Amendment, the Court went on to say that "[t]he
central purpose of the provision was not to empower States to
favor local liquor industries by erecting barriers to
competition." Id. at 276.  The Court instead applied a balancing
test, asking "whether the principles underlying the Twenty-first
Amendment are sufficiently implicated by the exemption . . . to
outweigh the Commerce Clause principles that would otherwise be
offended." Id. at 275.  Because the state attempted to justify
the tax exemption on the grounds that it would promote the local
liquor production industry, the Court struck down the statute
under the dormant Commerce Clause.  Id. at 276.

    In the years following the decision in Bacchus Imports, the
Court has had several other opportunities to examine the
relationship between the Commerce Clause and § 2 of the Twenty-
first Amendment.  The Court twice rejected state "price
affirmation" statutes which required liquor producers to affirm
that they were not charging lower prices for liquor in other
states.  See Healy v. Beer Institute, 491 U.S. 324, 343 (1989);
Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476
U.S. 573, 581-84 (1986).  In Healy, Justice Scalia noted in his
concurrence that the statute's "invalidity is fully established
by its facial discrimination against interstate commerce," and
that this "discriminatory character eliminates the immunity
afforded by the Twenty-first Amendment." Healy, 491 U.S. at 344

(Scalia, J., concurring in the judgment).  See also Mass. Food
Ass'n v. Mass. Alcoholic Beverages Control Comm'n, 197 F.3d 560,
565 (1st Cir. 1999) (upholding Massachusetts's three-license
limit against attack that it conflicts with Sherman Act, but
noting that "such statutes remain subject to the constraints of
the Commerce Clause").

Last year, the Court again revisited this area in Granholm
v. Heald, 125 S. Ct. 1885 (2005).  In so doing, the Court struck
down New York and Michigan statutes which operated to bar out-of-
state wineries from shipping directly to consumers while allowing
in-state wineries that very privilege.  Id. at 1891.  Like the
statute in this case, the Court found that the direct-shipping
statutes were facially discriminatory because "[t]hey deprive
citizens of their right to have access to the markets of other
States on equal terms."  Id. at 1896.  The Court reiterated that
"[t]he mere fact of nonresidence should not foreclose a producer
in one state from access to markets in other states."  Id. at
1895.

The Court then turned to whether the Twenty-first Amendment
rescued the discriminatory statutes, and the Court found that it
did not.  "The Amendment did not give States the authority to
pass nonuniform laws in order to discriminate against out-of-
state goods, a privilege they had not enjoyed at any earlier
time."  Id. at 1902.  The Court emphatically re-affirmed this
principle at several other points in the opinion.  See, e.g., id.

40

at 1903 ("Our more recent cases confirm that the Twenty-first
Amendment . . . does not displace the rule that States may not
give a discriminatory preference to their own producers."); id.
at 1904 (reiterating that "the Court has held that state
regulation of alcohol is limited by the nondiscrimination
principle of the Commerce Clause").

Once the Court found that the Twenty-first Amendment did not
protect the offending statutes from strict scrutiny, it rejected
the two "legitimate local purpose[s]" the states put forward in
their defense: tax collection and keeping liquor out of the hands
of minors.  Id. at 1905-07.  Finding that it was "mere
speculation" to assume that the laws served any purpose in
preventing underage drinking, the Court struck them down as
unjustifiably discriminatory against interstate commerce.  Id. at
1907.

The Court's logic in Granholm applies with equal force to
this case.  The statute at issue discriminates on its face
because it bars out-of-state liquor retailers from selling in
Massachusetts.  Under the Twenty-first Amendment, the
Commonwealth still must treat in-state and out-of-state goods
equally.

The defendants attempt to decant that logic by pointing out
the Supreme Court's pronouncement that States retain "virtually
complete control" over "how to structure the liquor distribution
system."  Id. at 1905.  In particular, the defendants rely on

41

Supreme Court precedent allowing a state to use a so-called "three-tier distribution system," in which separate licenses are required for producers, wholesalers, and retailers of alcohol. In Granholm, the Court cited its holding in North Dakota v. United States, 495 U.S. 423 (1990), which upheld, against a claim of federal preemption, a North Dakota statute requiring out-of-state importers to affix a label to all alcohol to be sold on a U.S. military base within the state's borders. Granholm, 125 S. Ct. at 1905. The Court stated:

> A State which chooses to ban the sale and consumption of alcohol altogether could bar its importation; and, as our history shows, it would have to do so to make its laws effective. States may also assume direct control of liquor distribution through state-run outlets or funnel sales through the three-tier system. We have previously recognized that the three-tier system itself is "unquestionably legitimate." State policies are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent. The instant cases, in contrast, involve straightforward attempts to discriminate in favor of local producers. The discrimination is contrary to the Commerce Clause and is not saved by the Twenty-first Amendment.

