08/09/06  12:08 FAX 401 222 6654       DEPT OF BUS REG                      ☒002

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * | CIVIL ACTION |
| WINE & SPIRITS          * | 04-418T |
| RETAILERS, INC., ET AL * | |
|                         * | |
| VS.                     * | JUNE 20, 2006 |
|                         * | |
| JEFFREY GREER, ET AL  * | PROVIDENCE, RI |
| * * * * * * * * * * | |

HEARD BEFORE THE HONORABLE ERNEST C. TORRES
CHIEF JUDGE
(DECISION)

APPEARANCES:

FOR THE PLAINTIFF:        ROBERT J. ROUGHSEDGE, ESQ.
                          Lawson & Weitzen, LLP
                          88 Black Falcon Avenue
                          Suite 345
                          Boston, MA  02210-1736
                          (617) 439-4990

FOR THE DEFENDANT
STATE OF RHODE ISLAND:    REBECCA PARTINGTON, ESQ.
                          Attorney General's Office
                          150 South Main Street
                          Providence, RI  02903
                          (401) 274-4400

FOR THE INTERVENOR
DEFENDANT:                JOSEPH S. LARISA, JR., ESQ.
                          Larisa Law and Consulting
                          55 Dorrance Street
                          Suite 301B
                          Providence, RI  02903
                          (401) 743-4700

Court Reporter:           Anne M. Clayton, RPR
                          One Exchange Terrace
                          Providence, RI  02903

Proceeding reported and produced by computer-aided
stenography

08/09/06  12:08 FAX 401 222 6654          DEPT OF BUS REG                    003

2

```
 1              THE COURT:  Good afternoon.
 2         MR. ROUGHSEDGE:  Good afternoon, your Honor.
 3         Your Honor, Mr. Lawson sends his regards.  He
 4    had a previously scheduled appointment the client asked
 5    him to attend.  He means no disrespect to the Court.
 6    He wanted to be here.  In fact, he's probably been
 7    trying to call me incessantly.
 8              THE COURT:  He sends his regards?
 9         MR. ROUGHSEDGE:  Yes.
10              THE CLERK:  The matter before the Court is Civil
11    Action 04-418T, Wine & Spirits, et al versus State of
12    Rhode Island.
13              THE COURT:  This case is here for the issuance
14    of a bench decision on the claims brought by the
15    plaintiffs.
16         The plaintiffs have brought a seven-count
17    Complaint that the Rhode Island statute prohibiting
18    chain store organizations and franchise operations from
19    engaging in retail sale of alcoholic beverages violates
20    nearly every provision of the Constitution except the
21    guarantee of the right to bear arms and the prohibition
22    against cruel and unusual punishment.  That's,
23    obviously, a slight overstatement, but maybe not too
24    much.
25         The Complaint consists of, basically, a litany
```

3

1   of the constitutional provisions allegedly violated

2   followed by a simple assertion that the statute

3   violates them.

4        As a general matter, it alleges that the Rhode

5   Island statute violates the plaintiff's First Amendment

6   rights of free speech and freedom of association, the

7   Commerce Clause, the Takings Clause of the Fifth

8   Amendment and the Equal Protection Clause of the 14th

9   Amendment.

10       Now, it's difficult to determine the precise

11  nature of some of the claims, because in some cases

12  neither the claim itself nor the basis for the claim is

13  very clearly articulated either in the Complaint, the

14  memoranda of counsel or the arguments that have been

15  advanced by counsel.

16       Most of the claims appear to be based on what

17  seems to be the, seems to the Court to be the

18  plaintiff's overly expansive interpretation of the

19  reach of various constitutional provisions, and the

20  plaintiff's view that any restrictions on what they

21  consider to be advantageous business practices are

22  unconstitutional.

23       This case originally was brought by Wine &

24  Spirits, the putative franchisor, and at the

25  preliminary injunction stage, on which the Court also

1  heard evidence, it focused on the claims that, first of

2  all, Section 3-5-11(b)(1) violated Wine & Spirits'

3  right to freedom of speech because it prevented Wine &

4  Spirits from providing advice to franchisees.

5      Second claim was that 3-5-11.1(a) violated Wine

6  & Spirits' right to associate with franchisees for

7  economic purposes, because it prohibits the issuance of

8  Class A licenses to either franchisors or franchisees.

9      And the third claim upon which the plaintiff

10  focused at the preliminary injunction stage was the

11  claim that the prohibition against franchise sales

12  violates Wine & Spirits' right to equal protection,

13  because it applies only to Class A licensees and not to

14  Class BV licensees, operators of restaurants and

15  similar establishments.

16      For reasons stated in this Court's memorandum

17  and order dated April 8, 2005, this Court found little

18  likelihood that Wine & Spirits would succeed on any of

19  those claims and, therefore, denied Wine & Spirits'

20  request for a preliminary injunction.

