# Exhibit A

06/09/06  12:08 FAX 401 222 0654      DEPT OF BUS REG                    002

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * *  CIVIL ACTION
WINE & SPIRITS        * 04-418T                   COPY
RETAILERS, INC., ET AL*

VS.                   * JUNE 20, 2006
                      *
JEFFREY GREER, ET AL  * PROVIDENCE, RI
* * * * * * * * * *

HEARD BEFORE THE HONORABLE ERNEST C. TORRES
CHIEF JUDGE
(DECISION)

APPEARANCES:

FOR THE PLAINTIFF:        ROBERT J. ROUGHSEDGE, ESQ.
                          Lawson & Weitzen, LLP
                          88 Black Falcon Avenue
                          Suite 345
                          Boston, MA  02210-1736
                          (617) 439-4990

FOR THE DEFENDANT
STATE OF RHODE ISLAND:    REBECCA PARTINGTON, ESQ.
                          Attorney General's Office
                          150 South Main Street
                          Providence, RI  02903
                          (401) 274-4400

FOR THE INTERVENOR
DEFENDANT:                JOSEPH S. LARISA, JR., ESQ.
                          Larisa Law and Consulting
                          55 Dorrance Street
                          Suite 301B
                          Providence, RI  02903
                          (401) 743-4700

Court Reporter:           Anne M. Clayton, RPR
                          One Exchange Terrace
                          Providence, RI  02903

Proceeding reported and produced by computer-aided
stenography

06/05/06  12:03 FAX 401 222 0634    DEPT OF BUS REG    ⊠003

2

```
 1              THE COURT:  Good afternoon.
 2         MR. ROUGHSEDGE:  Good afternoon, your Honor.
 3         Your Honor, Mr. Lawson sends his regards.  He
 4    had a previously scheduled appointment the client asked
 5    him to attend.  He means no disrespect to the Court.
 6    He wanted to be here.  In fact, he's probably been
 7    trying to call me incessantly.
 8              THE COURT:  He sends his regards?
 9         MR. ROUGHSEDGE:  Yes.
10              THE CLERK:  The matter before the Court is Civil
11    Action 04-418T, Wine & Spirits, et al versus State of
12    Rhode Island.
13              THE COURT:  This case is here for the issuance
14    of a bench decision on the claims brought by the
15    plaintiffs.
16              The plaintiffs have brought a seven-count
17    Complaint that the Rhode Island statute prohibiting
18    chain store organizations and franchise operations from
19    engaging in retail sale of alcoholic beverages violates
20    nearly every provision of the Constitution except the
21    guarantee of the right to bear arms and the prohibition
22    against cruel and unusual punishment.  That's,
23    obviously, a slight overstatement, but maybe not too
24    much.
25              The Complaint consists of, basically, a litany
```

3

1    of the constitutional provisions allegedly violated

2    followed by a simple assertion that the statute

3    violates them.

4          As a general matter, it alleges that the Rhode

5    Island statute violates the plaintiff's First Amendment

6    rights of free speech and freedom of association, the

7    Commerce Clause, the Takings Clause of the Fifth

8    Amendment and the Equal Protection Clause of the 14th

9    Amendment.

10         Now, it's difficult to determine the precise

11   nature of some of the claims, because in some cases

12   neither the claim itself nor the basis for the claim is

13   very clearly articulated either in the Complaint, the

14   memoranda of counsel or the arguments that have been

15   advanced by counsel.

16         Most of the claims appear to be based on what

17   seems to be the, seems to the Court to be the

18   plaintiff's overly expansive interpretation of the

19   reach of various constitutional provisions, and the

20   plaintiff's view that any restrictions on what they

21   consider to be advantageous business practices are

22   unconstitutional.

23         This case originally was brought by Wine &

24   Spirits, the putative franchisor, and at the

25   preliminary injunction stage, on which the Court also

1   heard evidence, it focused on the claims that, first of

2   all, Section 3-5-11(b)(1) violated Wine & Spirits'

3   right to freedom of speech because it prevented Wine &

4   Spirits from providing advice to franchisees.

5          Second claim was that 3-5-11.1(a) violated Wine

6   & Spirits' right to associate with franchisees for

7   economic purposes, because it prohibits the issuance of

8   Class A licenses to either franchisors or franchisees.

9          And the third claim upon which the plaintiff

10  focused at the preliminary injunction stage was the

11  claim that the prohibition against franchise sales

12  violates Wine & Spirits' right to equal protection,

13  because it applies only to Class A licensees and not to

14  Class BV licensees, operators of restaurants and

15  similar establishments.

16         For reasons stated in this Court's memorandum

17  and order dated April 8, 2005, this Court found little

18  likelihood that Wine & Spirits would succeed on any of

19  those claims and, therefore, denied Wine & Spirits'

20  request for a preliminary injunction.