Id. at 1905 (citations omitted).

At the hearing on the motion to dismiss, Defendants made much of a "see also" citation in Granholm to Justice Scalia's concurrence in North Dakota, in which he states: "The Twenty-first Amendment . . . empowers North Dakota to require that all liquor sold for use in the State be purchased from a licensed in-state wholesaler." Granholm, 125 S. Ct. at 1905 (quoting North Dakota, 495 U.S. at 447). Relying on these excerpts, Defendants

42

argue that the holding in Granholm -- to wit, that the Twenty-
first Amendment does not allow facial discrimination against out-
of-state liquor under the dormant Commerce Clause -- applies only
to liquor producers and not retailers.  In other words,
Defendants argue that Massachusetts may not discriminate against
out-of-state liquor producers, but it may discriminate all it
wants against such foreign liquor retailers.  This argument
cannot continue to have legs.  While the three-tiered system is
unquestionably legitimate, Granholm cannot be held to sanction
protectionist policies at any of the tiers.  As the four-member
dissent points out, there is no principled basis for not allowing
States to discriminate against out-of-state liquor producers, but
allowing such discrimination against out-of-state retailers.  Id.
at 1923 (Thomas, J., dissenting).  This is especially so in light
of the Court's prior dormant Commerce Clause jurisprudence
outside the liquor arena, which has rejected unjustified
discrimination against purveyors of goods and services.  See
Lewis, 447 U.S. at 39 (rejecting statute that "overtly prevents
foreign enterprises from competing in local markets"); see also
Walgreen, 405 F.3d at 58 n.5 (noting that because a statute
"regulates the ownership of local businesses rather than the flow
of goods into the Commonwealth does not affect this conclusion
[that dormant Commerce Clause scrutiny is triggered]").

    Additionally, nothing in the Court's language endorses a
system like the one put into place under § 15.  While it is true

that a state may constitutionally ban the importation of alcohol
into the state altogether, or only sell alcohol in state-run
stores, once the state opens the market, it may not open it only
to in-state retailers.  In Granholm, New York, for example, could
have prohibited the consumption of wine altogether within its
borders, but once it allowed direct-shipping of wine by domestic
producers the state could not constitutionally "deprive citizens
of their right to have access to the markets of other States on
equal terms."  125 S. Ct. at 1896.  The same logic which led the
Supreme Court to strike down the discriminatory laws in Granholm
must obtain in this case.  As the Court reiterated, the Twenty-
first Amendment "did not give States the authority to pass
nonuniform laws in order to discriminate against out-of-state
goods, a privilege they had not enjoyed at any earlier time."
Id. at 1902.

Even prior to the decision in Granholm, two courts had
struck down residency requirements for package store licenses on
dormant Commerce Clause grounds.  See Cooper v. McBeath, 11 F.3d
547, 548 (5th Cir. 1994) (finding that the "Twenty-first
Amendment provides no sanctuary for these parochial statutes");
Glazer's Wholesale Drug Co. v. Kansas, 145 F. Supp. 2d 1234, 1247
(D. Kan. 2001).  The status of these cases following Granholm is
unclear, but the logic of the Granholm majority suggests that
they are consistent with the Supreme Court's current trajectory.

In this case, the reasoning which led to the Supreme Court's conclusions in Granholm, bolstered by their jurisprudence in this area since Bacchus Imports, justifies denying the motion to dismiss.  The Court finds that the residency requirements for licensees and directors under § 15 are facially discriminatory and are not rescued by the Twenty-first Amendment.  The burden now falls to the state to "demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means."  Taylor, 477 U.S. at 138.

Almost in passing, Plaintiffs appear to challenge § 15's three-license limit on package store licenses as violating the dormant Commerce Clause.  Obviously, the three-license limit does not facially discriminate against interstate commerce, as it applies neutrally to both in-state and out-of-state entities.  As such, it would be analyzed under the balancing test in Pike v. Bruce Church, 397 U.S. 137, 142 (1970).  Thus far, there has been almost no litigation on this question from either side; Defendants have focused their resistance entirely on the impact of the Twenty-first Amendment.  The Court declines to dismiss the claim without further briefing from the parties.

The motion to dismiss the dormant Commerce Clause count is **DENIED**.

## ORDER

45

The motion to dismiss is **ALLOWED** in part and **DENIED** in part (Docket No. 11).  The motion is allowed with respect to all claims except the ERISA preemption and dormant Commerce Clause claims.

**S/PATTI B. SARIS**
United States District Judge

46