21      Wine & Spirits appealed and the Court of Appeals

22  affirmed.  The Court of Appeals agreed with this

23  Court's finding that nothing in the statute prevents

24  Wine & Spirits from providing advice to Class A

25  licensees.  The Court of Appeals did not reach the

1  question of whether the prohibitions against common

2  advertising or the use of a common name constituted

3  impermissible restraints on commercial speech, because,

4  first of all, it determined that Wine & Spirits'

5  activities were not commercial speech; and second, that

6  the Class A licensees were not a party to the suit,

7  that any commercial speech involved was commercial

8  speech that was possessed by the putative franchisees,

9  and they weren't parties.

10      The Court of Appeals also agreed that the First

11  Amendment Right of Association does not confer on

12  business entities any right to coordinate market

13  activities for the purpose of increasing their market

14  share simply because speech is a component of those

15  activities.

16      Finally, the Court of Appeals agreed with this

17  Court's finding that because the statute is economic

18  legislation that neither employs suspect

19  classifications nor infringes upon fundamental rights,

20  it should be judged under a rational basis test, and

21  that Wine & Spirits failed to demonstrate that the

22  statute lacks a rational basis or that the distinction

23  between Class A licensees and Class BV licensees is

24  arbitrary.

25      That's pretty much the travel of the case up to

6

1    this point, and little has changed since the

2    preliminary injunction was denied except that, first of

3    all, Wine & Spirits filed an Amended Complaint adding

4    as plaintiffs three Class A licensees that are

5    affiliated with Wine & Spirits.

6         The second change was that the plaintiffs have

7    now expanded their focus to include all of the other

8    complaints asserted in the Complaint.  They've now gone

9    beyond the First Amendment free speech and freedom of

10   association claims.

11        And the third thing, the only other change is

12   the plaintiffs have attempted to present a picture of

13   the relationship between Wine & Spirits and its

14   franchisees or the individual retail stores that is

15   much different than the picture that was presented at

16   the preliminary injunction hearing.

17        Based upon the evidence presented both at the

18   preliminary injunction hearing and the trial on the

19   merits, I find the relevant facts in this case to be as

20   follows:  Since 1933, Rhode Island has statutorily

21   prohibited the retail sale of alcoholic beverages by

22   what the statute refers to as chain store

23   organizations.

24        Further, I find that Wine & Spirits and all of

25   the individual stores that are, are or were franchisees

1   are Rhode Island entities; they're all either Rhode

2   Island corporations or Rhode Island residents.

3        Further, before the amendments to the statute

4   took place and the preliminary injunction was denied,

5   Wine & Spirits and its participating liquor stores were

6   parties to a Franchise Agreement that contained the

7   following provisions and had the following

8   characteristics:  Each franchisee was given an

9   exclusive franchise within a specified geographic area.

10   The franchisees each had different corporate names that

11   were significantly different in most cases.  For

12   example, one corporation was MAB Liquors, another was

13   CWS and so forth, but all of them did business under

14   the trade name Douglas Wine & Spirits.

15        The franchisees were required to carry certain

16   products and prohibited from carrying other products by

17   the Franchise Agreement, and Wine & Spirits specified

18   the vendors from which the franchisees could purchase

19   products and the layout of the franchisees' stores.

20        Franchisees were required to pay an annual

21   franchise fee and to contribute to an advertising and

22   promotion fund that was controlled by Wine & Spirits.

23   Wine & Spirits could terminate the Franchise Agreements

24   at any time due to a failure of the franchisee to

25   comply with the terms of the Franchise Agreement.

8

1          Franchisees displayed posters and other

2     literature at their individual stores containing

3     references to the Douglas website.  On behalf of all of

4     its franchisees, Douglas negotiated with liquor

5     wholesalers for volume discounts, and every two weeks

6     Douglas placed ads in the Providence Journal on behalf

7     of -- Douglas Wine & Spirits, I guess it was, placed

8     ads in the Providence Journal on behalf of all

9     participating stores, and those ads listed the products

10    for sale at all Douglas stores and the prices charged

11    for those products.

12          Now, more recently, the Franchise Agreements

13    have been replaced by what are labeled Consulting

14    Agreements, which purport to characterize Wine &

15    Spirits' role as simply providing what is referred to

16    as advice and suggestions, which the individual stores

17    are free to reject and which the Consulting Agreements

18    also characterize the stores as independent

19    contractors.

20          But the evidence shows that despite the

21    semantics, very little has changed.  The individual

22    stores still have exclusive territories assigned to

23    them.  The stores have all changed their corporate

24    names to, and continue to do business under Douglas

25    Wine & Spirits.  The only distinction in the names

1  being that they have added, each store has added a

2  single word stating the town in which the store is

3  located. So, for example, there is now a Douglas Wine

4  & Spirits Cranston, Douglas Wine & Spirits North

5  Providence, and so forth.

6       Wine & Spirits still negotiates prices with

7  wholesalers on behalf of all Wine & Spirits stores.