21         Wine & Spirits appealed and the Court of Appeals

22  affirmed.  The Court of Appeals agreed with this

23  Court's finding that nothing in the statute prevents

24  Wine & Spirits from providing advice to Class A

25  licensees.  The Court of Appeals did not reach the

DEPT OF BUS REG

5

1    question of whether the prohibitions against common

2    advertising or the use of a common name constituted

3    impermissible restraints on commercial speech, because,

4    first of all, it determined that Wine & Spirits'

5    activities were not commercial speech; and second, that

6    the Class A licensees were not a party to the suit,

7    that any commercial speech involved was commercial

8    speech that was possessed by the putative franchisees,

9    and they weren't parties.

10        The Court of Appeals also agreed that the First

11   Amendment Right of Association does not confer on

12   business entities any right to coordinate market

13   activities for the purpose of increasing their market

14   share simply because speech is a component of those

15   activities.

16        Finally, the Court of Appeals agreed with this

17   Court's finding that because the statute is economic

18   legislation that neither employs suspect

19   classifications nor infringes upon fundamental rights,

20   it should be judged under a rational basis test, and

21   that Wine & Spirits failed to demonstrate that the

22   statute lacks a rational basis or that the distinction

23   between Class A licensees and Class BV licensees is

24   arbitrary.

25        That's pretty much the travel of the case up to

6

1   this point, and little has changed since the

2   preliminary injunction was denied except that, first of

3   all, Wine & Spirits filed an Amended Complaint adding

4   as plaintiffs three Class A licensees that are

5   affiliated with Wine & Spirits.

6          The second change was that the plaintiffs have

7   now expanded their focus to include all of the other

8   complaints asserted in the Complaint.  They've now gone

9   beyond the First Amendment free speech and freedom of

10  association claims.

11         And the third thing, the only other change is

12  the plaintiffs have attempted to present a picture of

13  the relationship between Wine & Spirits and its

14  franchisees or the individual retail stores that is

15  much different than the picture that was presented at

16  the preliminary injunction hearing.

17         Based upon the evidence presented both at the

18  preliminary injunction hearing and the trial on the

19  merits, I find the relevant facts in this case to be as

20  follows:  Since 1933, Rhode Island has statutorily

21  prohibited the retail sale of alcoholic beverages by

22  what the statute refers to as chain store

23  organizations.

24         Further, I find that Wine & Spirits and all of

25  the individual stores that are, are or were franchisees

DEPT OF BUS REG                                          ☑008

7

1    are Rhode Island entities; they're all either Rhode

2    Island corporations or Rhode Island residents.

3         Further, before the amendments to the statute

4    took place and the preliminary injunction was denied,

5    Wine & Spirits and its participating liquor stores were

6    parties to a Franchise Agreement that contained the

7    following provisions and had the following

8    characteristics:  Each franchisee was given an

9    exclusive franchise within a specified geographic area.

10   The franchisees each had different corporate names that

11   were significantly different in most cases.  For

12   example, one corporation was MAB Liquors, another was

13   CWS and so forth, but all of them did business under

14   the trade name Douglas Wine & Spirits.

15        The franchisees were required to carry certain

16   products and prohibited from carrying other products by

17   the Franchise Agreement, and Wine & Spirits specified

18   the vendors from which the franchisees could purchase

19   products and the layout of the franchisees' stores.

20        Franchisees were required to pay an annual

21   franchise fee and to contribute to an advertising and

22   promotion fund that was controlled by Wine & Spirits.

23   Wine & Spirits could terminate the Franchise Agreements

24   at any time due to a failure of the franchisee to

25   comply with the terms of the Franchise Agreement.

05/09/06  12:11 FAX 401 222 6854    DEPT OF BUS REG    ☒009

8

1            Franchisees displayed posters and other

2      literature at their individual stores containing

3      references to the Douglas website.  On behalf of all of

4      its franchisees, Douglas negotiated with liquor

5      wholesalers for volume discounts, and every two weeks

6      Douglas placed ads in the Providence Journal on behalf

7      of -- Douglas Wine & Spirits, I guess it was, placed

8      ads in the Providence Journal on behalf of all

9      participating stores, and those ads listed the products

10     for sale at all Douglas stores and the prices charged

11     for those products.

12            Now, more recently, the Franchise Agreements

13     have been replaced by what are labeled Consulting

14     Agreements, which purport to characterize Wine &

15     Spirits' role as simply providing what is referred to

16     as advice and suggestions, which the individual stores

17     are free to reject and which the Consulting Agreements

18     also characterize the stores as independent

19     contractors.

20            But the evidence shows that despite the

21     semantics, very little has changed.  The individual

22     stores still have exclusive territories assigned to

23     them.  The stores have all changed their corporate

24     names to, and continue to do business under Douglas

25     Wine & Spirits.  The only distinction in the names

08/09/06  12:11 FAX 401 222 6654        DEPT OF BUS REG                    ☒010

9

1    being that they have added, each store has added a

2    single word stating the town in which the store is

3    located. So, for example, there is now a Douglas Wine

4    & Spirits Cranston, Douglas Wine & Spirits North

5    Providence, and so forth.

6         Wine & Spirits still negotiates prices with

7    wholesalers on behalf of all Wine & Spirits stores.