8  Although, apparently, that's not as an extensive

9  practice as it previously was. Wine & Spirits still

10  issues bulletins telling stores what products to carry

11  or not to carry and what prices to charge. And

12  although such admonitions are now characterized as

13  suggestions, some of them, like the prohibition in one

14  of the circulars against carrying Smirnoff Twisted

15  Grape flavored vodka appear to be much more than mere

16  suggestions.

17       Moreover, the products at all participating

18  stores continue to be priced by a computer keyed into

19  the cash register system in each store, and the prices

20  are entered centrally by Wine & Spirits although it is

21  claimed that individual store managers can mark down

22  the prices at the register in order to match prices

23  charged by competitors.

24       Wine & Spirits still issues what are now called

25  suggestions regarding store layouts and dress codes for

10

store employees.

Ads are still placed in the Providence Journal
every two weeks except that now the ads purportedly are
alternately placed by individual stores rather than by
Wine & Spirits.

However, each ad prominently displays the
Douglas Wine & Spirits name in large, bold-face type
followed by the location of the store that purportedly
placed the ad, which appears in much smaller type, that
is far less likely to be noticed by the reader.

In fact, there was testimony by one of the
plaintiff's own witnesses that the ads are paid for by
an entity called Tri-State, which is an affiliate of
Douglas Wine & Spirits.  All of the other participating
stores display exact copies of each ad and offer the
same products for the same prices listed in the ad, and
it appears that individual stores still pay a fee to
Douglas Wine & Spirits for its advice and services and
that Wine & Spirits retains its right to cancel the
relationship.

Although there was one individual store manager
who claimed that he determines the prices of the
products sold in his store, the evidence shows that
rarely, if ever, would any store fail to offer a
product shown in the ad, in an ad, at the price

08/09/06  12:12 FAX 401 222 6654        DEPT OF BUS REG                    ☒012

11

1    specified in the ad.

2          The evidence also shows that, with one or two

3    exceptions, the participating stores charge identical

4    prices for the non-advertising products that were

5    randomly surveyed by the Department of Business

6    Regulation, by Ms. Main.

7          As a result of the volume involved and

8    bargaining on behalf of all participating stores, Wine

9    & Spirits sometimes is able to lower prices from

10   wholesalers to levels that are lower than the prices

11   obtained by independently-operated stores, which gives

12   them a competitive advantage.

13         Wine & Spirits asserts that the savings have

14   been passed on to consumers, but there's been no

15   evidence to substantiate that assertion, we don't know

16   any particulars about that.

17         Those are the facts as the Court finds them.

18   I'll now proceed to each of the claims asserted by the

19   plaintiffs, and I'll lump some of them together.  First

20   of all, I will take up the First Amendment claims,

21   which allege violations of the right to speech and

22   association.  Those are the claims set forth in Counts

23   I and II.

24         The plaintiffs claim that Section 3-5-11(b)(1)

25   violates their First Amendment right to freedom of

05/09/06  12:12 FAX 401 222 6654          DEPT OF BUS REG                    ☑013

12

1     speech and association.  Both this Court and the First

2     Circuit have previously determined that Section

3     3-5-11(b)(1) does not infringe on any First Amendment

4     rights of Wine & Spirits.  So the only remaining

5     question is whether it infringes on any First Amendment

6     rights of the individual stores that have been added as

7     plaintiffs.

8            More specifically, the question is whether their

9     rights, the rights of those individual stores, whether

10    their rights of speech and/or association are violated

11    by the prohibitions against common advertising and/or

12    the use of a common name that are contained in

13    Subsections III and VI of 3-5-11(b)(1).

14           Those sections deem a Class A licensee to be a

15    part of the chain store organization if it participates

16    in a coordinated or common advertisement with one or

17    more liquor license businesses in any advertising media

18    and/or it uses any name, any term or name identified as

19    a chain or common entity.

20           So the question is whether those provisions

21    violate the speech or associational rights of the

22    individual stores.  I answer that question in the

23    negative for several reasons.

24           First of all, neither of those provisions

25    restricts the ability of individual licensees to speak

13

1    or associate.  The statute leaves the individual

2    licensees free to advertise their products, and it

3    places no limitations on the expressive content of

4    their ads.  They're free to advertise their products in

5    any way that they wish to.

6         What the statute prohibits is the placement of

7    common advertisements, which the evidence shows

8    involves concerted activity by the licensees in

9    agreeing, either expressly or tacitly, what products

10   will or will not be advertised and what prices will be

11   charged for those products.

12        The statute also leaves the licensees free to

13   use any name that they choose as long as it does not

14   identify them as a chain or common entity.  Like the

15   prohibition against common advertising, this limitation

16   does not restrict the message that may be conveyed by

17   the stores.  Rather, it's directed solely at the kind

18   of concerted activity that is embodied in the use of a

19   common name.