8    Although, apparently, that's not as an extensive

9    practice as it previously was. Wine & Spirits still

10   issues bulletins telling stores what products to carry

11   or not to carry and what prices to charge. And

12   although such admonitions are now characterized as

13   suggestions, some of them, like the prohibition in one

14   of the circulars against carrying Smirnoff Twisted

15   Grape flavored vodka appear to be much more than mere

16   suggestions.

17        Moreover, the products at all participating

18   stores continue to be priced by a computer keyed into

19   the cash register system in each store, and the prices

20   are entered centrally by Wine & Spirits although it is

21   claimed that individual store managers can mark down

22   the prices at the register in order to match prices

23   charged by competitors.

24        Wine & Spirits still issues what are now called

25   suggestions regarding store layouts and dress codes for

10

1    store employees.

2         Ads are still placed in the Providence Journal
3    every two weeks except that now the ads purportedly are
4    alternately placed by individual stores rather than by
5    Wine & Spirits.

6         However, each ad prominently displays the
7    Douglas Wine & Spirits name in large, bold-face type
8    followed by the location of the store that purportedly
9    placed the ad, which appears in much smaller type, that
10   is far less likely to be noticed by the reader.

11        In fact, there was testimony by one of the
12   plaintiff's own witnesses that the ads are paid for by
13   an entity called Tri-State, which is an affiliate of
14   Douglas Wine & Spirits.  All of the other participating
15   stores display exact copies of each ad and offer the
16   same products for the same prices listed in the ad, and
17   it appears that individual stores still pay a fee to
18   Douglas Wine & Spirits for its advice and services and
19   that Wine & Spirits retains its right to cancel the
20   relationship.

21        Although there was one individual store manager
22   who claimed that he determines the prices of the
23   products sold in his store, the evidence shows that
24   rarely, if ever, would any store fail to offer a
25   product shown in the ad, in an ad, at the price

1    specified in the ad.

2         The evidence also shows that, with one or two

3    exceptions, the participating stores charge identical

4    prices for the non-advertising products that were

5    randomly surveyed by the Department of Business

6    Regulation, by Ms. Main.

7         As a result of the volume involved and

8    bargaining on behalf of all participating stores, Wine

9    & Spirits sometimes is able to lower prices from

10   wholesalers to levels that are lower than the prices

11   obtained by independently-operated stores, which gives

12   them a competitive advantage.

13        Wine & Spirits asserts that the savings have

14   been passed on to consumers, but there's been no

15   evidence to substantiate that assertion, we don't know

16   any particulars about that.

17        Those are the facts as the Court finds them.

18   I'll now proceed to each of the claims asserted by the

19   plaintiffs, and I'll lump some of them together.  First

20   of all, I will take up the First Amendment claims,

21   which allege violations of the right to speech and

22   association.  Those are the claims set forth in Counts

23   I and II.

24        The plaintiffs claim that Section 3-5-11(b)(1)

25   violates their First Amendment right to freedom of

1    speech and association.  Both this Court and the First

2    Circuit have previously determined that Section

3    3-5-11(b)(1) does not infringe on any First Amendment

4    rights of Wine & Spirits.  So the only remaining

5    question is whether it infringes on any First Amendment

6    rights of the individual stores that have been added as

7    plaintiffs.

8         More specifically, the question is whether their

9    rights, the rights of those individual stores, whether

10   their rights of speech and/or association are violated

11   by the prohibitions against common advertising and/or

12   the use of a common name that are contained in

13   Subsections III and VI of 3-5-11(b)(1).

14        Those sections deem a Class A licensee to be a

15   part of the chain store organization if it participates

16   in a coordinated or common advertisement with one or

17   more liquor license businesses in any advertising media

18   and/or it uses any name, any term or name identified as

19   a chain or common entity.

20        So the question is whether those provisions

21   violate the speech or associational rights of the

22   individual stores.  I answer that question in the

23   negative for several reasons.

24        First of all, neither of those provisions

25   restricts the ability of individual licensees to speak

13

1    or associate.  The statute leaves the individual

2    licensees free to advertise their products, and it

3    places no limitations on the expressive content of

4    their ads.  They're free to advertise their products in

5    any way that they wish to.

6          What the statute prohibits is the placement of

7    common advertisements, which the evidence shows

8    involves concerted activity by the licensees in

9    agreeing, either expressly or tacitly, what products

10   will or will not be advertised and what prices will be

11   charged for those products.

12          The statute also leaves the licensees free to

13   use any name that they choose as long as it does not

14   identify them as a chain or common entity.  Like the

15   prohibition against common advertising, this limitation

16   does not restrict the message that may be conveyed by

17   the stores.  Rather, it's directed solely at the kind

18   of concerted activity that is embodied in the use of a

19   common name.