20        The use of a common name doesn't reflect

21   anything more than an agreement to engage in the same

22   type of concerted activity with respect to products and

23   prices that is embodied in common advertising.  There's

24   no other reason to use a common name unless that's the

25   case.  Indeed, the evidence shows that this is

```
 1        precisely the means that the plaintiffs have used in
 2        order to circumvent the statutory prohibition against
 3        chain stores or franchise operations.  Thus, as I
 4        stated earlier, each of the stores now has adopted the
 5        corporate name Douglas Wine & Spirits followed by a
 6        suffix indicating the town in which the store is
 7        located, for example, Douglas Wine & Spirits Cranston.
 8        Either Tri-State or one of the stores places an ad
 9        listing various products for sale and the prices for
10        those products.  The ad prominently displays the name
11        "Douglas Wine & Spirits" and in barely noticeable fine
12        print identifies the location of the store ostensibly
13        placing the ad, thereby conveying the impression that
14        the ad is placed on behalf of all Douglas Wine &
15        Spirits stores.
16             As I said before, an exact copy of the ad is
17        displayed at every other Douglas store, and each other
18        store displays or distributes material referring
19        customers to the Douglas website.
20             Now, there was some evidence that material had
21        previously been displayed in the window, was no longer
22        displayed by some of the stores, but was -- by the new
23        stores, I should say, but continued to be displayed in
24        some of the older stores.
25             In short, the prohibitions against common
```

15

1     advertising and the use of a common name do not impinge

2     on the ability of the licensees to communicate their

3     commercial message.  The prohibitions merely prevent

4     the kind of coordinated market activity that is

5     reflected in common advertising and the use of the

6     common name and that common advertising and use of the

7     common name are used to implement.

8            Put another way, what the statute restricts is

9     not the content of the licensee's speech, but rather

10    the concerted conduct that it evidences and that is

11    embodied in it.

12           It is well-established that a prohibition

13    against a particular type of conduct does not run afoul

14    of the First Amendment simply because words may be

15    among the means used in furtherance of that conduct.  I

16    believe it was the Supreme Court that said in the **RAV**

17    **versus City of St. Paul** case, "Words can, in some

18    circumstances, violate laws directed not against speech

19    but against conduct."  And as the Supreme Court said in

20    the Giboney case, "It has never been deemed an

21    abridgement of freedom of speech to make a course of

22    conduct illegal merely because the conduct was in part

23    initiated, evidenced or carried out by means of

24    language.  Such an expansive interpretation of the

25    constitutional guarantees of speech would make it

16

1   practically impossible ever to enforce laws against

2   agreements in restraint of trade as well as many other

3   agreements and conspiracies deemed injurious to

4   society."  Nor does the ban on franchise sales of

5   liquor contained in 3-5-11.1(a) prevent Class A

6   licensees from associating for any purpose except the

7   purpose of engaging in concerted economic activity as a

8   chain store organization.

9        As the First Circuit observed in its opinion,

10  "Business entities have no First Amendment right to

11  combine operations or coordinate market activities for

12  the purpose of obtaining a greater market share for

13  each participant."  And in this respect, the ban is

14  similar to the ban of sale of alcoholic beverages by

15  chain stores, which, as I observed in the written

16  decision denying the preliminary injunction, has been

17  upheld by just about every court in which the

18  constitutionality of such a ban has been challenged.

19       Even if the statute is viewed as somehow

20  burdening speech or anything that could be construed as

21  speech, it does not run afoul of the First Amendment.

22  The speech, if that's what it is, at issue in this case

23  is at most commercial speech because it proposes a

24  commercial transaction, the sale of liquor by a retail

25  establishment.  But commercial speech is not protected

1  by the First Amendment unless it concerns lawful

2  activity and it is not misleading.

3      Here, the regulated activity that is the subject

4  of the plaintiffs ads is their concerted action in

5  establishing a list of products to be advertised and

6  the prices to be charged for those products.

7      Now, while advertising by an individual licensee

8  clearly would be lawful activity and commercial speech

9  entitled to a measure of First Amendment protection,

10  the same cannot be said of common advertising or the

11  use of a common name, which has no independent

12  expressive significance and amounts to nothing more

13  than a means for carrying out the concerted activity,

14  which is prohibited by statute.

15      To put it another way, common advertising and

16  the use of a common name not only concerns unlawful

17  activity, it is part and parcel of the unlawful

18  activity.

19      Now, the plaintiffs claim that they operate

20  their stores independently with each store making its

21  own decision as to what products should be advertised

22  and what prices to be charged, but that claim is at

23  variance with the evidence and seems to the Court to be

24  patently incredible.  But even if that claim is to be

25  credited, the use of the name Douglas Wine & Spirits

08/08/06  12:14 FAX 401 222 6654          DEPT OF BUS REG                    ☒019

18

1  prominently displayed in ads purportedly placed by

2  individual stores would not be protected by the First

3  Amendment, because in that event it would be

4  misleading.  It conveys and, obviously, is intended to

5  convey to consumers the impression that all of the

6  stores are part of a single entity and operate in

7  concert, which if plaintiffs claim is credited would be

8  untrue and, therefore, misleading.