20          The use of a common name doesn't reflect

21   anything more than an agreement to engage in the same

22   type of concerted activity with respect to products and

23   prices that is embodied in common advertising.  There's

24   no other reason to use a common name unless that's the

25   case.  Indeed, the evidence shows that this is

14

1    precisely the means that the plaintiffs have used in

2    order to circumvent the statutory prohibition against

3    chain stores or franchise operations.  Thus, as I

4    stated earlier, each of the stores now has adopted the

5    corporate name Douglas Wine & Spirits followed by a

6    suffix indicating the town in which the store is

7    located, for example, Douglas Wine & Spirits Cranston.

8    Either Tri-State or one of the stores places an ad

9    listing various products for sale and the prices for

10   those products.  The ad prominently displays the name

11   "Douglas Wine & Spirits" and in barely noticeable fine

12   print identifies the location of the store ostensibly

13   placing the ad, thereby conveying the impression that

14   the ad is placed on behalf of all Douglas Wine &

15   Spirits stores.

16        As I said before, an exact copy of the ad is

17   displayed at every other Douglas store, and each other

18   store displays or distributes material referring

19   customers to the Douglas website.

20        Now, there was some evidence that material had

21   previously been displayed in the window, was no longer

22   displayed by some of the stores, but was -- by the new

23   stores, I should say, but continued to be displayed in

24   some of the older stores.

25        In short, the prohibitions against common

15

1    advertising and the use of a common name do not impinge

2    on the ability of the licensees to communicate their

3    commercial message.  The prohibitions merely prevent

4    the kind of coordinated market activity that is

5    reflected in common advertising and the use of the

6    common name and that common advertising and use of the

7    common name are used to implement.

8         Put another way, what the statute restricts is

9    not the content of the licensee's speech, but rather

10   the concerted conduct that it evidences and that is

11   embodied in it.

12        It is well-established that a prohibition

13   against a particular type of conduct does not run afoul

14   of the First Amendment simply because words may be

15   among the means used in furtherance of that conduct.  I

16   believe it was the Supreme Court that said in the RAV

17   versus City of St. Paul case, "Words can, in some

18   circumstances, violate laws directed not against speech

19   but against conduct."  And as the Supreme Court said in

20   the Giboney case, "It has never been deemed an

21   abridgement of freedom of speech to make a course of

22   conduct illegal merely because the conduct was in part

23   initiated, evidenced or carried out by means of

24   language.  Such an expansive interpretation of the

25   constitutional guarantees of speech would make it

06/09/06   12:13 FAX 401 222 6654      DEPT OF BUS REG                    Ø017

16

1    practically impossible ever to enforce laws against

2    agreements in restraint of trade as well as many other

3    agreements and conspiracies deemed injurious to

4    society."  Nor does the ban on franchise sales of

5    liquor contained in 3-5-11.1(a) prevent Class A

6    licensees from associating for any purpose except the

7    purpose of engaging in concerted economic activity as a

8    chain store organization.

9    As the First Circuit observed in its opinion,

10    "Business entities have no First Amendment right to

11    combine operations or coordinate market activities for

12    the purpose of obtaining a greater market share for

13    each participant."  And in this respect, the ban is

14    similar to the ban of sale of alcoholic beverages by

15    chain stores, which, as I observed in the written

16    decision denying the preliminary injunction, has been

17    upheld by just about every court in which the

18    constitutionality of such a ban has been challenged.

19    Even if the statute is viewed as somehow

20    burdening speech or anything that could be construed as

21    speech, it does not run afoul of the First Amendment.

22    The speech, if that's what it is, at issue in this case

23    is at most commercial speech because it proposes a

24    commercial transaction, the sale of liquor by a retail

25    establishment.  But commercial speech is not protected

U6/U8/UU  12:14 FAX 4U1 222 6654      DEPT OF BUS REG                      🗹018

1    by the First Amendment unless it concerns lawful

2    activity and it is not misleading.

3        Here, the regulated activity that is the subject

4    of the plaintiffs ads is their concerted action in

5    establishing a list of products to be advertised and

6    the prices to be charged for those products.

7        Now, while advertising by an individual licensee

8    clearly would be lawful activity and commercial speech

9    entitled to a measure of First Amendment protection,

10   the same cannot be said of common advertising or the

11   use of a common name, which has no independent

12   expressive significance and amounts to nothing more

13   than a means for carrying out the concerted activity,

14   which is prohibited by statute.

15       To put it another way, common advertising and

16   the use of a common name not only concerns unlawful

17   activity, it is part and parcel of the unlawful

18   activity.

19       Now, the plaintiffs claim that they operate

20   their stores independently with each store making its

21   own decision as to what products should be advertised

22   and what prices to be charged, but that claim is at

23   variance with the evidence and seems to the Court to be

24   patently incredible.  But even if that claim is to be

25   credited, the use of the name Douglas Wine & Spirits

00/00/00  12:14 FAX 401 222 6654       DEPT OF BUS REG                      ☑019

18

1    prominently displayed in ads purportedly placed by

2    individual stores would not be protected by the First

3    Amendment, because in that event it would be

4    misleading.  It conveys and, obviously, is intended to

5    convey to consumers the impression that all of the

6    stores are part of a single entity and operate in

7    concert, which if plaintiffs claim is credited would be

8    untrue and, therefore, misleading.