9          There's another First Amendment claim that I'm

10  not going to spend much time on because it hasn't been

11  very well-developed and that is that the, this is Count

12  III, that the First Amendment -- the statute violates

13  the plaintiffs First Amendment rights because it

14  contains or confers unfettered discretion on DBR.

15  That's about all the Complaint says.  It simply states

16  that "Section 3-5-11 prohibition of chain stores

17  permits unfettered discretion by the DBR in permitting

18  some Class A licensees to engage in the prohibited

19  activities while not permitting others."  But neither

20  the plaintiffs memorandum or the arguments of counsel

21  provide much guidance regarding the precise nature of

22  that claim.  And while it is denominated as a First

23  Amendment claim, it appears to the Court to be either a

24  rehash of the equal protection claim, that is to say a

25  selective enforcement claim, or some sort of an

DEPT OF BUS REG    @020

19

1    unarticulated due process claim, perhaps a claim that

2    the statute is void for vagueness.

3         To the extent that the plaintiffs are seeking

4    the stated equal protection or selective enforcement

5    claim, I will consider that in connection with the

6    discussion of the claims of Count VI.

7         To the extent that the plaintiffs seek to assert

8    a due process or a void for vagueness claim, I reject

9    the claim on the ground it has not been adequately

10   briefed, argued or supported by any evidence.

11        That brings me to the next claim, which is the

12   Commerce Clause claim. I believe that's Count IV. The

13   Commerce Clause prevents states from adopting

14   regulations that discriminate against interstate

15   commerce by treating it less favorably by intrastate

16   commerce.

17        Notwithstanding the 21st Amendment, the ban on

18   discrimination against interstate commerce applies to

19   the sale of liquor as well as to the sale of other

20   commodities. However, the State regulation of liquor

21   sales does not necessarily run afoul of the Commerce

22   Clause simply because it may have some incidental

23   affect on interstate commerce.

24        And this is where the 21st Amendment does have

25   some significance. The 21st Amendment grants the

1    states virtually complete control over whether to

2    permit the importation of sale of liquor and how to

3    structure the liquor distribution system if liquor

4    sales are permitted.

5         So a state may entirely ban the importation of

6    liquor; it may prevent anyone other than the State from

7    selling liquor, as New Hampshire has done; or it may

8    regulate the system by which liquor is distributed, as

9    Rhode Island has done.

10        The Commerce Clause is implicated only where the

11   regulation discriminates against interstate commerce by

12   significantly favoring in-state commercial interests

13   over out-of-state commercial interests.  As the Supreme

14   Court said in Granholm, if the State chooses to allow

15   direct shipment of wine, it must do so on even-handed

16   terms.

17        If the State law regulates in-state and

18   out-of-state interests even-handedly, the statute

19   passes muster under the Commerce Clause unless the

20   burden imposed on interstate commerce is clearly

21   excessive in relation to the putative local benefits.

22        The burden of establishing that a regulation is

23   discriminatory rests on the party challenging it, in

24   this case the plaintiffs.

25        The plaintiff may carry its burden by showing

08/09/06  12:13 FAX 401 222 6834      DEPT OF BUS REG                    022

21

1   either that the regulation on its face discriminates

2   against interstate commerce or out-of-state interests

3   or that the regulation has the effect of so

4   discriminating.  And here the plaintiffs have failed to

5   come close to showing either.

6           On their face, the statutory prohibitions

7   against the sale of liquor by chain store organizations

8   and/or franchise operations make no distinction

9   whatever between in-state entities and out-of-state

10  entities.  Section 3-5-11(a) prohibits the issuance of

11  a Class A license to any chain store organization which

12  subsection (b)(1) defines as any group of one or more

13  holders of Class A liquor licenses that engage in any

14  of the practices enumerated in that subsection.

15          Similarly, Section 3-5-11.1 prohibits the

16  issuance of a Class A liquor license to any liquor

17  franchisor or franchisee.  The statute by its terms

18  applies across the board regardless of whether the

19  franchisee is local or out-of-state.  Nor have the

20  plaintiffs presented any evidence that, despite their

21  facial neutrality, these sections have the practical

22  effect of discriminating against out-of-state sellers.

23          The plaintiffs argue that the prohibition

24  against sales by chain store organizations and/or

25  franchise operations is discriminatory because it

22

1    prevents out-of-state chain stores and/or franchisees

2    from selling in the Rhode Island market, and it cites

3    the First Circuit's decision in <u>Walgreen</u> in support of

4    that argument.  But I find that argument to be both a

5    logical non-sequitur and also to be based on a

6    misreading of the holding in <u>Walgreen</u>.

7         While the statute does ban sales by franchisees

8    as well as chain stores, it does so, as I've already

9    said, without regard to whether they are located

10   in-state or out-of-state.