9         There's another First Amendment claim that I'm

10   not going to spend much time on because it hasn't been

11   very well-developed and that is that the, this is Count

12   III, that the First Amendment -- the statute violates

13   the plaintiffs First Amendment rights because it

14   contains or confers unfettered discretion on DBR.

15   That's about all the Complaint says.  It simply states

16   that "Section 3-5-11 prohibition of chain stores

17   permits unfettered discretion by the DBR in permitting

18   some Class A licensees to engage in the prohibited

19   activities while not permitting others."  But neither

20   the plaintiffs memorandum or the arguments of counsel

21   provide much guidance regarding the precise nature of

22   that claim.  And while it is denominated as a First

23   Amendment claim, it appears to the Court to be either a

24   rehash of the equal protection claim, that is to say a

25   selective enforcement claim, or some sort of an

19

1    unarticulated due process claim, perhaps a claim that

2    the statute is void for vagueness.

3        To the extent that the plaintiffs are seeking

4    the stated equal protection or selective enforcement

5    claim, I will consider that in connection with the

6    discussion of the claims of Count VI.

7        To the extent that the plaintiffs seek to assert

8    a due process or a void for vagueness claim, I reject

9    the claim on the ground it has not been adequately

10   briefed, argued or supported by any evidence.

11       That brings me to the next claim, which is the

12   Commerce Clause claim. I believe that's Count IV. The

13   Commerce Clause prevents states from adopting

14   regulations that discriminate against interstate

15   commerce by treating it less favorably by intrastate

16   commerce.

17       Notwithstanding the 21st Amendment, the ban on

18   discrimination against interstate commerce applies to

19   the sale of liquor as well as to the sale of other

20   commodities. However, the State regulation of liquor

21   sales does not necessarily run afoul of the Commerce

22   Clause simply because it may have some incidental

23   affect on interstate commerce.

24       And this is where the 21st Amendment does have

25   some significance. The 21st Amendment grants the

20

1    states virtually complete control over whether to

2    permit the importation of sale of liquor and how to

3    structure the liquor distribution system if liquor

4    sales are permitted.

5         So a state may entirely ban the importation of

6    liquor; it may prevent anyone other than the State from

7    selling liquor, as New Hampshire has done; or it may

8    regulate the system by which liquor is distributed, as

9    Rhode Island has done.

10        The Commerce Clause is implicated only where the

11   regulation discriminates against interstate commerce by

12   significantly favoring in-state commercial interests

13   over out-of-state commercial interests.  As the Supreme

14   Court said in _Granholm_, if the State chooses to allow

15   direct shipment of wine, it must do so on even-handed

16   terms.

17        If the State law regulates in-state and

18   out-of-state interests even-handedly, the statute

19   passes muster under the Commerce Clause unless the

20   burden imposed on interstate commerce is clearly

21   excessive in relation to the putative local benefits.

22        The burden of establishing that a regulation is

23   discriminatory rests on the party challenging it, in

24   this case the plaintiffs.

25        The plaintiff may carry its burden by showing

DEPT OF BUS REG

21

1      either that the regulation on its face discriminates

2      against interstate commerce or out-of-state interests

3      or that the regulation has the effect of so

4      discriminating.  And here the plaintiffs have failed to

5      come close to showing either.

6          On their face, the statutory prohibitions

7      against the sale of liquor by chain store organizations

8      and/or franchise operations make no distinction

9      whatever between in-state entities and out-of-state

10     entities.  Section 3-5-11(a) prohibits the issuance of

11     a Class A license to any chain store organization which

12     subsection (b)(1) defines as any group of one or more

13     holders of Class A liquor licenses that engage in any

14     of the practices enumerated in that subsection.

15         Similarly, Section 3-5-11.1 prohibits the

16     issuance of a Class A liquor license to any liquor

17     franchisor or franchisee.  The statute by its terms

18     applies across the board regardless of whether the

19     franchisee is local or out-of-state.  Nor have the

20     plaintiffs presented any evidence that, despite their

21     facial neutrality, these sections have the practical

22     effect of discriminating against out-of-state sellers.

23         The plaintiffs argue that the prohibition

24     against sales by chain store organizations and/or

25     franchise operations is discriminatory because it

00/09/00  12:19 FAX 401 222 0004    DEPT OF BUS REG    ✪023

22

```
 1    prevents out-of-state chain stores and/or franchisees

 2    from selling in the Rhode Island market, and it cites

 3    the First Circuit's decision in Walgreen in support of

 4    that argument.  But I find that argument to be both a

 5    logical non-sequitur and also to be based on a

 6    misreading of the holding in Walgreen.

 7         While the statute does ban sales by franchisees

 8    as well as chain stores, it does so, as I've already

 9    said, without regard to whether they are located

10    in-state or out-of-state.

11         In fact, since Class A licenses may be obtained

12    only by Rhode Island residents or entities, as a

13    practical matter, the prohibition applies solely to

14    in-state sellers, because they are the only ones that

15    hold Class A licenses and, therefore, could seek to

16    sell as franchisees.  So by prohibiting franchise sales

17    by anyone, the State has not conferred any competitive

18    advantage on in-state sellers over out-of-state

19    sellers, and the fact that the prohibition might have

20    the incidental effect of preventing out-of-state

21    interests as well as in-state interests from conducting

22    franchise operations does not by itself establish

23    discrimination against interstate commerce.

24         In this respect, the case is readily

25    distinguishable from Walgreen, because in Walgreen the
```