11        In fact, since Class A licenses may be obtained

12   only by Rhode Island residents or entities, as a

13   practical matter, the prohibition applies solely to

14   in-state sellers, because they are the only ones that

15   hold Class A licenses and, therefore, could seek to

16   sell as franchisees.  So by prohibiting franchise sales

17   by anyone, the State has not conferred any competitive

18   advantage on in-state sellers over out-of-state

19   sellers, and the fact that the prohibition might have

20   the incidental effect of preventing out-of-state

21   interests as well as in-state interests from conducting

22   franchise operations does not by itself establish

23   discrimination against interstate commerce.

24        In this respect, the case is readily

25   distinguishable from <u>Walgreen</u>, because in <u>Walgreen</u> the

00/00/00  12:10 FAX 401 222 8054          DEPT OF BUS REG                    ☒024

1   First Circuit held that a Puerto Rico statute requiring

2   that pharmacies seeking to open or relocate first

3   obtain a Certificate of Necessity from the Commonwealth

4   violated the Commerce Clause because it impermissibly

5   discriminated against out-of-state pharmacies, but that

6   decision was based on a number of factors not present

7   in this case.  One is that the Puerto Rico statute did

8   not apply to existing pharmacies, 92 percent of which

9   were locally owned.  Another was that if anyone in

10  Puerto Rico objected to an application for a

11  Certificate of Necessity, the application process could

12  be delayed for several years by administrative hearings

13  and judicial review.

14      So the Court in _Walgreen_ found that as a

15  practical matter the Puerto Rico statute favored, and I

16  quote, "the largely local group of established

17  pharmacies over a similarly situated

18  out-of-Commonwealth pharmacies seeking to open new

19  stores," that's the end of the quote, by exempting them

20  from the Certificate of Necessity requirement while

21  simultaneously permitting them to prevent competition

22  from what essentially the evidence in that case showed

23  were out-of-state pharmacies by objecting to

24  Certificate of Need applications.

25      Neither of those elements is present in this

DEPT OF BUS REG                                      ☒025

24

1    case.  As already noted, the statute contains no

2    exemption for local liquor stores.  They're not exempt

3    from the prohibition against franchising or operating

4    chain store organizations, and, as I said, the fact

5    that they're the only ones that come within the reach

6    of that prohibition at the present time.

7         Furthermore, Rhode Island licensees, and in

8    particular local licensees, do not wield any power to

9    delay or deny competition by franchise operations or

10   chain store organizations either out-of-state or

11   in-state.  They cannot force a series of hearings or

12   judicial delays.  The statute flatly prohibits liquor

13   sales by such entities whether or not existing

14   licensees object.

15        The plaintiffs refer to the fact that 3-5-10,

16   another section of the statute, allows Class A licenses

17   to be issued only to Rhode Island residents or

18   entities, and I've already mentioned that limitation.

19   To the extent that this observation somehow is intended

20   to buttress their Commerce Clause argument, it fails

21   for two reasons.

22        First, the plaintiffs lack standing to challenge

23   3-5-10 because, as I've already said, all of the

24   individual stores that are certainly, at least that are

25   parties in this case, and I'm sure even those that

1   aren't, are Rhode Island entities that already hold

2   Class A licenses, and Wine & Spirits is not only a

3   Rhode Island corporation, but Mr. Haronian testified

4   that it has no desire to obtain a Class A license.

5        The second reason that 3-5-10 lends no support

6   to the Commerce Clause argument is that whether a

7   non-resident may obtain a Class A license has nothing

8   whatever to do with the prohibition against chain

9   stores and franchises, because even if an out-of-state

10   entity could obtain a Class A license, it, like local

11   Class A licensees, still would be prohibited from

12   operating a chain store or participating in a franchise

13   operation. So whether it is or is not constitutional

14   for Rhode Island to only grant Class A licenses to

15   local entities has no bearing whatsoever on the

16   validity of the prohibition against franchises and

17   chain stores.

18        That brings me to Count V, the takings claim

19   asserted under the Fifth Amendment. In Count V, the

20   plaintiffs claim that 3-5-11(1) and 3-5-11.1 take their

21   property without just compensation, quote, "By

22   eliminating the reasonable investment-backed property

23   rights in their business and the value of their

24   existing contractual relationship.

25        In order to prevail on a takings claim, the

08/09/06  12:17 FAX 401 222 6654        DEPT OF BUS REG                          ☒027

26

1    plaintiffs must establish, among other things, that

2    some property of theirs was taken by the State.

3    Governmental appropriation of physical property is not

4    required to establish a taking.  You don't have to show

5    that the Government took some physical property.

6            A regulation may rise to the level of a taking

7    if it places a significant restriction upon an owner's

8    use of his property for which justice and fairness

9    require that compensation be given.  In deciding

10   whether a particular regulation constitutes a

11   regulatory taking, a court must consider the economic

12   impact of the regulation, its interference with

13   reasonable investment-backed expectations, and the

14   character of the Government action.  That's what

15   Supreme Court said in the <u>Kaiser-Aetna</u> case.

16           In takings cases, whether they're physical or

17   regulatory takings cases, courts consider the extent to

18   which the Government action interferes or interfered

19   with the use of the affected property as a whole and

20   not to the extent to which it has interfered with

21   particular aspects or segments of that property.