1    First Circuit held that a Puerto Rico statute requiring

2    that pharmacies seeking to open or relocate first

3    obtain a Certificate of Necessity from the Commonwealth

4    violated the Commerce Clause because it impermissibly

5    discriminated against out-of-state pharmacies, but that

6    decision was based on a number of factors not present

7    in this case.  One is that the Puerto Rico statute did

8    not apply to existing pharmacies, 92 percent of which

9    were locally owned.  Another was that if anyone in

10   Puerto Rico objected to an application for a

11   Certificate of Necessity, the application process could

12   be delayed for several years by administrative hearings

13   and judicial review.

14        So the Court in _Walgreen_ found that as a

15   practical matter the Puerto Rico statute favored, and I

16   quote, "the largely local group of established

17   pharmacies over a similarly situated

18   out-of-Commonwealth pharmacies seeking to open new

19   stores," that's the end of the quote, by exempting them

20   from the Certificate of Necessity requirement while

21   simultaneously permitting them to prevent competition

22   from what essentially the evidence in that case showed

23   were out-of-state pharmacies by objecting to

24   Certificate of Need applications.

25        Neither of those elements is present in this

@025

24

1    case.  As already noted, the statute contains no

2    exemption for local liquor stores.  They're not exempt

3    from the prohibition against franchising or operating

4    chain store organizations, and, as I said, the fact

5    that they're the only ones that come within the reach

6    of that prohibition at the present time.

7         Furthermore, Rhode Island licensees, and in

8    particular local licensees, do not wield any power to

9    delay or deny competition by franchise operations or

10   chain store organizations either out-of-state or

11   in-state.  They cannot force a series of hearings or

12   judicial delays.  The statute flatly prohibits liquor

13   sales by such entities whether or not existing

14   licensees object.

15        The plaintiffs refer to the fact that 3-5-10,

16   another section of the statute, allows Class A licenses

17   to be issued only to Rhode Island residents or

18   entities, and I've already mentioned that limitation.

19   To the extent that this observation somehow is intended

20   to buttress their Commerce Clause argument, it fails

21   for two reasons.

22        First, the plaintiffs lack standing to challenge

23   3-5-10 because, as I've already said, all of the

24   individual stores that are certainly, at least that are

25   parties in this case, and I'm sure even those that

DEPT OF BUS REG                                    026

25

1    aren't, are Rhode Island entities that already hold

2    Class A licenses, and Wine & Spirits is not only a

3    Rhode Island corporation, but Mr. Haronian testified

4    that it has no desire to obtain a Class A license.

5         The second reason that 3-5-10 lends no support

6    to the Commerce Clause argument is that whether a

7    non-resident may obtain a Class A license has nothing

8    whatever to do with the prohibition against chain

9    stores and franchises, because even if an out-of-state

10   entity could obtain a Class A license, it, like local

11   Class A licensees, still would be prohibited from

12   operating a chain store or participating in a franchise

13   operation. So whether it is or is not constitutional

14   for Rhode Island to only grant Class A licenses to

15   local entities has no bearing whatsoever on the

16   validity of the prohibition against franchises and

17   chain stores.

18        That brings me to Count V, the takings claim

19   asserted under the Fifth Amendment. In Count V, the

20   plaintiffs claim that 3-5-11(1) and 3-5-11.1 take their

21   property without just compensation, quote, "By

22   eliminating the reasonable investment-backed property

23   rights in their business and the value of their

24   existing contractual relationship.

25        In order to prevail on a takings claim, the

05/09/06  12:11 FAX 401 222 8854        DEPT OF BUS REG                      ☑027

26

1    plaintiffs must establish, among other things, that

2    some property of theirs was taken by the State.

3    Governmental appropriation of physical property is not

4    required to establish a taking.  You don't have to show

5    that the Government took some physical property.

6         A regulation may rise to the level of a taking

7    if it places a significant restriction upon an owner's

8    use of his property for which justice and fairness

9    require that compensation be given.  In deciding

10   whether a particular regulation constitutes a

11   regulatory taking, a court must consider the economic

12   impact of the regulation, its interference with

13   reasonable investment-backed expectations, and the

14   character of the Government action.  That's what

15   Supreme Court said in the Kaiser-Aetna case.

16        In takings cases, whether they're physical or

17   regulatory takings cases, courts consider the extent to

18   which the Government action interferes or interfered

19   with the use of the affected property as a whole and

20   not to the extent to which it has interfered with

21   particular aspects or segments of that property.