22           In other words, for those of you who remember

23   your property law days, it's whether the Government

24   regulation interferes with the whole bundle of sticks

25   or just one of the sticks in the bundle.

08/03/06  12:17 FAX 401 222 0034    DEPT OF BUS REG    ⬚028

1    While the plaintiffs do not explain what

2  reasonable investment-backed property rights have been

3  taken, they presumably refer to their purported right

4  to engage in franchise sales of liquor, but the

5  franchise sale of liquor is not a reasonable

6  investment-backed property right for several reasons.

7    First of all, in order to qualify as property

8  within the meaning of the Takings Clause, a claimed

9  right must amount to something more than an abstract

10  desire or hope of obtaining what is being claimed. And

11  here, the plaintiffs never had any right to engage in

12  the franchise sale of liquor. At most, they had a

13  hope, and an unrealistic hope at that under the

14  circumstances, of obtaining such a right.

15    The Rhode Island statute prohibiting chain

16  stores organizations from selling liquor, as I said

17  before, has been in effect since 1933, long before the

18  plaintiffs began their operations. And while

19  franchising per se was not banned under the previous

20  version of the statute, chain stores were and the

21  business conducted by the plaintiffs falls well within

22  the definition of a chain store organization.

23    The fact that initially the Franchise Agreements

24  may have been, I suppose, tacitly approved by the

25  Department of Business Regulation's franchise division

08/09/06  12:17 FAX 401 222 6654        DEPT OF BUS REG                    ☒029

28

1   does not mean that the franchise sales of liquor were

2   legal.

3          As was explained, the franchise division has no

4   regulatory responsibilities with respect to liquor

5   sales, and apparently was unaware of the prohibition

6   against franchise sales of liquors, was unaware that

7   under Rhode Island law franchise sales of liquor is

8   treated differently from franchise sales of other

9   products.

10          In addition, the statute does not rise to the

11   level of a regulatory taking of the plaintiffs' Class A

12   licenses, because like other Class A licensees the

13   plaintiffs can still operate their stores to sell

14   liquor. All the statute does is close loopholes in the

15   pre-existing prohibition against the sale of liquor by

16   chain store organizations. It seeks to clarify what

17   are deemed to be chain stores. I suppose absent these

18   provisions there would be a claim that the statute was

19   unconstitutional because it was vague, it didn't tell

20   anybody what a chain store organization is. So it's

21   sort of you're darned if you do, darned if you don't

22   situation.

23          Furthermore, any expectation by the plaintiffs

24   that they would have a right to engage in franchise

25   liquor sales was patently unreasonable under the

DEPT OF BUS REG    ☑030

1    circumstances.  The sale of liquor, as the cases have

2    repeatedly said, is very heavily regulated, and it's

3    unreasonable to expect that the regulations governing

4    liquor sales will not be amended from time to time when

5    necessary to close loopholes or to further the goals of

6    the regulation.

7         That brings me to the final claim, which is the

8    equal protection claim set forth in Count VI.

9         Again, this claim was addressed by the Court and

10   the Court of Appeals in connection with the denial of

11   the preliminary injunction, at least insofar as Wine &

12   Spirits was concerned.

13        The allegations in Count VI setting forth the

14   equal protection claim are just as sparse as the

15   allegations made in connection with the other claims.

16   Count VI simply asserts that Sections 3-5-11 and

17   3-5-11.1 deny fundamental rights to the plaintiffs and

18   treat the plaintiffs differently from similarly

19   situated individuals and businesses.  The assertion

20   regarding denial of fundamental rights was added by the

21   Amended Complaint, but the plaintiffs failed to explain

22   what fundamental rights they refer to, if there are any

23   rights that haven't been -- that aren't the subject of

24   other counts or, if so, how those rights may differ

25   from the rights that are the subject of the other

30

1   counts of the Complaint.

2       The assertion that the statue treats the
3   plaintiffs differently from others similarly situated
4   previously was rejected by this Court and the Court of
5   Appeals, at least as far as Wine & Spirits was
6   concerned.  But undaunted by that rebuff and,
7   apparently, unwilling to accept no for an answer, the
8   plaintiffs attempt to relitigate the claim by now
9   seeking to compare themselves to not restaurants and
10  other similar enterprises as they did in the
11  preliminary injunction hearing, but now to wineries,
12  which hold farmer winery manufacturers licenses and/or
13  brewpubs, which hold manufacturers Class BM licenses.

14      This apples-to-oranges comparison is similar to
15  the comparison previously rejected by this Court and
16  the Court of Appeals.  As previously held, the Rhode
17  Island statute is economic legislation that does not
18  employ suspect classifications or impinge on
19  fundamental rights.  So in order to prevail on their
20  equal protection claim, the plaintiffs must show that
21  the statute treats retail liquor stores holding Class A
22  licenses differently from wineries, which hold farmer
23  winery manufacturers licenses, and/or brewpubs that
24  hold manufactures Class BM licenses and that the two
25  types of establishments are so similarly situated that

1    the difference in treatment is arbitrary and

2    irrational.