22        In other words, for those of you who remember

23   your property law days, it's whether the Government

24   regulation interferes with the whole bundle of sticks

25   or just one of the sticks in the bundle.

DEPT OF BUS REG                    @023

27

1       While the plaintiffs do not explain what
2    reasonable investment-backed property rights have been
3    taken, they presumably refer to their purported right
4    to engage in franchise sales of liquor, but the
5    franchise sale of liquor is not a reasonable
6    investment-backed property right for several reasons.
7       First of all, in order to qualify as property
8    within the meaning of the Takings Clause, a claimed
9    right must amount to something more than an abstract
10   desire or hope of obtaining what is being claimed.  And
11   here, the plaintiffs never had any right to engage in
12   the franchise sale of liquor.  At most, they had a
13   hope, and an unrealistic hope at that under the
14   circumstances, of obtaining such a right.
15       The Rhode Island statute prohibiting chain
16   stores organizations from selling liquor, as I said
17   before, has been in effect since 1933, long before the
18   plaintiffs began their operations.  And while
19   franchising per se was not banned under the previous
20   version of the statute, chain stores were and the
21   business conducted by the plaintiffs falls well within
22   the definition of a chain store organization.
23       The fact that initially the Franchise Agreements
24   may have been, I suppose, tacitly approved by the
25   Department of Business Regulation's franchise division

05/08/06  12:17 FAX 401 222 6654    DEPT OF BUS REG    @029

28

1    does not mean that the franchise sales of liquor were
2    legal.
3          As was explained, the franchise division has no
4    regulatory responsibilities with respect to liquor
5    sales, and apparently was unaware of the prohibition
6    against franchise sales of liquors, was unaware that
7    under Rhode Island law franchise sales of liquor is
8    treated differently from franchise sales of other
9    products.
10         In addition, the statute does not rise to the
11   level of a regulatory taking of the plaintiffs' Class A
12   licenses, because like other Class A licensees the
13   plaintiffs can still operate their stores to sell
14   liquor.  All the statute does is close loopholes in the
15   pre-existing prohibition against the sale of liquor by
16   chain store organizations.  It seeks to clarify what
17   are deemed to be chain stores.  I suppose absent these
18   provisions there would be a claim that the statute was
19   unconstitutional because it was vague, it didn't tell
20   anybody what a chain store organization is.  So it's
21   sort of you're darned if you do, darned if you don't
22   situation.
23         Furthermore, any expectation by the plaintiffs
24   that they would have a right to engage in franchise
25   liquor sales was patently unreasonable under the

DEPT OF BUS REG                                                                    @030

29

1    circumstances.  The sale of liquor, as the cases have

2    repeatedly said, is very heavily regulated, and it's

3    unreasonable to expect that the regulations governing

4    liquor sales will not be amended from time to time when

5    necessary to close loopholes or to further the goals of

6    the regulation.

7            That brings me to the final claim, which is the

8    equal protection claim set forth in Count VI.

9            Again, this claim was addressed by the Court and

10   the Court of Appeals in connection with the denial of

11   the preliminary injunction, at least insofar as Wine &

12   Spirits was concerned.

13           The allegations in Count VI setting forth the

14   equal protection claim are just as sparse as the

15   allegations made in connection with the other claims.

16   Count VI simply asserts that Sections 3-5-11 and

17   3-5-11.1 deny fundamental rights to the plaintiffs and

18   treat the plaintiffs differently from similarly

19   situated individuals and businesses.  The assertion

20   regarding denial of fundamental rights was added by the

21   Amended Complaint, but the plaintiffs failed to explain

22   what fundamental rights they refer to, if there are any

23   rights that haven't been -- that aren't the subject of

24   other counts or, if so, how those rights may differ

25   from the rights that are the subject of the other

1    counts of the Complaint.

2         The assertion that the statue treats the

3    plaintiffs differently from others similarly situated

4    previously was rejected by this Court and the Court of

5    Appeals, at least as far as Wine & Spirits was

6    concerned.  But undaunted by that rebuff and,

7    apparently, unwilling to accept no for an answer, the

8    plaintiffs attempt to relitigate the claim by now

9    seeking to compare themselves to not restaurants and

10   other similar enterprises as they did in the

11   preliminary injunction hearing, but now to wineries,

12   which hold farmer winery manufacturers licenses and/or

13   brewpubs, which hold manufacturers Class BM licenses.

14        This apples-to-oranges comparison is similar to

15   the comparison previously rejected by this Court and

16   the Court of Appeals.  As previously held, the Rhode

17   Island statute is economic legislation that does not

18   employ suspect classifications or impinge on

19   fundamental rights.  So in order to prevail on their

20   equal protection claim, the plaintiffs must show that

21   the statute treats retail liquor stores holding Class A

22   licenses differently from wineries, which hold farmer

23   winery manufacturers licenses, and/or brewpubs that

24   hold manufactures Class BM licenses and that the two

25   types of establishments are so similarly situated that

08/08/06  12:15 FAX 401 222 6654       DEPT OF BUS REG                    ☒032

31

1    the difference in treatment is arbitrary and

2    irrational.