3        The differences in treatment cited by the

4    plaintiffs are that, first, wineries can sell their

5    wines to multiple liquor stores, and, in addition, they

6    can place advertisements identifying the liquor stores

7    at which their wines may be purchased.

8        What the plaintiffs ignore is that neither of

9    the two types of -- neither the two types of entities

10    nor the activities in which they engage are comparable

11    to the activities in which the plaintiffs engage.

12        The plaintiffs haven't presented any evidence

13    that they are similarly situated to wineries or

14    brewpubs, and it is apparent to even the casual

15    observer that significant differences exist between, on

16    the one hand, Class A liquor store licensees and

17    wineries and brewpubs.

18        Wineries produce the wine that they sell, as do

19    brewpubs, whereas liquor stores obtain the products

20    that they sell through distributors.  There's no

21    evidence that in distributing their wine through liquor

22    stores wineries engage in concerted activity with those

23    stores to determine what wines the stores will

24    advertise or what prices they will charge for those

25    wines.  There is no evidence of any affiliation between

1   the wineries and the liquor stores with which they deal

2   or that the wineries deal only with certain liquor

3   stores, or that the liquor stores have to carry only

4   the products of a particular winery.  Nor is there any

5   evidence that liquor stores within any geographic

6   region have the exclusive right to obtain a winery's

7   product within that region.

8        The plaintiffs also appear to base their equal

9   protection argument in part on what seems to me to be a

10  selective enforcement claim that some other Class A

11  licensees are permitted to use what the plaintiffs

12  characterize as a common name.

13       So there was evidence presented that several

14  stores previously operated by members of the Haxton

15  family under the name Haxton's Liquors have been

16  permitted to continue operating under the names of

17  their individual owners.  They were required to change

18  the names from Haxton's Liquors to names such as Tom

19  Haxton's Wine & Spirits, Mike Haxton's Wine & Spirits,

20  Karen Haxton Kent Liquor Company and so forth.  But

21  Mr. Greer, the State's enforcement officer, explained

22  the distinction between that and the plaintiffs use of

23  the common name Douglas Wine & Spirits followed by a

24  geographical location.  He testified that the Haxton

25  stores were owned by individuals using their own names.

08/30/06  12:15 FAX 401 222 8034        DEPT OF BUS REG                    ☒034

1   They used their own names, they were individuals using
2   their own names, whereas the plaintiffs, at least under
3   the present, are using and changed to the common name
4   Douglas Wine & Spirits, and their names are
5   distinguished only by the addition, usually in small
6   letters, of the location of the city or town in which
7   they're located.

8         Mr. Greer testified that the inclusion of the
9   first names of the owners of the Haxton stores
10  sufficiently distinguished one store from another and
11  that simply appending to what otherwise is a common
12  name the location of a particular store does not make
13  that distinction.

14        The plaintiffs have failed to show that the
15  distinctions are irrational, particularly in the
16  absence of any evidence that the Haxton stores engage
17  in common advertising, common pricing or any of the
18  other concerted activities in which the plaintiffs
19  engage.

20        Furthermore, the plaintiffs have failed to show
21  that the alleged activity and prosecution was based on
22  impermissible considerations such as race, religion,
23  intent to inhibit or punish the exercise of
24  constitutional rights or malicious bad faith intent to
25  injure.  Those are all generally required, or at least

34

1    one of those is required to make out a claim of

2    selective prosecution.

3        So for all of the foregoing reasons, this Court

4    finds that, first of all, in exercising its authority

5    to regulate the sale of alcoholic beverages, Rhode

6    Island did not act irrationally in prohibiting sales by

7    chain store organizations and/or franchise operations;

8    that as evidenced by the techniques utilized by

9    plaintiffs in attempting to circumvent that ban, the

10   prohibitions in Section 3-5-11 of concerted activities

11   characteristic of chain store operations are necessary

12   to implement that ban; that those prohibitions do not

13   infringe on any of the plaintiffs constitutionally

14   protected rights of speech and/or association; that the

15   statute does not discriminate against interstate

16   commerce; that neither the statute or the manner in

17   which it is interpreted or enforced violates the

18   plaintiffs right to equal protection; and that the ban

19   does not constitute any taking of any property of the

20   plaintiffs.

21       For all of the foregoing reasons, judgment may

22   enter in favor of the defendants, denying and

23   dismissing all of the plaintiffs claims.

24       The Court will be in recess.

25       (Court concluded at 4:15 p.m.)



08/09/06   12:20 FAX 401 222 6654          DEPT OF BUS REG                    ☒037

C E R T I F I C A T I O N

      I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

_____
          Anne M. Clayton, RPR

_____
             Date