3        The differences in treatment cited by the

4    plaintiffs are that, first, wineries can sell their

5    wines to multiple liquor stores, and, in addition, they

6    can place advertisements identifying the liquor stores

7    at which their wines may be purchased.

8        What the plaintiffs ignore is that neither of

9    the two types of -- neither the two types of entities

10   nor the activities in which they engage are comparable

11   to the activities in which the plaintiffs engage.

12       The plaintiffs haven't presented any evidence

13   that they are similarly situated to wineries or

14   brewpubs, and it is apparent to even the casual

15   observer that significant differences exist between, on

16   the one hand, Class A liquor store licensees and

17   wineries and brewpubs.

18       Wineries produce the wine that they sell, as do

19   brewpubs, whereas liquor stores obtain the products

20   that they sell through distributors. There's no

21   evidence that in distributing their wine through liquor

22   stores wineries engage in concerted activity with those

23   stores to determine what wines the stores will

24   advertise or what prices they will charge for those

25   wines. There is no evidence of any affiliation between

06/09/06  12:10 FAX 401 222 6654       DEPT OF BUS REG                    033

32

1    the wineries and the liquor stores with which they deal

2    or that the wineries deal only with certain liquor

3    stores, or that the liquor stores have to carry only

4    the products of a particular winery.  Nor is there any

5    evidence that liquor stores within any geographic

6    region have the exclusive right to obtain a winery's

7    product within that region.

8         The plaintiffs also appear to base their equal

9    protection argument in part on what seems to me to be a

10   selective enforcement claim that some other Class A

11   licensees are permitted to use what the plaintiffs

12   characterize as a common name.

13        So there was evidence presented that several

14   stores previously operated by members of the Haxton

15   family under the name Haxton's Liquors have been

16   permitted to continue operating under the names of

17   their individual owners.  They were required to change

18   the names from Haxton's Liquors to names such as Tom

19   Haxton's Wine & Spirits, Mike Haxton's Wine & Spirits,

20   Karen Haxton Kent Liquor Company and so forth.  But

21   Mr. Greer, the State's enforcement officer, explained

22   the distinction between that and the plaintiffs use of

23   the common name Douglas Wine & Spirits followed by a

24   geographical location.  He testified that the Haxton

25   stores were owned by individuals using their own names.

01/05/00  12:19 FAX 401 222 0004    DEPT OF BUS REG    ☒034

33

1    They used their own names, they were individuals using

2    their own names, whereas the plaintiffs, at least under

3    the present, are using and changed to the common name

4    Douglas Wine & Spirits, and their names are

5    distinguished only by the addition, usually in small

6    letters, of the location of the city or town in which

7    they're located.

8        Mr. Greer testified that the inclusion of the

9    first names of the owners of the Haxton stores

10   sufficiently distinguished one store from another and

11   that simply appending to what otherwise is a common

12   name the location of a particular store does not make

13   that distinction.

14       The plaintiffs have failed to show that the

15   distinctions are irrational, particularly in the

16   absence of any evidence that the Haxton stores engage

17   in common advertising, common pricing or any of the

18   other concerted activities in which the plaintiffs

19   engage.

20       Furthermore, the plaintiffs have failed to show

21   that the alleged activity and prosecution was based on

22   impermissible considerations such as race, religion,

23   intent to inhibit or punish the exercise of

24   constitutional rights or malicious bad faith intent to

25   injure.  Those are all generally required, or at least

34

1    one of those is required to make out a claim of

2    selective prosecution.

3            So for all of the foregoing reasons, this Court

4    finds that, first of all, in exercising its authority

5    to regulate the sale of alcoholic beverages, Rhode

6    Island did not act irrationally in prohibiting sales by

7    chain store organizations and/or franchise operations;

8    that as evidenced by the techniques utilized by

9    plaintiffs in attempting to circumvent that ban, the

10   prohibitions in Section 3-5-11 of concerted activities

11   characteristic of chain store operations are necessary

12   to implement that ban; that those prohibitions do not

13   infringe on any of the plaintiffs constitutionally

14   protected rights of speech and/or association; that the

15   statute does not discriminate against interstate

16   commerce; that neither the statute or the manner in

17   which it is interpreted or enforced violates the

18   plaintiffs right to equal protection; and that the ban

19   does not constitute any taking of any property of the

20   plaintiffs.

21           For all of the foregoing reasons, judgment may

22   enter in favor of the defendants, denying and

23   dismissing all of the plaintiffs claims.

24           The Court will be in recess.

25           (Court concluded at 4:15 p.m.)



08/09/06  12:20 FAX 401 222 5654        DEPT OF BUS REG                    ☑037

C E R T I F I C A T I O N

 

 

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

 

 

_Anne M. Clayton_
Anne M. Clayton, RPR

 

 

_July 26, 2006_
Date